UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CELLINFO, LLC,<br><br>                    Plaintiff,<br><br>         v.<br><br>AMERICAN TOWER CORPORATION,<br>AMERICAN TOWER LLC,<br>AMERICAN TOWER DO BRASIL – CESSAO<br>DE INFRAESTRUTURAS LTDA, and ATC IP<br>LLC,<br><br>                    Defendants. | C.A. No. |

## COMPLAINT

Plaintiff CellInfo, LLC ("CellInfo") for its Complaint against Defendants American Tower Corporation ("ATC"), American Tower LLC ("ATLLC"), American Tower do Brasil – Cessao de Infraestruturas Ltda ("ATB"), and ATC IP LLC ("ATC IP"), hereby alleges:

## PRELIMINARY STATEMENT

1.      This action arises out of a scheme orchestrated by Defendants and their executives and employees to misappropriate CellInfo's confidential information and trade secrets for the purpose of unfairly competing with CellInfo and improperly benefiting Defendants.  These activities are part of Defendants' unlawful strategy to increase enterprise value by copying CellInfo's asset intelligence platform and other confidential information.

2.      CellInfo is a small Massachusetts company that built an innovative asset intelligence platform that provides real-time analysis for strategic and tactical business decisions

for companies owning and operating wireless and broadcast communication infrastructure.  For more than two years, CellInfo provided business consulting services to ATC and its subsidiaries.  CellInfo's services included the use of and access to CellInfo's innovative platform, which CellInfo tailored for ATC's specific needs because ATC did not have any similar platform or software.

3.      At the outset of its effort to drive corporate value for ATC, CellInfo presented to one of ATC's executives, Mr. William H. "Hal" Hess, a plan to build measurable enterprise value for ATC by (1) collecting and categorizing data from multiple disparate sources (i.e., "normalizing" the data) and then (2) analyzing the normalized data to enable ATC to better manage its tower assets, wherever they might be located.  By retrieving, normalizing, and analyzing data from disparate sources both inside and outside of ATC, CellInfo believed that it could unlock untapped revenues for ATC and enhance ATC's safety protocols.

4.      Following discussions with Mr. Hess, ATC agreed to give CellInfo the opportunity to demonstrate the value of its ideas.  Specifically, CellInfo would engage in a "proof of concept" test for ATC in Brazil, and, if successful, the parties would negotiate in good faith to reach agreement on a benefit-sharing arrangement or other compensation mechanism that would fairly compensate CellInfo for its contributions.

5.      Results of CellInfo's "Proof of Concept" test at ATC's Brazilian subsidiary (ATB)—internally called Project Sherlock—were incredibly positive.  CellInfo's platform identified millions of dollars' worth of additional annual cash flow, safety shortcomings, and market cap value for Defendants.  Yet, Defendants terminated the consulting agreement with CellInfo and represented that they would stop using CellInfo's platform, trade secrets, and other confidential information.

6.      As explained in detail below, CellInfo investigated ATC's representations and uncovered evidence indicating that Defendants' employees—including Flavio Cardoso, Marcelo Magaldi, Marcelo Kozonoe, Alilson Cozadi, Roberta Leal, Marcus Conceicao, Fabio Ascencao, Davi Borges, Marcos Cipriano, Patricia Sanches, Kathy Bello, Jonathan Sabino, Julia Cardoso, Douglas Silva, Alan Ewald, Marlon Rojas, Emerson Hughes, Josie Lima, Doug Crowe, and Rob Sherman (the "ATC Employees")—accessed, shared, and copied CellInfo's trade secrets and highly confidential information, including during Project Sherlock.

7.      The Defendants have engaged in substantial unlawful conduct, including the systematic poaching of CellInfo's innovative platform architecture, ideas, and software, with the improper motive and by the improper means of obtaining CellInfo's proprietary information for use at ATC; theft of CellInfo's proprietary, highly confidential, and competitively sensitive materials through unauthorized access, downloading, and copying of CellInfo's files, algorithms, platform architecture and design, specifications, and software; and the improper use and distribution of proprietary information stolen from CellInfo to benefit Defendants at the expense of CellInfo.

8.      CellInfo asserts claims for violation of the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836); misappropriation of trade secrets and confidential information in violation of Massachusetts common law and M.G.L. Ch. 93, §§ 42 and 42A; breach of contract; unjust enrichment; violation of the Massachusetts unfair and deceptive trade practices statute, M.G.L. Ch. 93A §§ 2 and 11; conversion; and aiding and abetting misappropriation of trade secrets.

9.      CellInfo seeks an injunction and other relief to prevent Defendants from further using CellInfo's highly confidential, proprietary information; to prevent Defendants from disclosing that information to others, including vendors of Defendants; to cause Defendants to

provide an accounting of their uses of CellInfo's highly confidential, proprietary information; and to cause Defendants to destroy all works, including software, that contain such information.

## THE PARTIES

10.     Plaintiff CellInfo, LLC is a limited liability company organized under the laws of the Commonwealth of Massachusetts, with a principal place of business located at 75 Park Plaza, Boston, Massachusetts 02116.

11.     Defendant American Tower Corporation is a corporation organized under the laws of the State of Delaware, with a principal place of business located at 116 Huntington Avenue, Boston, Massachusetts 02116.

12.     Defendant American Towers LLC is a Delaware limited liability company, with a principal place of business at 116 Huntington Avenue, Boston, Massachusetts 02116.  American Towers LLC is a subsidiary of American Tower Corporation.

13.     Defendant American Tower do Brasil – Cessao de Infraestruturas Ltda is a company organized under the laws of Brazil, with a principal place of business at Rua Olimpiadas, 205 to 8º andar, Sao Paulo-SP-Brazil 04551-000.  American Tower do Brasil is a subsidiary of American Tower Corporation.

14.     Defendant ATC IP LLC is a limited liability company organized under the laws of the State of Delaware, with a principal place of business located at 116 Huntington Avenue, Boston, Massachusetts 02116.  ATC IP LLC is a subsidiary of American Tower Corporation.

## JURISDICTION AND VENUE

15.     This action arises from Defendants' theft of CellInfo's proprietary software platform and related trade secrets for their own commercial advantage.

16.     This Court has subject matter jurisdiction over the claim for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016 pursuant to 28 U.S.C. § 1331 and 18

U.S.C. § 1336(c).  This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367 because such claims are so closely related to CellInfo's claim under the Defend Trade Secrets Act of 2016 that they form part of the same case or controversy and arise from the same set of operative facts concerning, among other things, Defendants' theft of CellInfo's confidential and trade secret information.

17.     Defendants ATC, ATLLC, and ATC IP are subject to this Court's personal jurisdiction because they reside and conduct business in Massachusetts.  Defendant ATB is subject to this Court's personal jurisdiction because there is an adequate link between ATB's misconduct and this forum, including that ATB's misconduct was directed by and for the benefit of ATC and its employees in Boston.  Additionally, Defendants misappropriated and used CellInfo's confidential information and trade secrets to benefit ATC in Massachusetts; have violated nondisclosure and consulting agreements and other contracts formed in Massachusetts and governed by the laws of this jurisdiction; and have caused, and continue to cause, injury to CellInfo in this district.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) and (c) because Defendants ATC, ATLLC, and ATC IP reside in Massachusetts and because Defendant ATB does not reside in the United States

## **BACKGROUND**

### *CellInfo's Innovative Platform*

19.     CellInfo was founded in Boston in 2014 to help wireless companies identify underserved areas—those that are high-traffic but lack adequate cellular coverage.  Co-founders Nate Drouin and Matt Mühlemann, high school classmates, used a data-driven approach and innovative software to collect signal-strength information from smartphones all over the country and to map and analyze that information.

20.     Realizing the value of data in this industry, and how data could be packaged and utilized in the cellular tower space, Messrs. Drouin and Mühlemann built back-end software and an iOS/Android application for sourcing and analyzing millions of network data points to identify high-traffic locations that lacked adequate cellular coverage, and then marketed them for new tower development.

21.     CellInfo continued to develop software and enhance its internal operating architecture and processes, creating an innovative asset intelligence platform based on CellInfo's proprietary software, architecture, and algorithms.   Within a year of its founding, CellInfo identified and executed more than 100 ground leases for wireless communications facilities. CellInfo then sold lease options to companies that own and operate wireless infrastructure, such as cellular towers.   ATC was one of those companies, and quickly became CellInfo's largest customer

22.     CellInfo's instant success was due in large part to its proprietary and confidential asset intelligence platform, which continuously amasses real-time data from various sources, organizes and maintains that data, and then analyzes and correlates the data using proprietary algorithms.   CellInfo's asset intelligence platform produces tangible financial benefits by identifying free but uncaptured cash flow and by boosting enterprise market value, increasing safety, and improving customer satisfaction and investor confidence.

23.     For example, one advantage of CellInfo's proprietary platform is the ability to quickly and easily determine whether all equipment installed on a cellular tower is allowed to be there under a contract between the tower owner and a wireless carrier or other operator who uses the tower.   The tower owner can use this information to identify additional sources of revenue

and—importantly—to determine whether equipment installed on a cellular tower exceeds wind loading restrictions specified in a contract or elsewhere.

24.     As another example, CellInfo's platform allows a tower owner to quickly and easily identify instances where operators are improperly sharing equipment or other resources on a cellular tower.  This technology allows a tower owner to identify operators who are in violation of relevant contract provisions and, as a result, potential additional revenue streams.

25.     CellInfo's robust asset intelligence platform did not come easy.  CellInfo invested thousands of hours to develop its highly confidential and innovative software and platform architecture.

26.     CellInfo protects its confidential information and trade secrets, including, without limitation, its software, architecture, specifications, functionality, operations, design, projects, proposals, research and development strategies, data, formulae, prototypes, computer processes, templates, forms, and other intellectual property.  This information is competitively sensitive, highly confidential, and owned by CellInfo.

27.     CellInfo's employees are entrusted with access to various types of CellInfo's confidential information and trade secrets, depending on their role within the company. All employees are required to sign a nondisclosure agreement.  CellInfo also has internal policies and procedures that each employee is obligated to read and with which each employee must comply.

28.     CellInfo also adopts numerous other reasonable and exceptional steps to safeguard the secrecy of its confidential information and trade secrets, including requiring third parties (including clients and customers) to sign nondisclosure agreements, password protecting

its computer systems, restricting file and drive access, and employing various physical security measures at its facilities.

29.     As explained below, Defendants recognized the benefits of CellInfo's platform and other innovations.   But rather than purchasing CellInfo's products and services to legitimately use them, Defendants embarked on a campaign to steal CellInfo's proprietary information and trade secrets and use them to develop—in house—an identical asset intelligence platform, maliciously cutting CellInfo out of the process.

*CellInfo's Relationship with ATC*

30.     In 2015, CellInfo and ATC discussed a possible business relationship in which CellInfo would provide certain site acquisition services to ATC.   In connection with those discussions, the parties executed a Non-Disclosure Agreement in May 2015 (the "2015 NDA").

31.     Pursuant to the 2015 NDA, ATLLC and its parent company (ATC), subsidiaries, and affiliates agreed to hold all information provided by CellInfo in confidence, and to use such information only for the purpose of evaluating a possible business relationship between the parties.   The agreement also provided that CellInfo retained ownership of all information disclosed during the parties' relationship.

32.     In February 2016, Mr. Hess, ATC's Executive Vice President for International Operations and President for Latin America and EMEA, visited CellInfo's offices in Boston to inspect CellInfo's software platform.   Following that meeting, Mr. Hess sent CellInfo lists of all ATC cellular sites in certain countries for testing purposes.

33.     In April 2016, CellInfo provided ATC with a confidential video presentation summarizing the features and benefits of CellInfo's "Asset Intelligence Tool."   After reviewing that presentation, ATC invited Mr. Drouin, CellInfo's founder and CEO, to Brazil to meet with ATC's leadership team for Latin America.

34.     Mr. Drouin traveled to Brazil to present CellInfo's asset intelligence platform to ATC's leadership team for Latin America, including Flavio Cardoso, ATB's General Manager, and Olivier Puech, ATC's CEO for Latin America.  Defendants' executives were blown away by the volume of information CellInfo was able to gather and by the ease of using CellInfo's software.  At the end of the meeting, Mr. Puech said, "We're doing this," shook Mr. Drouin's hand, and walked out of the room.

### *CellInfo's Negotiations with ATC*

35.     In early June 2016, Mr. Drouin met with Messrs. Hess, Puech, and Cardoso in Boston.  Mr. Puech expressed interest in moving forward with CellInfo, and Mr. Hess asked Mr. Drouin for a proposal for ATC's potential acquisition of CellInfo's asset intelligence platform.

36.     Mr. Drouin sent Mr. Hess the proposal he requested.  CelInfo's proposal described the architecture and benefits of its asset intelligence platform, and outlined a plan under which ATC would acquire CellInfo and integrate the platform with ATC's existing systems.

37.     In July 2016, CellInfo and ATC continued to discuss a potential acquisition, and CellInfo began developing a "proof of concept" (or "PoC") for the asset intelligence platform. Rob Sherman, ATC's Chief Information Security Officer and Vice President for IT, proposed that CellInfo and ATC execute a new nondisclosure agreement and draft a formal statement of work for the PoC project.  Mr. Sherman also asked Mr. Drouin to ensure that the video presentation CellInfo provided to ATC in April 2016 remained confidential.

38.     On or about July 28, 2016, CellInfo and ATLLC entered into a second Non-Disclosure Agreement (the "2016 NDA"), pursuant to which ATLLC and its parent company, subsidiaries, and affiliates again agreed not to disclose CellInfo's confidential information and to

use it only for the purpose of evaluating CellInfo's asset intelligence platform and a possible acquisition or other relationship between the parties.

39.     CellInfo then sent ATC a draft statement of work for the Integrity and Available Space ("IAS") component of CellInfo's software platform, along with a confidential video demonstration that described the architecture and benefits of the IAS component in detail. CellInfo also provided ATC with a detailed proposal for a consulting arrangement, under which ATC would pay CellInfo consulting and licensing fees.  The proposal included a benefit-sharing element for economic benefits that exceeded a certain threshold.

40.     Over the next few months, CellInfo and ATC negotiated the terms of an agreement pursuant to which CellInfo would make its asset intelligence platform available to ATC as a proof of concept to demonstrate the economic and other benefits ATC would obtain if it acquired CellInfo and deployed the platform across ATC's operations worldwide.

41.     Throughout the negotiation process, ATC repeatedly tried to insert or modify a provision that would give ATC ownership of CellInfo's proprietary asset intelligence platform. CellInfo consistently refused to modify the agreement in this way.  The final agreement executed by the parties made clear that CellInfo retained complete ownership of its proprietary software and other confidential information and that any unauthorized use or distribution by Defendants of CellInfo's confidential information and trade secrets was prohibited.

*The Master Consulting Services Agreement*

42.     On or about January 23, 2017, CellInfo and ATC IP signed a Master Consulting Services Agreement (the "MCSA").

43.     Pursuant to the MCSA, CellInfo agreed to provide certain "Consulting Services," including application development and testing; process design, education, and training; and data conversion and extraction.

44.     The MCSA included a Statement of Work (the "SOW") that set forth additional details of the services CellInfo would provide.  In particular, CellInfo agreed to provide a PoC for its asset intelligence platform, which would include a number of specified software modules and conform to various specifications set forth in the SOW.

45.     The MCSA also included a Software as a Service Agreement (the "SaaS License"), which granted ATC a non-exclusive right to access and use CellInfo's software platform to support Defendants' operations in Brazil during the term of the MCSA.  For the first 90 days of the PoC period, CellInfo agreed not to charge ATC IP any additional fees in connection with the SaaS License.

46.     Pursuant to the MCSA, ATC IP agreed not to disclose CellInfo's "Confidential Information" or to use it in any way for its own commercial benefit.  "Confidential Information" included CellInfo's computer software, hardware, processes, and systems in use or in any stage of development, as well as any other confidential, proprietary, and trade secret information.

47.     Pursuant to the MCSA, CellInfo is expressly entitled to seek injunctive relief from ATC IP's breach of the MCSA's confidentiality provisions.

48.     Pursuant to the MCSA, CellInfo is entitled to its reasonable costs and expenses, including attorneys' fees, incurred to enforce the MCSA.

### *CellInfo's Deployment of Its Proprietary Software Platform*

49.     In February 2017, after the parties signed the contract, CellInfo began deploying its asset intelligence platform and integrating it with ATB's existing systems.  During a trip to Brazil, Mr. Drouin demonstrated a live version of the platform for ATB employees, illustrating some data discrepancies, such as cellular sites that had customers without contracts.

50.     Almost immediately, CellInfo began finding instances where Defendants were not being paid by cellular carriers that were using their towers.  ATC validated CellInfo's results. CellInfo found similar instances on rooftops with cellular infrastructure managed by ATC.

51.     After only a month in Brazil, Mr. Drouin realized that CellInfo had already identified the lost revenues and/or cost inefficiencies that he had promised to Mr. Hess a year earlier.  Mr. Drouin immediately called and informed Mr. Hess of these results, who promised to "manage any fallout on the management side."  Throughout the spring of 2017, CellInfo's testing continued to prove the benefits of its platform and the shortcomings of ATB's own internal systems.

52.     Many of Defendants' employees involved in the project were impressed with CellInfo's initial results, but some in Brazil were concerned that CellInfo's success would expose their own failure to identify lost revenue streams and problems with ATC's infrastructure, among other issues.  Members of the ATB team were worried about losing their jobs if ATC management learned about these missing revenue streams and just how inadequate ATB's business processes were.  In April 2017, for example, Mr. Magaldi begged Mr. Drouin not to share CellInfo's results with ATC management, offering support for accelerated bonus payments in return.

53.     On June 11, 2017, Mr. Drouin formally informed Mr. Hess that CellInfo's original predictions for ATC's increased revenue underestimated the amount of additional value created by CellInfo's platform.  Mr. Drouin provided Mr. Hess with two additional video presentations describing the architecture and benefits of CellInfo's proprietary software. Mr. Drouin also reminded Mr. Hess about ATC's agreement to negotiate a longer-term deal with CellInfo once the company produced material quantifiable results, which it had now done.

54.     Mr. Hess never responded to this email.  In fact, the next time CellInfo heard from Mr. Hess was more than six months later, in December 2017, when Mr. Hess asked to be omitted from all further correspondence between CellInfo and ATC.

### *Defendants' Unlawful Use of CellInfo's Confidential Information and Trade Secrets*

55.     In May 2017, CellInfo learned that ATC was planning to seek third-party bids for development of a software platform that would provide the same benefits as CellInfo's asset intelligence platform.  CellInfo immediately reached out to ATC, both to emphasize the benefits of its own, nearly-complete platform over a third-party bidding process and to remind ATC of its obligations not to disclose or use CellInfo's confidential information during the bidding process and any subsequent development work.

56.     Later, CellInfo learned that ATC was developing its own, rudimentary version of one of the software modules in CellInfo's platform.  CellInfo began to receive requests from Defendants' employees for the algorithms and parameters used by CellInfo's proprietary software.  For example, Mr. Sabino, ATC's Director of Business Analytics, requested login credentials so he could get a "sneak peek" at the CellInfo platform.  CellInfo later learned that ATC was trying to develop its own software to mimic a number of "key modules" from CellInfo's platform.

57.     In a letter dated July 24, 2017, CellInfo again reminded ATC of its confidentiality obligations and requested that ATC refrain from using CellInfo's confidential information in attempting to replicate CellInfo's results while developing ATC's own, internal solution.  In a response dated August 1, 2017, ATC asserted that it never obtained ***any*** confidential information from CellInfo, and, therefore, that the results of any ATC development work belonged to ATC.  At a meeting in Boston on August 3, 2017, Mr. Sabino confirmed that he was working on an "internal project" for ATC.

13

58.     On August 8, 2017, in response to ATC's request that CellInfo identify the confidential information it provided to ATC, CellInfo's counsel emailed Mr. Sherman, ATC's Vice President for Information Technology, with representative categories of confidential CellInfo information provided to Defendants.  Those categories included the architecture and specifications of the CellInfo platform and the structure, function, operation, design, and implementation of CellInfo software modules and user interfaces.   Those categories also included confidential know-how, business strategies, and operational processes CellInfo provided to Defendants subject to the confidentiality provisions of the MCSA and the parties' other nondisclosure agreements.  Defendants never responded to this August 8, 2017 email from CellInfo's counsel.

59.     In late August 2017, Mr. Cardoso declared Project Sherlock (CellInfo's PoC) a success and congratulated his team in Brazil.  ATC validated CellInfo's results, and then informed CellInfo that the 90-day software license period specified in the MCSA would start on August 31, 2017.

60.     Despite the success of the PoC project, Defendants decided to terminate its relationship with CellInfo at the end of the 90-day license period specified in the SaaS Agreement.   Instead of negotiating an extension to the SaaS Agreement or some other arrangement whereby Defendants could continue to lawfully access and use CellInfo's asset intelligence platform, Defendants secretly chose to copy key features of CellInfo's platform in order to create a similar ATC platform.

61.     During an internal meeting in October 2017 to discuss CellInfo's PoC platform— with no CellInfo employees present—ATB concluded that it was possible to develop its own system (known as "Tower Analytics") using the concepts CellInfo demonstrated during the PoC.

62.     Shortly after that October 2017 meeting, ATB's management, including Mr. Magaldi, instructed other ATB employees to take screenshots of and download HTML code for CellInfo's user interfaces before ATB lost access to the CellInfo platform.

63.     In a letter from Mr. Sherman dated November 27, 2017, ATC formally notified CellInfo that it did "not wish to renew the Initial SOW and related SaaS Services." Mr. Sherman's letter also stated that "the Parties owe no continuing obligations to one another."

64.     On November 29, 2017, the last day of the 90-day PoC period under the SaaS Agreement, CellInfo again requested that Defendants comply with its confidentiality obligations under the MCSA and the parties' other agreements.  In response, ATC represented that it "has not made any use of CellInfo confidential information, nor will it in the future."

65.     Notwithstanding its representations to the contrary, Defendants have continued to develop an internal software platform, called Tower Analytics, using CellInfo's confidential information and trade secrets, including the architecture and specifications of CellInfo's asset intelligence platform; the structure, function, operation, design, and implementation of platform components and CellInfo's user interface; CellInfo's explanations of how to efficiently retrieve, select, and integrate relevant data from disparate sources to allow for improved asset management; and new business strategies and operational processes disclosed by CellInfo.

## COUNT I
### (*Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836*)

66.     CellInfo realleges and incorporates by reference the allegations contained in the preceding paragraphs.

67.     Defendants provide wireless and cellular tower services to customers in the United States and worldwide.  Using CellInfo's proprietary business information, algorithms,

and software, Defendants are developing an asset intelligence platform that Defendants intend to use in interstate and international commerce across their respective portfolios.

68.     CellInfo provided consulting services to the Defendants and, while providing those services, worked with the ATC Employees.  In their respective roles at the Defendants, the ATC Employees accessed and used CellInfo's trade secrets (including the trade secrets identified above).

69.     The ATC Employees were entrusted with access to various types of CellInfo's trade secrets and utilized CellInfo's trade secrets (including the trade secrets identified above) while CellInfo provided consulting services to the Defendants.

70.     Defendants knew or should have known that the information the ATC Employees accessed and used is competitively sensitive, highly confidential, trade secret information developed and owned by CellInfo.  The trade secrets accessed and used by the ATC Employees relate to CellInfo products and services that have been used, and are intended for use, in interstate and international commerce.

71.     The trade secrets misappropriated by Defendants comprise the information identified above, including, for example, CellInfo's confidential technical and business information; design and functionality of its platform user interface; platform architecture and specifications; and platform (and subcomponents thereof) structure, function, operation, design, implementation, and interoperability.   CellInfo's trade secrets and confidential business information are vital to its operations and business interests.

72.     As explained above, CellInfo diligently protects its trade secrets and other confidential business information and, at all relevant times, CellInfo has taken reasonable steps to safeguard the secrecy of its trade secrets, including by limiting their disclosure to third parties

only pursuant to nondisclosure agreements. CellInfo has taken reasonable measures to keep its trade secrets and confidential business information secret. See 18 U.S.C. 1839(3).

73. The MCSA between Defendants and CellInfo required that Defendants will not:

(i) disclose to anyone (other than to fulfill its express obligations under this Agreement) any Confidential Information with respect to the business or affairs of the Disclosing Party; (ii) use Confidential Information in any way for its own account or the account of any third party; or (iii) disclose to any third party (other than to fulfill its express obligations under this Agreement) any Confidential Information revealed to it by the Disclosing Party or discovered by such Party during the performance of the Consulting Services.

74. The MCSA defines "Confidential Information" to include "all proprietary, confidential, and unique information disclosed by either Party" and information that "concerns specific computer software, processes, systems, or hardware in use or in any stage of development."

75. CellInfo's Non-Disclosure Agreements with the Defendants also expressly restrict Defendants' use and disclosure of "confidential and proprietary information related to [CellInfo's] business activities."

76. Defendants and the ATC Employees had a duty to maintain the secrecy of CellInfo's trade secrets, including but not limited to obligations under the MCSA and the Non-Disclosure Agreements with CellInfo. Defendants knew or should have known of these obligations.

77. Defendants willfully and improperly misappropriated CellInfo's trade secrets and intentionally used and/or disclosed such trade secrets for the benefit of the Defendants.

78. The trade secret information obtained and used by Defendants is a "trade secret" under 18 U.S.C. § 1839(3).

79.     CellInfo has not expressly or impliedly consented to Defendants' use or disclosure of CellInfo's trade secrets to, for example, create a copycat asset intelligence platform.

80.     Defendants are aware that they do not have CellInfo's consent to use CellInfo's trade secrets.

81.     As a result of Defendants' misappropriation of CellInfo's trade secrets, Defendants have violated the Defend Trade Secrets Act of 2016, including 18 U.S.C. § 1836.

82.     Defendants' misappropriation of CellInfo's trade secrets for their own gain is willful, wanton, and malicious, and Defendants took the information with reckless disregard for CellInfo's rights.

83.     As a result of Defendant's misappropriation of CellInfo's trade secrets, CellInfo has suffered—and will continue to suffer—actual and irreparable harm and money damages, including actual loss.

84.     Defendants have been unjustly enriched as a result of the misappropriation of CellInfo's trade secrets.

## COUNT II
### (*Misappropriation of Trade Secrets Under Massachusetts Law*)

85.     CellInfo realleges and incorporates by reference the allegations contained in the preceding paragraphs.

86.     As explained above, CellInfo has highly confidential and trade secret information, tangible or intangible or electronically kept or stored, that constitutes, represents, evidences, or records a secret scientific, technical, merchandising, production, or management information, design, process, procedure, formula, invention, or improvement.

87.     As a result of the conduct described above, Defendants have misappropriated CellInfo's confidential information and trade secrets, including, but not limited to, the

confidential information and trade secrets misappropriated by the ATC Employees and described above.  The information is confidential, competitively sensitive, and owned by CellInfo.

88.     This information is used in CellInfo's business and it has independent economic value by virtue of not being known to CellInfo's competitors, including the Defendants.

89.     As explained herein, CellInfo takes, and at all relevant times has taken, reasonable steps to safeguard the secrecy of its confidential information and trade secrets, including, but not limited to, by requiring its customers to sign non-disclosure agreements; password protecting its computer systems at multiple levels; restricting file and drive access; restricting access to information—including source code—based on an employee's role within CellInfo; requiring employees to sign a Non-Disclosure Agreement; and employing various and physical security measures at all of its facilities.

90.     Defendants were aware that their use and disclosure of CellInfo confidential information and trade secrets is controlled by the confidential relationship between the parties.  Defendants knew or should have known that unauthorized use or disclosure of CellInfo's confidential information and trade secrets was prohibited.

91.     As described above, Defendants knowingly and intentionally misappropriated, stole, unlawfully took, carried away, concealed, copied, or otherwise used and disclosed this information from CellInfo with intent to convert that information to Defendants' own use.  This conduct was willful, knowing, and/or in bad faith.

92.     Defendants' conduct violates M.G.L. Ch. 93, §§ 42 and 42A.

93.     As a result of Defendants' misappropriation of CellInfo's confidential information and trade secrets, CellInfo has suffered, and will continue to suffer, actual and irreparable harm and money damages, and Defendants have been and will continue to be unjustly enriched.

94.     Unless injunctive relief is granted, CellInfo will be irreparably harmed in a manner not fully compensable by money damages.

## COUNT III
### (*Common Law Misappropriation of Confidential Information and Trade Secrets*)

95.     CellInfo realleges and incorporates by reference the allegations contained in the preceding paragraphs.

96.     As explained above, CellInfo has highly confidential and trade secret information, tangible or intangible or electronically kept or stored, that constitutes, represents, evidences, or records a secret scientific, technical, merchandising, production, or management information, design, process, procedure, formula, invention, or improvement.

97.     As a result of the conduct described above, Defendants have misappropriated CellInfo's confidential information and trade secrets, including but not limited to the confidential information and trade secrets misappropriated by the ATC Employees and described above.  The information is confidential, competitively sensitive, and owned by CellInfo.

98.     This information is used in CellInfo's business, and it has independent economic value by virtue of not being known to CellInfo's competitors, including the Defendants.

99.     As explained herein, CellInfo takes, and at all relevant times has taken, reasonable steps to safeguard the secrecy of its confidential information and trade secrets, including, but not limited to, by requiring its clients—like Defendants—to sign nondisclosure agreements; password protecting its computer systems at multiple levels; restricting file and drive access; restricting access to information based on an employee's role; requiring employees to sign a nondisclosure agreement; and employing various and physical security measures at all of its facilities.

100.    Defendants were aware that their use and disclosure of CellInfo confidential information and trade secrets is controlled by the confidential relationship between the parties. Defendants knew or should have known that unauthorized use or disclosure of CellInfo's confidential information and trade secrets was prohibited.

101.    As described above, Defendants knowingly and intentionally misappropriated and otherwise unlawfully used and disclosed this information from CellInfo, and knowingly induced and assisted other employees of the Defendants in acquiring, using, and/or disclosing CellInfo's confidential information and trade secrets, with intent to benefit Defendants.

102.    As a result of Defendants' misappropriation of CellInfo's confidential information and trade secrets, CellInfo has suffered and will continue to suffer actual and irreparable harm and money damages, including actual loss.

### COUNT IV
#### (*Breach of Contract*)

103.    CellInfo realleges and incorporates by reference the allegations contained in the preceding paragraphs.

104.    The Non-Disclosure Agreements and MCSA between CellInfo and the Defendants are valid, binding, and enforceable written contracts that were made for valid consideration.

105.    The MCSA between Defendants and CellInfo required that Defendants

will not: (i) disclose to anyone (other than to fulfill its express obligations under this Agreement) any Confidential Information with respect to the business or affairs of the Disclosing Party; (ii) use Confidential Information in any way for its own account or the account of any third party; or (iii) disclose to any third party (other than to fulfill its express obligations under this Agreement) any Confidential Information revealed to it by the Disclosing Party or discovered by such Party during the performance of the Consulting Services.

106.    The MCSA defines "Confidential Information" to include "all proprietary, confidential, and unique information disclosed by either Party" and information that "concerns specific computer software, processes, systems, or hardware in use or in any stage of development."

107.    CellInfo's Non-Disclosure Agreements with the Defendants also expressly restrict Defendants' use and disclosure of "confidential and proprietary information related to [CellInfo's] business activities."

108.    The Non-Disclosure Agreements and MCSA are reasonable, consonant with public policy, and necessary to protect the business interests of CellInfo.

109.    CellInfo fully performed its contractual duties under the Non-Disclosure Agreements and MCSA.

110.    As described above, the ATC Employees, including Flavio Cardoso, Marcelo Magaldi, Marcelo Kozonoe, Kathy Bello, Jonathan Sabino, Julia Cardoso, Douglas Silva, Alan Ewald, Marlon Rojas, Emerson Hughes, Josie Lima, Doug Crowe, and Rob Sherman, breached the MCSA and Non-Disclosure Agreements by, among other things, improperly and unlawfully misappropriating, taking, using, and/or disclosing CellInfo's confidential information and trade secrets to and for the benefit of parties other than CellInfo, including the Defendants.

111.    As a result of this conduct, CellInfo has suffered and will continue to suffer actual and irreparable harm and money damages.

### COUNT V
#### (*Unjust Enrichment*)

112.    CellInfo realleges and incorporates by reference the allegations contained in the preceding paragraphs.

113.   As a result of the conduct described herein, including Defendants' misappropriation of CellInfo's confidential information and trade secrets, the Defendants received a benefit from CellInfo, including but not limited to, business opportunities, revenue, and increased market share, to which the Defendants were not entitled.

114.   The Defendants have improperly, and without consent by CellInfo, retained these benefits and CellInfo's confidential information and trade secrets, to which they were not entitled.

115.   The Defendants have no legitimate entitlement to the CellInfo confidential information and trade secrets or the benefits derived from such information.

116.   On information and belief, the Defendants have continued to use the ill-gotten property and information and trade secrets and revenues and monies for their own benefit.

## COUNT VI
### (*Unfair Competition Under Massachusetts Statute*)

117.   CellInfo realleges and incorporates by reference the allegations contained in the preceding paragraphs.

118.   CellInfo is a "person" and engages in "trade or commerce" that directly or indirectly affects the people of Massachusetts as required by Mass. Gen. Laws c. 93A, § 1.  The Defendants are each a "person" and engage in "trade or commerce" that directly or indirectly affects the people of Massachusetts within the meaning of Mass. Gen. Laws c. 93A, § 1.

119.   The Defendants' actions described above—including their misappropriation of CellInfo's trade secrets and confidential information—constitute willful and knowing violations of Mass. Gen. Laws c. 93A, §§ 2 and 11.

120.   As a result of the Defendants' unfair competition violations, CellInfo has suffered and/or may suffer loss of money or property, including monetary damages and irreparable injury,

and is threatened with further substantial and irreparable harm for which there is no adequate remedy at law.

## COUNT VII
### (*Conversion*)

121.    CellInfo realleges and incorporates by reference the allegations contained in the preceding paragraphs.

122.    As explained above, CellInfo owns highly confidential and trade secret information.

123.    Defendants knowingly misappropriated CellInfo's highly confidential and trade secret information and have unlawfully used and/or disclosed that information in opposition to CellInfo's rights.

124.    Defendants knew this unauthorized use and disclosure of CellInfo's confidential information and trade secrets was prohibited.

125.    As a result of Defendants' misappropriation, use, and/or disclosure of CellInfo's confidential information and trade secrets, CellInfo has suffered and will continue to suffer actual and irreparable harm and money damages, including actual loss.

## COUNT VIII
### (*Aiding and Abetting Misappropriation of Trade Secrets*)

126.    CellInfo realleges and incorporates by reference the allegations contained in the preceding paragraphs.

127.    On information and belief, Defendants were aware of the misappropriation of CellInfo's trade secrets and confidential information that is described above, and they knowingly and actively participated in or substantially assisted the ATC Employees in their misappropriation, use, and disclosure of that information, including their copying CellInfo's proprietary information and trade secrets for the benefit of the Defendants.   Defendants

encouraged and substantially assisted the ATC Employees in these activities with full knowledge that the ATC Employees were breaching a legal duty to CellInfo, including under the Non-Disclosure Agreements and MCSA.

128.    As a direct and proximate result of the Defendants' aiding and abetting the ATC Employees' misappropriation, disclosure, and use of CellInfo's trade secrets and confidential information, CellInfo suffered and continues to suffer actual and irreparable harm and money damages, and Defendants have been and will continue to be unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, CellInfo respectfully requests that the Court grant the following relief:

a)    Enter judgment in CellInfo's favor on each Count set forth above in this Complaint;

b)    Enter preliminary and permanent injunctive relief necessary to prevent irreparable harm to CellInfo, including an accounting and order directing the Defendants to return or destroy any and all CellInfo trade secrets, confidential information, and property in their possession, custody, or control; enjoining Defendants' use of CellInfo's trade secrets and confidential information; and ordering an accounting and disgorgement of all monies, revenues, profits, and unjust enrichment resulting from Defendants' unlawful conduct;

c)    Award damages to CellInfo in an amount to be proven at trial to compensate it for each of the unlawful acts set forth in this Complaint;

d)    Award CellInfo double, treble, and/or punitive damages as permitted by applicable law, including M.G.L. cc 93A §§ 2 & 11;

e)    Award pre-judgment and post-judgment interest on such damages to CellInfo and order an accounting of damages that accrue between the close of fact discovery and the date a final judgment is entered in this litigation;

f)      Award CellInfo its cost of suit and attorneys' fees and related expenses as permitted by applicable law and the parties' agreements;

g)      Award any other remedy and/or relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

CellInfo respectfully requests a trial by jury on all issues triable thereby.


Dated:  June 15, 2018                     Respectfully submitted,

                                          /s/ *David H. Rich*

                                          David H. Rich (BBO #634275)
                                          Todd & Weld LLP
                                          One Federal Street, 27th Floor
                                          Boston, Massachusetts 02110
                                          Tel:  (617) 720-2626
                                          Fax:  (617) 227-5777
                                          drich@toodweld.com