## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CELLINFO, LLC,<br><br>         Plaintiff,<br><br>    v.<br><br>AMERICAN TOWER CORPORATION,<br>AMERICAN TOWER LLC,<br>AMERICAN TOWER DO BRASIL – CESSAO<br>DE INFRAESTRUTURAS LTDA, and ATC IP<br>LLC,<br><br>         Defendants. | No. 18-cv-11250-ADB |

## **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OR STAY AND COMPEL ARBITRATION**

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND .................................................................................1

        A.      The Parties and the Master Consulting Services Agreement ....................1

        B.      The Arbitration Provisions of the MCSA ..................................................2

        C.      The Lawsuit ...............................................................................................3

III.    ARGUMENT ..........................................................................................................4

        A.      The Federal Arbitration Act Governs this Dispute ...................................4

        B.      A Valid Agreement to Arbitrate Exists and CellInfo is Bound to Arbitrate
                Its Claims ..................................................................................................5

        C.      The Parties Delegated Questions of Arbitrability to the Arbitrators, and
                Even if They Did Not, the Parties Agreed to Arbitrate this Dispute .....................6

                1.      The Parties Delegated Questions as to the Scope of the Arbitration
                        Clause to the Arbitrators .................................................................6

                2.      Even if the Court Addresses the Scope of the Arbitration Clause,
                        CellInfo's Claims Clearly Must Be Arbitrated ...........................9

                        a.      The Parties Adopted a Broad Arbitration Clause that
                                Covers All of CellInfo's Claims ......................................9

                        b.      There is No Judicial Forum "Carve-Out" for Injunctive
                                Relief ...............................................................................11

        D.      ATC and Its Subsidiaries May Invoke the Arbitration Agreement .....................15

IV.     CONCLUSION ....................................................................................................17

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AT&T Mobility LLC v. Concepcion*,
    131 S. Ct. 1740 (2011) ...................................................................................................5

*Awuah v. Coverall N. Am., Inc.*,
    554 F.3d 7 (1st Cir. 2009) ........................................................................................6, 7, 8

*Baychar, Inc. v. Frisby Techs.*,
    No. 01-CV-28, 2001 U.S. Dist. LEXIS 11037 (D. Me. July 26, 2001) ...................14

*Bekele v. Lyft, Inc.*,
    199 F. Supp. 3d 284 (D. Mass. 2016) .........................................................................9

*Comedy Club, Inc. v. Improv West Assocs.*,
    553 F.3d 1277 (9th Cir. 2009) ..............................................................................14, 15

*Commercial Union Ins. Co. v. Gilbane Bldg. Co.*,
    992 F.2d 386 (1st Cir. 1993) ......................................................................................11

*Dean Witter Reynolds, Inc. v. Byrd*,
    470 U.S. 213 (1985) .....................................................................................................5

*Gilmer v. Interstate/Johnson Lane Corp.*,
    500 U.S. 20 (1991) .....................................................................................................11

*Grand Wireless, Inc. v. Verizon Wireless, Inc.*,
    748 F.3d 1 (1st Cir. 2014) .............................................................................5, 9, 10, 11

*H2O Res., LLC v. Oilfield Tracking Servs.*,
    No. 18-1164, 2018 U.S. Dist. LEXIS 104991 (E.D. Pa. June 22, 2018) ..................11

*United States ex rel. Hagerty v. Cyberonics, Inc.*,
    146 F. Supp. 3d 337 (D. Mass. 2015) .........................................................................9

*Info. Sys. Audit & Control Ass'n v. Telecomm. Sys.*,
    No. 17 C 2066, 2017 U.S. Dist. LEXIS 97180 (N.D. Ill. June 23, 2017) ...........8, 15

*Kingstown Corp. v. Black Cat Cranberry Corp.*, 65 Mass. App. Ct. 154, 839 N.E.
    2d 333 (2005) ............................................................................................................13

*Machado v. System4 LLC*, 471 Mass. 204 (2015) ......................................................16

*Micoperi v. CHM Mar.*,
   No. 15-cv-10296-ADB, 2015 U.S. Dist. LEXIS 26978 (D. Mass. Mar. 5,
   2015) ..................................................................................................................6, 7

*Next Step Med. Co. v. Johnson & Johnson Int'l*,
   619 F.3d 67 (1st Cir. 2010) ...........................................................................12

*Ouadani v. TF Final Mile LLC*,
   876 F.3d 31 (1st Cir. 2017) .................................................................5, 15, 16

*PowerShare, Inc. v. Syntel, Inc.*,
   597 F.3d 10 (1st Cir. 2010) ...........................................................................5, 14

*Rent-A-Center, W., Inc. v. Jackson*,
   561 U.S. 63 (2010)......................................................................................4, 7

*Simula, Inc. v. Autoliv, Inc.*,
   175 F.3d 716 (9th Cir. 1999) .........................................................................11

*Sourcing Unlimited, Inc. v. Asimco Int'l, Inc.*,
   526 F.3d 38 (1st Cir. 2008) ...........................................................................17

*WMT Inv'rs, LLC v. Visionwall Corp.*,
   2010 U.S. Dist. LEXIS 65869 (S.D.N.Y. June 28, 2010).............................8

**Statutes**

Federal Arbitration Act (9 U.S.C. § 1, *et seq.*) .....................................................4, 5

Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836) .......................................4, 11

M.G.L. c. 93, §§ 42 and 42A ...............................................................................4

M.G.L. c. 93A..........................................................................................................4

**Other Authorities**

Commercial Arbitration Rules of the American Arbitration Association ("AAA") .............7, 8, 13

## I.      INTRODUCTION

In January 2017, Plaintiff CellInfo entered into a consulting agreement with a subsidiary of Defendant American Tower Corporation ("ATC").  After the initial consulting project ended in November 2017, ATC elected to exercise its contractual right not to renew the parties' relationship.  Dissatisfied with ATC's choice, CellInfo lobbed a series of accusations about ATC's continued alleged use of CellInfo's confidential and proprietary information that ultimately culminated in the filing of this lawsuit.  CellInfo's claims have no merit and ATC will vigorously defend them, but CellInfo filed this litigation in the wrong forum.  The parties' consulting agreement contains a broad arbitration provision that requires CellInfo to arbitrate all of its claims.  Accordingly, Defendants bring this motion to compel arbitration and dismiss the Complaint, or in the alternative, stay this litigation pending arbitration.

## II.      FACTUAL BACKGROUND

### A.      The Parties and the Master Consulting Services Agreement

ATC is a leading independent owner, operator and developer of communications real estate, with a portfolio of over 160,000 communications sites, including approximately 40,000 towers in the United States and more than 119,000 communications sites internationally.  ATC's communications sites support various communications equipment, including cellular and wireless, radio and television broadcast, microwave, and two-way radio.  ATC partners with operators of cellular networks and broadcasters to provide the infrastructure needed to expand and maintain robust communications and broadcast coverage around the world.

In January 2017, CellInfo and Defendant ATC IP, an ATC subsidiary, entered into a Master Consulting Services Agreement ("MCSA" or "the Agreement").  *See* Complaint ("Compl.") ¶ 42.  The Agreement was the product of several months of negotiations between the parties.  *Id.* ¶ 40.  Under the MCSA, CellInfo agreed to provide certain "Consulting Services" to

ATC according to a written "Statement of Work" ("SOW") agreed upon by the parties.  *Id.* ¶ 43.  The initial (and only) SOW is attached to the MCSA as Exhibit A thereto.  *See* Affidavit of Thomas Wintner, Ex. 1.  In the SOW, ATC agreed to make substantial payments to CellInfo in exchange for the completion of a proof of concept at ATC's Brazilian subsidiary.  *See* MCSA § 1.8 & Ex. A ¶ 20 ("Fees").  The MCSA also included a "Software as a Service Agreement," which granted ATC a non-exclusive right to access and use CellInfo's software platform for supporting Defendants' operations in Brazil for a period of 90 days after the completion of the proof of concept.  *Id.*, Ex. B.  At the end of this 90-day period, which expired in November 2017, ATC had no obligation to agree to any further SOWs with CellInfo or to offer any additional consulting work to CellInfo.  *Id.* § 1.4 ("No Guarantee of Work").  The consulting arrangement between ATC and CellInfo was non-exclusive, meaning that CellInfo was free (and still is free) to offer its consulting services to anyone, including competing cell tower companies, at any time.

CellInfo alleges that it completed the first proof of concept contemplated by the MCSA in August 2017; this project involved working with ATC's subsidiary in Brazil to identify potential lost revenue streams or cost inefficiencies.  Compl. ¶¶ 51, 59.  After reviewing the results of the proof of concept during the 90-day period provided by the Agreement, ATC exercised its right not to initiate any additional projects or renew the consulting relationship with CellInfo.  Compl. ¶¶ 60, 63.

### B.   The Arbitration Provisions of the MCSA

The parties also agreed to arbitrate "any dispute, controversy, or claim" that arises out of or relates to any portion of the Agreement.  In particular, section 7.1 of the Agreement provides:

> ***The Parties agree to submit any dispute, controversy, or claim arising out of or related to any portion of this Agreement other than those involving Article Six of this Agreement, or the creation, validity, interpretation, breach, or termination of this Agreement that the Parties are unable to resolve through informal discussions, to binding arbitration in accordance with the provisions of this***

> ***article***. The arbitration will be: (a) held in Suffolk County, Massachusetts; (b) conducted before a panel of three (3) arbitrators, each knowledgeable in fields related to the subject matter of the dispute, one chosen by each Party within ten (10) days of a demand for arbitration and the third by the two (2) so chosen; (c) governed by the Commercial Arbitration Rules of the American Arbitration Association ("AAA") except as otherwise expressly provided in this section; and (d) administered by the AAA unless the Parties agree otherwise. The arbitrators: (a) may not add to, amend or disregard this Agreement in whole or in any part; (b) will allow such discovery as is appropriate to the purposes of arbitration in accomplishing fair, speedy and cost effective resolution of disputes; (c) will reference the rules of evidence of the Federal Rules of Civil Procedure then in effect in setting the scope and direction of such discovery; and (d) will not be required to make findings of fact or render opinions of law.

MCSA § 7.1 (emphasis added).  The only exception to this broad agreement to arbitrate is for disputes involving Article Six, which pertains to indemnification.  *Id.*

Section 7.2 of the Agreement further provides that Article Seven, the dispute resolution procedures, are a "complete defense" to any suit or action commenced in any court or administrative tribunal that is covered by the arbitration clause:

> Other than with respect to those matters involving the warranties, indemnities, and other matters addressed by Article Six of this Agreement, or matters involving injunctive relief as a remedy, or any action necessary to enforce the award of the arbitrators, ***the provisions of this article are a complete defense to any suit, action, or other proceeding instituted in any court or before any administrative tribunal with respect to any dispute, controversy or claim between the Parties hereto and arising out of or related to this Agreement or the creation, validity, interpretation, breach, or termination of this Agreement***. The decision of and award rendered by the arbitrators will be final and binding on the Parties. Nothing in this article prevents the Parties from exercising any rights set forth in this Agreement, including without limitation termination rights.

MCSA § 7.2 (emphasis added).  Nothing in section 7.2 purports to limit the scope of the broad agreement to arbitrate set forth in section 7.1.

### C.    The Lawsuit

CellInfo initiated this lawsuit in June 2018 against ATC and several of its subsidiaries (collectively, "Defendants").  CellInfo alleges that Defendants misappropriated CellInfo's "proprietary, highly confidential and competitively sensitive materials" during the course of the

parties' relationship.  *See, e.g.*, Compl. ¶¶ 6, 7; *see also id.* ¶ 68 ("CellInfo provided consulting services to the Defendants and, while providing those services, worked with the ATC Employees. In their respective roles at the Defendants, the ATC Employees accessed and used CellInfo's trade secrets.").

Based on these allegations, CellInfo asserts eight claims against all Defendants: (1) violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836; misappropriation of trade secrets under (2) M.G.L. c. 93, §§ 42 and 42A, and (3) Massachusetts common law; (4) breach of the MCSA; (5) unjust enrichment; (6) unfair competition under M.G.L. c. 93A; (7) conversion; and (8) aiding and abetting misappropriation of trade secrets.  *See* Compl. ¶ 8. Each of these claims relies on the alleged use of CellInfo's "trade secrets" and "confidential information" that Defendants purportedly obtained during the course of the parties' consulting arrangement.  *Id*. ¶¶ 71-72, 87, 97, 110, 113-114, 119, 123, 127.  None of these claims relates to indemnification or Article Six of the MCSA.  In its prayer for relief, CellInfo seeks monetary damages, preliminary and permanent injunctive relief, and attorney's fees.

## III.   ARGUMENT

### A.   <u>The Federal Arbitration Act Governs this Dispute.</u>

The Federal Arbitration Act ("FAA") provides that an arbitration clause in "a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or equity for the revocation of any contract."  9 U.S.C. § 2.  Under Section 3 of the FAA, "a party may apply to a federal court for a stay of the trial of an action 'upon any issue referable to arbitration under an agreement in writing for such arbitration.'"  *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010) (quoting 9 U.S.C. § 3). Under Section 4, "a party 'aggrieved' by the failure of another party 'to arbitrate under a written agreement for arbitration' may petition a federal court 'for an order directing that such arbitration

proceed in the manner provided for in such agreement.'" *Id.* (quoting 9 U.S.C. § 4). The FAA "leaves no room for the exercise of discretion" when an agreement provides for arbitration. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

A party that seeks to compel arbitration generally "must show [1] that a valid agreement to arbitrate exists, [2] that the movant is entitled to invoke the arbitration clause, [3] that the other party is bound by that clause, and [4] that the claim asserted comes within the clause's scope." *Ouadani v. TF Final Mile LLC*, 876 F.3d 31, 36 (1st Cir. 2017). The FAA "was designed to promote arbitration," and thus "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1749 (2011). "At a minimum, this policy requires that ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration." *PowerShare, Inc. v. Syntel, Inc.*, 597 F.3d 10, 15 (1st Cir. 2010) (internal quotation marks and alteration omitted). "This presumption in favor of arbitration applies unless the party opposing arbitration rebuts it." *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 7 (1st Cir. 2014).

Arbitration is required here because all four elements are met: (1) there is a valid agreement to arbitrate; (2) all Defendants are entitled to invoke the arbitration clause with respect to CellInfo's claims; (3) CellInfo is bound by that clause; and (4) the parties delegated questions as to the scope of the arbitration clause to the arbitrators—and, even if they did not—CellInfo's claims unmistakably come within the ambit of the arbitration provision.

### B. A Valid Agreement to Arbitrate Exists and CellInfo is Bound to Arbitrate Its Claims.

The MCSA is a valid, binding agreement between CellInfo and ATC IP, LLC. The Agreement was negotiated at arms-length over the course of several months and signed by both

parties.  *See* Compl. ¶¶ 40, 49.  The Agreement contains a broad arbitration clause.  MCSA § 7.1.

CellInfo admits that "[t]he Non-Disclosure Agreements and MCSA between CellInfo and the

Defendants are valid, binding, and enforceable written contracts that were made for valid

consideration."  Compl. ¶ 104.  Thus, the MCSA is a valid agreement to arbitrate and CellInfo is

bound to arbitrate according to its provisions.

### C.   The Parties Delegated Questions of Arbitrability to the Arbitrators, and Even if They Did Not, the Parties Agreed to Arbitrate this Dispute.

The parties agreed to arbitrate "any dispute, controversy, or claim arising out of or related

to any portion of [the] Agreement," including any disputes over "interpretation" of the

Agreement.  MCSA §§ 7.1, 7.2.  They also agreed that any arbitration would be "governed by

the Commercial Arbitration Rules of the American Arbitration Association ('AAA') except as

otherwise expressly provided in [section 7.1]."  The agreement to use the AAA rules further

indicates the parties' desire that the arbitrators—and not a court—decide any gateway questions

as to the arbitrability of Plaintiff's claims.  Moreover, even if the court were to consider

arbitrability in the first instance, the broad arbitration provision in the parties' agreement requires

arbitration of all of Plaintiff's claims.

#### 1.   The Parties Delegated Questions as to the Scope of the Arbitration Clause to the Arbitrators.

In general, "whether an issue is subject to arbitration under an agreement containing an

arbitration clause is itself presumptively a matter for the court to decide before ordering

arbitration."  *Awuah v. Coverall N. Am., Inc*., 554 F.3d 7, 10 (1st Cir. 2009).  This "general rule,"

however, "can be qualified by agreement of the parties."  *Id*.  Thus, "where the parties have

themselves 'clearly and unmistakably agreed' that the arbitrator should decide whether an issue

is arbitrable, the Supreme Court has held that this issue is to be decided by the arbitrator."

*Micoperi v. CHM Mar*., No. 15-cv-10296-ADB, 2015 U.S. Dist. LEXIS 26978, at *6 (D. Mass.

Mar. 5, 2015) (Burroughs, J.) (quoting *Awuah*, 554 F.3d at 10); *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010) ("We have recognized that parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.")

There is a widely-recognized way for parties to agree to arbitrate "gateway" questions: by agreeing to governing rules for their arbitration that provide for a decision on such questions by the arbitrator.  When parties incorporate arbitration rules into their contract, and those rules provide that the arbitrator is to decide issues as to his or her own jurisdiction or the scope of the arbitration agreement, the parties have agreed to submit the question of arbitrability to the arbitrator, not the court.  *See, e.g.*, *Micoperi*, 2015 U.S. Dist. LEXIS 26978, at *7 (arbitrator must decide gateway issue of arbitrability where parties incorporated the Maritime Arbitration Association rules into their agreement, and a relevant rule of that arbitral body "unequivocally delegates to the arbitrator the power to decide the proper scope of the arbitration, and to rule upon what claims may or may not be arbitrable in that proceeding").

Here, the parties agreed to arbitration "governed by the Commercial Arbitration Rules of the American Arbitration Association ("AAA") except as otherwise expressly provided in [section 7.1]."  MCSA § 7.1.  Rule R-7(a) of the AAA Commercial Rules provides that: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or ***to the arbitrability of any claim or counterclaim***."[1]  This is a "clear and unmistakable" agreement to delegate to the arbitrators any gateway questions as to the scope of the arbitration clause, according to the First Circuit and the vast majority of courts to address the issue.  *Awuah*, 554 F.3d at 11 (parties

---

[1] Available at: https://www.adr.org/sites/default/files/Commercial%20Rules.pdf (emphasis added).

incorporated the AAA rules into their contract; Rule 7(a) of these rules "says plainly that the arbitrator may 'rule on his or her own jurisdiction' including any objection to the 'existence, scope or validity of the arbitration agreement'[;] [t]his is about as 'clear and unmistakable' as language can get, meeting the standard we have followed"); *see also, e.g., Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013) ("Virtually every circuit to have considered the issue has determined that incorporation of the American Arbitration Association's (AAA) arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability."); *Info. Sys. Audit & Control Ass'n v. Telecomm. Sys.*, No. 17 C 2066, 2017 U.S. Dist. LEXIS 97180, at *5-7 (N.D. Ill. June 23, 2017) ("[T]he vast majority of courts have held that an agreement to arbitrate in accordance with the AAA's Rules clearly indicates the parties' intention to let an arbitrator determine whether their dispute is arbitrable."); *WMT Inv'rs, LLC v. Visionwall Corp.*, 2010 U.S. Dist. LEXIS 65869, at *6 (S.D.N.Y. June 28, 2010) ("[T]he parties' incorporation of the AAA Commercial Rules into the License Agreement . . . serves as clear and unmistakable evidence of the parties' intent to delegate [issues of arbitrability] to an arbitrator.") (internal quotation marks omitted) (collecting cases).

Although the MCSA provides that arbitration will be governed by the AAA Commercial Rules "except as otherwise provided in this section," there is no relevant exception to the agreement to the AAA rules in section 7.1 of the MCSA, and in particular, nothing that would indicate the parties intended to depart from the well-known AAA rule that provides for the arbitrators to decide gateway questions of arbitrability. In the absence of a relevant exception in the Agreement, any question as to the arbitrability of CellInfo's claims is for the arbitrator to decide. *See Awuah*, 554 F.3d at 9. This is also consistent with section 7.1's express statement that all matters of contract "interpretation" be submitted to an arbitrator.

     2.        **Even if the Court Addresses the Scope of the Arbitration Clause, CellInfo's Claims Clearly Must Be Arbitrated.**

         a.       **The Parties Adopted a Broad Arbitration Clause that Covers All of CellInfo's Claims.**

Section 7.1 of the Agreement extends to "any dispute, controversy, or claim arising out of or related to any portion of this Agreement" with an exception, not relevant here, for disputes involving Article Six of the Agreement.  Courts in this district recognize that such language "indicate[s] an intent to arbitrate a broad scope of claims."  *United States ex rel. Hagerty v. Cyberonics, Inc.*, 146 F. Supp. 3d 337, 348 (D. Mass. 2015); *see also Bekele v. Lyft, Inc.*, 199 F. Supp. 3d 284, 313 (D. Mass. 2016) ("use of phrases such as 'arising under' or 'arising out of' in an arbitration provision generally indicates an intent to arbitrate a broad scope of claims").  The presumption in favor of arbitration "is particularly appropriate where, as here, the arbitration clause is broadly worded."  *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 8 (1st Cir. 2014); *see also id.* at 6 (parties agreed to arbitrate "'any controversy or claim arising out of or relating to' their Agreement").  Rebutting the presumption of arbitrability requires a showing "that the parties ***intended to exclude*** this type of dispute from the scope of the arbitration clause."  *Id.* at 8-9 (emphasis added).  CellInfo cannot rebut that presumption; there is no such evidence of intent.

CellInfo's eight claims all "relate to" and "arise out of" the Agreement in a very direct way.  All of the claims pertain to the parties' relationship that was defined and created by, in the first instance, the Agreement.  *See Grand Wireless*, 748 F.3d at 8 ("These factual issues relate to the terms of the Agreement or, at a minimum, to the relationship established between Grand and Verizon under the Agreement.").  All of the claims concern the alleged misappropriation of CellInfo's "trade secrets" and "confidential information" that Defendants allegedly obtained during the course of the parties' consulting arrangement.  *See* Compl. ¶¶ 71-72, 87, 97, 110, 113-

114, 119, 123, 127.  The disputes CellInfo raises about what, if any, "continuing obligations" (Compl. ¶ 63) the parties owed to one another with respect to any information generated during the consulting relationship all relate to the Agreement that created and defined that relationship in the first place.  Issues that CellInfo raises concerning confidentiality, ownership of proprietary information and return of any proprietary information at the end of the consulting relationship are explicitly addressed in detail by Article Three of the Agreement (concerning "Confidentiality and Ownership").  *See also* Compl. ¶ 41.

CellInfo's claims are also premised on its belief that the parties had agreed to "negotiate a longer-term deal" if the initial proof of concept test in Brazil were successful.  This implicates the provisions of the Agreement concerning renewal and termination.  *See* Compl. ¶¶ 4, 53, 63; MCSA Article Four ("Term and Termination") and § 1.4 ("No Guarantee of Work"); *Grand Wireless*, 748 F.3d at 8 ("Grand's allegations about Verizon's termination of their business relationship may implicate extensive portions of the Agreement concerning termination.").  Ultimately, that "some of the issues" raised by CellInfo's claims "may require resort to the Agreement," *Grand Wireless*, 748 F.3d at 8, is sufficient to require arbitration under the broad language of section 7.1.

Any residual doubt as to whether arbitration is required for all of CellInfo's claims must be resolved in favor of arbitration.  Under First Circuit law, "where the language of an arbitration clause is broad and in the absence of any express provision excluding a particular grievance from arbitration . . . ***only the most forceful evidence*** of a purpose to exclude the claim from arbitration can prevail."  *Grand Wireless*, 748 F.3d at 8 (emphasis added, internal quotation marks omitted).  Claims such as those advanced by CellInfo are repeatedly sent to arbitration in light of a broad agreement to arbitrate claims that touch on matters covered by a written contract.  *See, e.g.*,

*Grand Wireless*, 748 F.3d at 9 (RICO and state law tort claims); *Commercial Union Ins. Co. v. Gilbane Bldg. Co.*, 992 F.2d 386, 387-88, 391 (1st Cir. 1993) (Massachusetts unfair and deceptive trade practices claim subject to arbitration under similarly broad arbitration clause); *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999) (noting that courts "routinely refer claims for misappropriation of trade secrets to arbitration").[2]

Accordingly, given the plain language of section 7.1 of the MCSA and the strong presumption in favor of arbitrability, all of the claims in this litigation are subject to mandatory arbitration.

  **b.**  **There is No Judicial Forum "Carve-Out" for Injunctive Relief.**

CellInfo may contend that the parties carved out rights to seek injunctive relief in a judicial forum, and that because CellInfo seeks such relief (in addition to damages), its claims are not subject to the mandatory arbitration clause.  Such an argument would misapprehend the plain language of the parties' Agreement.

In Section 7.1, the parties agreed to arbitrate ***any*** dispute relating to or arising out of the Agreement, with only the exception of disputes under Article Six, concerning indemnification. Injunctive or equitable relief is not mentioned at all.  This section provides clear and unmistakable evidence of the parties' intent to arbitrate the broadest possible range of disputes. Section 7.2 provides, in turn, only "a complete defense to any suit, action, or other proceeding instituted in any court…with respect to any dispute, controversy or claim between the Parties hereto and arising out of or related to this Agreement."  This "defense" does not apply to "those

---

[2] Federal statutory claims, such as the one brought by Plaintiff under the Defend Trade Secrets Act, must be arbitrated pursuant to a valid arbitration agreement unless "Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) (internal quotation marks omitted).  No such intention is present within or without the DTSA.  To wit, courts have compelled arbitration of Defend Trade Secrets Act claims without protest that such claims are statutorily excluded from arbitration.  *See, e.g.*, *H2O Res., LLC v. Oilfield Tracking Servs.*, No. 18-1164, 2018 U.S. Dist. LEXIS 104991 (E.D. Pa. June 22, 2018).

matters involving the warranties, indemnities, and other matters addressed by Article Six of this Agreement, or matters involving injunctive relief as a remedy, or any action necessary to enforce the award of the arbitrators." Those "matters" which involve injunctive relief as a remedy under the Agreement are Article 3.1(b),[3] concerning the confidential information of each party, and Article 9.1, which provides Defendants the right to seek injunctive relief in the event of, or to prevent, a breach of the MCSA by CellInfo.[4] Neither section, however, permits either party to seek injunctive relief *in court* as opposed to in an arbitral forum.

Thus, section 7.2 cannot override the broad agreement to arbitrate set forth in Section 7.1. This interpretation does not render section 7.2 superfluous, because "even where preliminary relief is for the arbitrator" under an agreement, as a general matter, "a district court retains power to grant an *interim* preliminary injunction, where otherwise justified, for the interval needed to resort to the arbitrator—that is, for the period between the time the district court orders arbitration and the time the arbitrator is set up and able to offer interim relief itself." *Next Step Med. Co. v. Johnson & Johnson Int'l*, 619 F.3d 67, 70 (1st Cir. 2010) (italics in original) (citing *Teradyne, Inc. v. Mostek Corp.,* 797 F.2d 43, 51 (1st Cir. 1986)). In this limited fashion, Article 7 does not stand in the way of either party seeking such interim, preliminary relief from the court. This interpretation also aligns with the other carve-out in Section 7.2 that is not included in Section 7.1—for "any action necessary to enforce the award of the arbitrators"—which is, of course, limited to post-arbitration actions.

---

[3] Section 3.1(b) provides in relevant part that: "If the provisions of this article are breached, or are threatened to be breached, the Disclosing Party will be entitled to seek injunctive relief in addition to seeking any relief otherwise available at law or under the terms of this Agreement."

[4] Section 9.1 provides in relevant part that: "Consultant expressly agrees that AMT is entitled at all times to seek injunctive and other equitable relief in the event of, or to prevent, a breach of any provision of this Agreement by Consultant."

The point is ultimately moot here, as CellInfo would be unable to make the requisite showing for short-term relief. The First Circuit has characterized the entitlement to such interim preliminary relief as requiring "a showing of some short-term emergency that demands attention while the arbitration machinery is being set in motion." *Next Step Med.*, 619 F.3d at 70. CellInfo has not sought (nor could it seek) any such "emergency" relief. CellInfo alleges that the software license terminated at the end of November 2017 (Compl. ¶ 64), and that it knew of facts giving rise to at least some of its claims as early as May 2017 (Compl. ¶¶ 55-65). Yet CellInfo did not file this lawsuit until six months to a year later, nor even accompany its complaint with a motion for preliminary relief. That is not the behavior of a party in need of emergency relief.

In short, nothing in section 7.2 purports to limit the scope of the agreement to arbitrate in section 7.1; by its terms, the section is only a "complete defense" to any action, not a limitation on the kinds of disputes the parties agreed to send to arbitration in the first place. Requiring arbitration is also consistent with either party's right to seek injunctive relief in certain circumstances, because the arbitrators have the authority to grant whatever preliminary or permanent "injunctive relief" may be warranted. *See* AAA Rules, R-47(a) ("The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract."); *Brown v. Coleman Co.*, 220 F.3d 1180, 1183 (10th Cir. 2000) ("It is beyond question that an arbitrator may have broad equity powers if the rules under which he is operating provide for equitable relief"); *Kingstown Corp. v. Black Cat Cranberry Corp.*, 65 Mass. App. Ct. 154, 161, 839 N.E. 2d 333, 338 (2005) (holding that arbitration clause requiring arbitration and further providing that each party shall not be deprived "of its right to obtain injunctive or other equitable

relief" required "mandatory arbitration while also empowering an arbitrator to grant injunctive or other equitable relief at the request of either party").

In the absence of any explicit carve-out allowing certain types of claims to be brought in court, arbitration is mandatory under the Agreement. This interpretation aligns with First Circuit case law. In *PowerShare, Inc. v. Syntel, Inc.*, 597 F.3d 10, 12-13 (1st Cir. 2010), for example, the parties' agreement provided for the arbitration of all disputes "arising out of or in relation to [the] Agreement," and further that "[n]othing in this clause shall prejudice [either party's] right to seek injunctive relief or any other equitable/legal relief or remedies available under law." The First Circuit rejected the argument that the latter clause preserved the right to pursue remedies "in court" as opposed to in arbitration. Based on the plain language of the arbitration provision, the court determined that "the only sensible reading is that the [first clause] mandates arbitration and the [second clause] furnishes the arbitrator with broad legal and equitable powers should either party seek special kinds of relief (say, an injunction)." *Id.* at 16; *see also Baychar, Inc. v. Frisby Techs.*, No. 01-CV-28, 2001 U.S. Dist. LEXIS 11037, at *9 (D. Me. July 26, 2001) (broad agreement to arbitrate, with an additional clause providing that "each Party shall have the right to seek and obtain injunctive relief upon any violation" of the section of the agreement governing confidential information; the court found that all of plaintiffs' claims were arbitrable and denied request for preliminary injunctive relief because otherwise it would be "interfering with the arbitration rather than facilitating it").

Indeed, even when an arbitration provision does set forth an explicit exemption allowing a party to seek injunctive relief in a judicial forum, courts routinely grant motions to compel arbitration and/or stay the claims. In *Comedy Club, Inc. v. Improv West Assocs.*, 553 F.3d 1277 (9th Cir. 2009), for example, the provision at issue provided for the arbitration of all disputes, but

that "[n]otwithstanding this agreement to arbitrate, the parties, in addition to arbitration, shall be

entitled to pursue equitable remedies and agree that the state and federal courts shall have

exclusive jurisdiction for such purpose." *Id.* at 1281-82, 1985.  The court reasoned that the

carve-out, although ambiguous, was "intended to apply only to claims designed to maintain the

status quo between the parties."  Given the presumption in favor of arbitration, the court held that

the "arbitrator could decide both equitable and legal claims and [] the provision for court

jurisdiction on equitable matters was ancillary to the arbitration."  *Id.*  Courts considering

arbitration clauses similar to *Comedy Club* "have consistently construed equitable-relief

exceptions  . . . as either authorizing courts to issue temporary equitable relief once a dispute has

been submitted to arbitration . . . or . . . as authorizing courts to enforce arbitral awards once

arbitration is complete."  *Info. Sys. Audit & Control Ass'n v. Telecomm. Sys.*, No. 17 C 2066,

2017 U.S. Dist. LEXIS 97180, at *7-8 (N.D. Ill. June 23, 2017).

>   **D.**     **ATC and Its Subsidiaries May Invoke the Arbitration Agreement.**

CellInfo named as defendants not only the ATC subsidiary that is a party to the MCSA,

ATC IP, but also several other ATC subsidiaries and ATC itself.  These non-signatories may

invoke the arbitration agreement because relevant federal and state contract law principles estop

CellInfo from avoiding arbitration with these entities.

To determine whether a non-signatory may enforce an arbitration provision against a

signatory, the court looks to federal common law in this federal question case.  *Ouadani v. TF*

*Final Mile LLC*, 876 F.3d 31, 36-37 (1st Cir. 2017).  Federal common law "incorporates 'general

principles of contract and agency law," including incorporation by reference, assumption,

agency, alter ego, estoppel, and third-party beneficiary.  *Id.*

Under federal common law, estoppel bars any assertion that non-signatories American

Tower Corporation, American Towers LLC, and American Tower DO Brasil-Cessao de

Infraestruturas LTDA cannot compel arbitration of the claims asserted against them.  Federal

courts are "willing to estop a signatory from avoiding arbitration with a nonsignatory when the

issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement

that the estopped party has signed."  *Ouadani*, 876 F.3d at 38.  The test is substantially identical

under Massachusetts common law.[5]

CellInfo—a signatory—should be estopped from avoiding arbitration with

nonsignatories—ATC and its subsidiaries—because the issues that Defendants seek to resolve in

arbitration are intertwined with the agreement that CellInfo has signed.  Throughout the

Complaint, CellInfo does not distinguish between the various Defendants, and notably, all eight

of its claims are asserted against all Defendants.  CellInfo's indiscriminate allegations show how

"intertwined" all of the Defendants and their employees allegedly were with the Agreement at

issue.  For example:

- ¶ 2: "For more than two years, CellInfo provided business consulting services to ATC and its subsidiaries."

- ¶ 4: ATC is the entity that "agreed to give CellInfo the opportunity to demonstrate the value of its ideas," through a "'proof of concept' test for ATC in Brazil."

- ¶¶ 6, 9: Defendants' employees—whom CellInfo labels the "ATC Employees"— "accessed, shared and copied CellInfo's trade secrets and highly confidential information."  CellInfo seeks an injunction and other relief "to prevent Defendants from further using CellInfo's highly confidential, proprietary information."

- ¶ 17: ATC Brazil's conduct "was directed by and for the benefit of ATC and its employees in Boston."

- ¶ 40: "CellInfo and ATC negotiated the terms" of what became the MCSA.

---

[5] *See Machado v. System4 LLC*, 471 Mass. 204, 211 (2015) ("Equitable estoppel typically allows a nonsignatory to compel arbitration in either of two circumstances: (1) when a signatory "must rely on the terms of the written agreement in asserting its claims against the nonsignatory," or (2) when a signatory "raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.").

- ¶¶ 49-50, 59: CellInfo deployed its system for ATC's Brazilian subsidiary, and ATC "validated CellInfo's results."

- ¶ 60: "Defendants secretly chose to copy key features of CellInfo's platform."

- ¶ 68: "CellInfo provided consulting services to the Defendants and, while providing those services, worked with the ATC Employees. In their respective roles at the Defendants, the ATC Employees accessed and used CellInfo's trade secrets."

All of CellInfo's claims rely on a core allegation of misappropriation of confidential and proprietary information by the "Defendants" to this litigation, information that the "Defendants" allegedly obtained during the course of the parties' consulting arrangement.  *See* Compl. ¶¶ 71-72, 87, 97, 110, 113-114, 119, 123, 127.  In CellInfo's Complaint, all Defendants are similarly situated.  Because resolution of CellInfo's claims as to each Defendant will likely require the same legal analysis and the same evidence, the issues Defendants seek to resolve in arbitration are intertwined with the agreement that CellInfo has signed.  *See, e.g., Sourcing Unlimited, Inc. v. Asimco Int'l, Inc.*, 526 F.3d 38, 47 (1st Cir. 2008) (where plaintiff named subsidiary's CEO and corporate parent as defendants, but only subsidiary signed the arbitration agreement, court granted defendants' motion to compel arbitration of tort, statutory and contract claims where all of the claims against the corporate parent "ultimately derive from benefits [plaintiff] alleges are due" under the agreement with the subsidiary).

In sum, all Defendants may invoke the arbitration provision of the MCSA.

## IV.    CONCLUSION

Because (1) there exists a valid agreement to arbitrate; (2) all Defendants may invoke the arbitration clause with respect to CellInfo's claims; (3) CellInfo is bound by that clause; and (4) the parties delegated questions as to the scope of the arbitration clause to the arbitrators (and, in any event, CellInfo's claims unmistakably come within the ambit of the arbitration provision), CellInfo must arbitrate its claims.

Dated: July 30, 2018                        Respectfully submitted,

                                            **AMERICAN TOWER CORPORATION,
                                            AMERICAN TOWERS LLC,
                                            AMERICAN TOWER DO BRASIL –
                                            CESSAO DE INFRAESTRUTURAS LTDA,
                                            and ATC IP LLC**

                                            By their attorneys,

                                            /s/ James M. Wodarski
                                            James M. Wodarski (BBO # 627036)
                                            Thomas H. Wintner (BBO # 667329)
                                            Geoffrey A. Friedman (BBO #692771)
                                            MINTZ, LEVIN, COHN, FERRIS,
                                            GLOVSKY AND POPEO, P.C.
                                            One Financial Center Boston, MA 02111
                                            617.542.6000 (telephone)
                                            617.542.2241 (fax)
                                            jwodarski@mintz.com
                                            twintner@mintz.com
                                            gfriedman@mintz.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically

to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper

copies will be sent to those indicated as non-registered participants on the date of electronic filing.

/s/ James M. Wodarski