UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CELLINFO, LLC,<br>                    Plaintiff,<br><br>          v.<br><br>AMERICAN TOWER CORPORATION,<br>AMERICAN TOWER LLC,<br>AMERICAN TOWER DO BRASIL –<br>CESSAO DE INFRAESTRUTURAS LTDA,<br>AND ATC IP LLC,<br><br>                    Defendants. | CIVIL ACTION<br>NO. 18-11250-WGY |

YOUNG, D.J.                                    December 19, 2018

**MEMORANDUM OF DECISION**

## I.    INTRODUCTION

This is a case abounding in irony.  CellInfo, LLC
("CellInfo"), a Massachusetts-based business that works with
wireless companies to improve their consumers' cellular
coverage, Compl. ¶¶ 2, 19, ECF No. 1, brought this action
against American Tower Corporation, American Tower LLC, American
Tower do Brasil – Cessao de Infraestruturas Ltda ("American
Tower do Brasil"), and ATC IP LLC ("ATC IP") (collectively,
"American Tower") alleging misappropriation of confidential
information and trade secrets in order to create unfair
competition between the parties, breach of contract, unjust
enrichment, unfair and deceptive trade practices, conversion,

and aiding and abetting misappropriation of trade secrets.
Compl. ¶¶ 1, 8.

American Tower Corporation owns, operates, and develops
communications real estate, Defs.' Mem. Dismiss/Stay 1, ECF No.
18, and is the parent company of American Towers LLC, ATC IP,
and American Tower do Brasil, Compl. ¶¶ 12-14.

CellInfo and American Tower engaged in business that
included the purchase of lease options, site acquisition
services, and consulting services.  Compl. ¶¶ 21, 30, 43.

CellInfo and ATC IP entered into a Master Consulting
Services Agreement (the "Agreement") on January 23, 2017.
CellInfo's Mot. Prelim. Inj.: Master Consulting Services
Agreement, Ex. 2 ("MCSA"), ECF No. 29-5.  The Agreement defines
certain professional and legal obligations between CellInfo and
ATC IP that govern CellInfo's provision of consulting services
to ATC IP.  Compl. ¶¶ 42-48.

In reliance on the Agreement, American Tower filed a motion
to dismiss or, in the alternative, stay and compel arbitration,[1]

---

[1] Though only CellInfo and ATC IP are parties to the
Agreement, American Tower argues that American Tower
Corporation, American Tower LLC, and American Tower do Brasil
may also "invoke . . . arbitration" pursuant to the Agreement
under a non-signatory contract estoppel theory.  Defs.' Mem.
Dismiss/Stay 15-17 (quoting both Ouadani v. TF Final Mile LLC,
876 F.3d 31, 36-38 (1st Cir. 2017) (holding that "Federal courts
generally have been willing to estop a signatory from avoiding
arbitration with a nonsignatory when the issues the nonsignatory
is seeking to resolve in arbitration are intertwined with the

Defs.' Mot. Dismiss/Stay ("Defs.' Mot.") 1-2, ECF No. 17, which CellInfo opposed, Pl.'s Opp'n Mem. Dismiss/Stay ("Pl.'s Opp'n") 3-8, ECF No. 27.

The portion of the Agreement under contention here is the "Dispute Resolution" provision, article seven. Defs.' Mem. Dismiss/Stay 2-3, 6-15; see MCSA 13. The parties disagree over whether article seven, which compels arbitration of controversies between the parties (section 7.1), provides an exception to arbitration where the moving party seeks injunctive relief (section 7.2). Defs.' Mem. Dismiss/Stay 4-15; Pl.'s Opp'n 3-8; see MCSA 13-14. American Tower argues that sections 7.1 and 7.2 of the Agreement require that this Court stay and compel arbitration of this action, Defs.' Mem. Dismiss/Stay 5-17, while CellInfo insists that these sections preclude this Court from granting American Tower's motion to dismiss or stay, Pl.'s Opp'n 3-8.

---

agreement that the estopped party has signed") (internal citations and quotations omitted)) and Machado v. System4 LLC, 471 Mass. 204, 211 (2015)). American Tower's brief on this issue is persuasive and CellInfo does not dispute this argument either in its brief or during the hearing on this issue. See generally Pl.'s Opp'n; Hr'g Tr., ECF No. 47. At this stage of the analysis, therefore, this Court provisionally accepts American Tower's contention and treats American Tower Corporation, American Tower LLC, and American Tower do Brasil as having equal rights to arbitration.

## II.   PROCEDURAL HISTORY

In light of what follows, it is perhaps helpful to describe the course of proceedings in some detail.  CellInfo filed its complaint with this Court on June 15, 2018.  Compl. 26.  Forty-five days later, American Tower filed a motion to dismiss CellInfo's complaint or, in the alternative, stay this action and compel arbitration, as well as an accompanying memorandum. Defs.' Mot. Dismiss/Stay 1-2; Defs.' Mem. Dismiss/Stay 18. Nearly a month passed; then, on August 27, 2018, CellInfo filed its opposition to American Tower's motion to dismiss, Pl.'s Opp'n 9, and -- signaling a change of course -- a motion to expedite discovery, CellInfo's Mot. Expedited Disc. ("Pl.'s Mot. Disc.") 1-2, ECF No. 26.

The next day, CellInfo further moved for a preliminary injunction against American Tower.  CellInfo's Mot. Prelim. Inj. 1-2, ECF No. 29.  American Tower duly filed their opposition to CellInfo's motions for expedited discovery and preliminary injunction on September 14, 2018.  Defs.' Mem. Opp'n Pl.'s Mot. Expedited Disc., ECF No. 34; Defs.' Mem. Opp'n Pl.'s Mot. Prelim. Inj., ECF No. 35.

On October 24, 2018, this Court heard argument on the motion to dismiss or stay this action.  Hr'g Tr. 1, ECF No. 47. The Court expressed a willingness to collapse a further hearing on the preliminary injunction with trial on the merits, Fed. R.

[4]

Civ. P. 65(a), and asked CellInfo when it wanted to try the case. Hr'g Tr. 3:18-23. Facing the prospect of an actual evidentiary hearing as opposed to dueling affidavits,[2] CellInfo promptly lost its appetite for emergency relief. While it welcomed the prospect of complete equitable relief, it indicated that a trial could wait until late January 2019. Hr'g Tr. 3:18-4:3. This Court then denied the motion to dismiss and turned to the preliminary injunction request. Hr'g Tr. 9:2, 11:9-10. American Tower agreed that there was a need to resolve the motion for **preliminary** injunction, but argued that, under the Agreement's arbitration clause, the Court's role was limited to considering whether to issue a "stand still" injunction. Hr'g Tr. 6:7-21. Everything else, American Tower argued, had to go to the arbitrators. Hr'g Tr. 6:23-25. Both parties agreed that the Court should construe the Agreement and resolve this initial question. Hr'g Tr. 9-11. Frankly baffled, the Court took the matter under advisement. Hr'g Tr. 11. As it turns out, both parties are wrong.

---

[2] "The affidavit is the Potemkin Village of today's litigation landscape. Purported adjudication by affidavit is like walking down a street between two movie sets, all lawyer-painted façade and no interior architecture." In re Nexium (Esomeprazole) Antitrust Litig., 309 F.R.D. 107, 145 n.55 (D. Mass. 2015) (quoting United States v. Massachusetts, 781 F. Supp. 2d 1, 22 n.25 (D. Mass. 2011)).

## III. ANALYSIS

The way to construe an agreement is to start with the Agreement itself.  This one has a broad arbitration clause.  It is important to note that this is not "forced arbitration," that one-sided species of arbitration unconscionably forced on vulnerable consumers and workers and almost universally reviled,[3] enforceable only due to the mandate of a slim majority of the Supreme Court.  See American Express Co. v. Italian Colors Rest., 570 U.S. 228, 238-39 (2013); AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 344-52 (2011).

No.  It appears that the broad arbitration clause here is the product of mutual negotiation among independent equals, each represented by skilled counsel.  This is precisely the knowing mutual resort to arbitration to which the Federal Arbitration Act, 9 U.S.C. §§ 3-4, applies.  The Court must strive therefore to give effect to the expressed intention of the parties.

---

[3] See, e.g., Terri Gerstein, No More Forced Arbitration, N.Y. Times, Nov. 17, 2018, at A27.

Here's why forced arbitration is unfair: Workers win less often in arbitration than in court, and when they do win, they get less money than in court. Arbitration is secret, shielding companies' wrongdoing from public view. There's no right to appeal.  Forced-arbitration provisions usually bar class actions, making it more daunting and difficult to sue an employer.  And workers can't realistically opt out; they're typically presented with a take-it-or-leave-it contract to sign if they want to put food on the table.

Here, Section 7.1, entitled "Arbitration Procedure,"

provides that:

> The Parties agree to submit any dispute, controversy, or
> claim arising out of or related to any portion of this
> Agreement other than those involving Article Six of this
> Agreement, or the creation, validity, interpretation,
> breach, or termination of this Agreement that the
> Parties are unable to resolve through informal
> discussions, to binding arbitration in accordance with
> the provisions of this article. The arbitration will
> be: (a) held in Suffolk County, Massachusetts; (b)
> conducted before a panel of three (3) arbitrators, each
> knowledgeable in fields related to the subject matter of
> the dispute, one chosen by each Party within ten (10)
> days of a demand for arbitration and the third by the
> two (2) so chosen; (c) governed by the Commercial
> Arbitration Rules of the American Arbitration
> Association ("AAA") except as otherwise expressly
> provided in this section; and (d) administered by the
> AAA unless the Parties agree otherwise. The
> arbitrators: (a) may not add to, amend or disregard this
> Agreement in whole or in any part; (b) will allow such
> discovery as is appropriate to the purposes of
> arbitration in accomplishing fair, speedy and cost
> effective resolution of disputes; (c) will reference the
> rules of evidence of the Federal Rules of Civil Procedure
> then in effect in setting the scope and direction of
> such discovery; and (d) will not be required to make
> findings of fact or render opinions of law.

MCSA 13. Additionally, section 7.2, entitled "Enforcement,"

states that:

> Other than with respect to those matters involving the
> warranties, indemnities, and other matters addressed by
> Article Six of this Agreement, or matters involving
> injunctive relief as a remedy, or any action necessary
> to enforce the award of the arbitrators, the provisions
> of this article are a complete defense to any suit,
> action, or other proceeding instituted in any court or
> before any administrative tribunal with respect to any
> dispute, controversy or claim between the Parties hereto
> and arising out of or related to this Agreement or the
> creation, validity, interpretation, breach, or

[7]

termination of this Agreement.  The decision of and award rendered by the arbitrators will be final and binding on the Parties.  Nothing in this article prevents the Parties from exercising any rights set forth in this Agreement, including without limitation termination rights.

Id. at 13-14.

Congress enacted the Federal Arbitration Act "to ensure that courts would honor the contractual agreements of parties who choose to resolve their disputes by means of the informal arbitration procedure." New England Energy, Inc. v. Keystone Shipping Co., 855 F.2d 1, 3 (1st Cir. 1988).  The Federal Arbitration Act requires courts to "treat arbitration agreements in the same way as other contracts and 'enforce them according to their terms.'" Farnsworth v. Towboat Nantucket Sound, Inc., 790 F.3d 90, 96 (1st Cir. 2015) (quoting Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63, 67 (2010)).  Section 3 of the Federal Arbitration Act allows parties to an arbitration agreement to move the court "to stay a judicial proceeding when the matter before the court involves an issue governed by an agreement to arbitrate." Campbell v. General Dynamics Gov't Sys. Corp., 407 F.3d 546, 552 (1st Cir. 2005); see also 9 U.S.C. § 3; Langley v. Colonial Leasing Co. of New England, 707 F.2d 1, 3 (1st Cir. 1983).  Section 4 of the Federal Arbitration Act permits parties "aggrieved by another party's refusal to arbitrate to petition a district court to compel arbitration in accordance with the

parties' preexisting agreement." Campbell, 407 F.3d at 552; see also 9 U.S.C. § 4; Langley, 707 F.2d at 3. Under either section, the moving party must demonstrate: "that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope." Campbell, 407 F.3d at 552 (quoting InterGen N.V. v. Grina, 334 F.3d 134, 142 (1st Cir. 2003)).

These precedents all apply here. That would seem to do it. But there's more. Arbitrators have no enforceable equitable powers. Thus, with a real belt and suspenders flare, the drafters of the Agreement included rights to injunctive relief as well. Specifically, the Agreement provides:

> If the provisions of this [Confidentiality] article are breached, or are threatened to be breached, the Disclosing Party will be entitled to seek injunctive relief in addition to seeking any relief otherwise available at law or under the terms of this Agreement.[4]

---

[4] There's also a rather one-sided right to injunctive relief under the Agreement's general provisions which provides in relevant part:

> The Parties hereto acknowledge that the services to be rendered by Consultant under this Agreement and the rights and privileges granted to AMT under the Agreement are of a special, unique, unusual, and extraordinary character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated by damages in any action at law, and the breach by Consultant of any of the provisions of this Agreement will cause AMT irreparable injury and damage. Consultant expressly agrees that AMT is at all times entitled to seek injunctive and other equitable relief

MCSA 7. Surely, the drafters must have thought, that ought cover it.

When this dispute arose, however, the Agreement's ambiguities became glaringly apparent. Here, it is precisely an alleged breach of the confidentiality provisions of which CellInfo principally complains. Compl. ¶¶ 46-47. Must this dispute be arbitrated (as American Tower contends) or is permanent equitable relief available from this Court (as CellInfo contends)? The Agreement has no express provision governing the relationship of these remedies.

Generally, it is for a district court to determine "whether an issue is subject to arbitration under an agreement containing an arbitration clause," unless "the parties have themselves 'clearly and unmistakably agreed' that the arbitrator should decide whether an issue is arbitrable." Awuah v. Coverall N.

---

in the event of, or to prevent, a breach of any provision of this Agreement by Consultant; provided, however, that resort to such equitable relief shall not be construed to be a waiver of any other rights or remedies that AMT may have for damages or otherwise. The various rights and remedies of AMT under this Agreement are not intended to be exhaustive. The exercise by AMT of any right or remedy under this Agreement or any other agreement between the Parties does not preclude the exercise of any other rights or remedies by AMT, all of which are cumulative and are in addition to any other rights or remedies that may now or subsequently exist in law or in equity or by statute or otherwise.

MCSA 16.

Am., Inc., 554 F.3d 7, 10 (1st Cir. 2009) (quoting Howsam v.
Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002)); see also
Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d 1, 7
(1st Cir. 2014) (quoting AT&T Techs., Inc. v. Communications
Workers of Am., 475 U.S. 643, 649 (1986)); Apollo Comput., Inc.
v. Berg, 886 F.2d 469, 472-73 (1st Cir. 1989).  Arbitrators
rather than courts, however, should decide issues involving
procedure that "grow out of the dispute and bear on its final
disposition."  Dialysis Access Ctr. v. RMS Lifeline, Inc., 638
F.3d 367, 375 (1st Cir. 2011) (internal citations and quotations
omitted).  Where an arbitration agreement states that the
American Arbitration Association's Rules govern the agreement,
American Arbitration Association Rule 7(a) is "clear and
unmistakable" in providing that an arbitrator has the ability to
rule on issues involving the scope of the agreement.  Hopkinton
Drug, Inc. v. CaremarkPCS, L.L.C., 77 F. Supp. 3d 237, 248 (D.
Mass. 2015) (quoting Awuah, 554 F.3d at 11).

Moreover, where an arbitration provision's scope is
unclear, arbitration is the favored means of dispute resolution.
Ouadani v. TF Final Mile LLC, 876 F.3d 31, 36 (1st Cir. 2017);
Grand Wireless, 748 F.3d at 7.  No party, however, should "be
required to submit to arbitration any dispute which [it] has not
agreed so to submit."  Ouadani, 876 F.3d at 36 (quoting AT&T
Techs., 475 U.S. at 648); see also Grand Wireless, 748 F.3d at

[11]

7.  When determining whether parties have contracted to
arbitrate, courts "generally . . . apply ordinary state-law
principles that govern the formation of contracts." Grand
Wireless, 748 F.3d at 7 (quoting First Options of Chi., Inc. v.
Kaplan, 514 U.S. 938, 944 (1995)); Dialysis Access Ctr., 638
F.3d at 376.  Federal policy, however, dictates that a court's
analysis of an arbitration contract should ensure that "the
parties' intentions control, but [that] those intentions are
generously construed as to issues of arbitrability," Grand
Wireless, 784 F.3d at 7 (quoting Mitsubishi Motors Corp. v.
Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985)), and
that "ambiguities as to the scope of the arbitration clause
itself . . . be resolved in favor of arbitration," id. (quoting
PowerShare, Inc. v. Syntel, Inc., 597 F.3d 10, 15 (1st Cir.
2010) (internal alternations omitted)); Dialysis Access Ctr.,
638 F.3d at 376 (quoting Mastrobuono v. Shearson Lehman Hutton,
Inc., 514 U.S. 52, 62 (1995)).

     To determine whether a dispute falls within the scope of an
arbitration agreement, a court must examine "the factual
allegations underlying the claims in the complaint." Grand
Wireless, 748 F.3d at 7 (quoting Dialysis Access Ctr., 638 F.3d
at 378) (internal alterations omitted).  A presumption of
arbitration endures "where the language of an arbitration clause
is broad," id. at 8, and there is neither an "express provision

[12]

excluding a particular grievance from arbitration" nor "the most forceful evidence of [the parties'] purpose to exclude the claim," id. (quoting AT&T Techs., 475 U.S. at 650).

Here, the argument in favor of arbitration is persuasive. Section 7.1 of the Agreement provides that:

> The Parties agree to submit any dispute, controversy, or claim arising out of or related to any portion of this Agreement other than those involving Article Six of this Agreement, or the creation, validity, interpretation, breach, or termination of this Agreement that the Parties are unable to resolve through informal discussions, to binding arbitration in accordance with the provisions of this article.

MCSA 13 (emphasis added).  In this section, the Agreement directly states that disputes over issues including the creation, validity, and interpretation of the contract are subject to arbitration.  Id.  Section 7.1 further provides that arbitrations between the parties are "governed by the Commercial Arbitration Rules of the American Arbitration Association ('AAA') except as otherwise expressly provided in this section." Id.  Section 7.1 does not provide an exception for the use of the AAA Rules for conflicts involving the creation, validity, or interpretation of the contract.  See id.  As previously discussed, section 7(a) of the AAA Rules provides "clear and unmistakable" language that arbitrators have the power to resolve disputes over an agreement's scope.  Hopkinton Drug, 77 F. Supp. 3d at 248.

While CellInfo argues that section 7.2 requires an exception for issues concerning injunctive relief, this argument bypasses the initial inquiry as to whether this Court may consider the scope of the Agreement or whether the arbitrators must resolve this issue. See Pl.'s Opp'n 7. This Court rules that it is for the arbitrators in the first instance -- and not this Court -- to construe the ambiguities in the Agreement and determine the extent of this Court's role in adjudicating this dispute.

A final issue, explored more thoroughly by the parties during the hearing before this Court in October, is whether this Court has the ability to provide the parties with a preliminary injunction freezing the status quo. Hr'g Tr. 6-9.

In the First Circuit, a district court may grant a party's request for injunctive relief where there is "an arbitrable dispute pending arbitration, provided that the prerequisites for injunctive relief are satisfied." Teradyne, Inc. v. Mostek Corp., 797 F.2d 43, 51 (1st Cir. 1986); see also Danieli & C. Officine Meccaniche S.p.A. v. Morgan Constr. Co., 190 F. Supp. 2d 148, 154 (D. Mass. 2002) (Gorton, J.). Further, a district court may grant a preliminary injunction before determining whether a dispute requires judicial or arbitral action. Teradyne, 797 F.2d at 51. Allowing courts to provide such relief permits the "preserv[ation of] the status quo pending

arbitration and, _ipso facto_, the meaningfulness of the arbitration process." _Id._[5]

American Tower indicated at the October hearing that it had no problem with such relief.  Hr'g Tr. 6:18-25 ("If this Court, in light of the language of Section 7.2, believes that there should be some sort of a preliminary injunction so that the status quo is frozen pending the commencement of arbitration, we're -- as we've indicated to the other side, we're fine with that.").

For these reasons, this Court concluded that its role in the process is to hear and resolve CellInfo's motion for preliminary relief, commit everything else to the arbitrators (remaining available for further judicial action should the arbitrators -- not this Court -- construe the Agreement to afford the scope for such action), and, once an arbitration award is delivered, to handle the proceedings, if any, involved in confirming or vacating such an award.

Having reached this decision, the Court promptly entered a conclusory order setting it forth, ECF No. 63.  This memorandum explains the Court's reasoning.  Four days after the order

---

[5] A court's ability to issue a preliminary or permanent injunction, in the labor arbitration context, is limited by the Norris-LaGuardia Act, 29 U.S.C. §§ 101 _et seq._, _see_ _Independent Oil & Chem. Workers of Quincy, Inc._ v. _Gamble Mfg. Co._, 864 F.2d 927, 928-29 (1st Cir. 1988), but such statutory restriction is not relevant to this case and is not raised by the parties.

entered, the parties jointly proposed a stipulated preliminary injunction which will terminate should the parties' presently anticipated arbitration not proceed in due course.  The Court entered the stipulated preliminary injunction on November 20, 2018 and administratively closed the case, ECF No. 66.  The preliminary injunction apparently gets CellInfo the temporary relief it needs, and these corporations otherwise appear well on their way (wisely) to a private settlement.

## IV.   WHATEVER WERE THEY THINKING?  MYTHS AND REALITIES CONCERNING COURTS AND ARBITRATION

How could an otherwise sophisticated agreement have made such a hash out of the parties' intentions concerning the interplay of arbitration and court processes?  It appears that in this "big law" era, the drafters operated under the myth that arbitration is cheaper, faster, and more confidential than litigation (only one of these is true) without talking to trial lawyers who understand the reality that while people may not want trials, what they **do** want is a firm and reasonably prompt trial date before an impartial fact-finder as the best chance for a fairly negotiated settlement.  Consider:[6]

---

[6] Thoughtful, well supported comparisons are especially important today.

Seventeen years ago, the U.S. Supreme Court perceived real benefits to the enforcement of arbitration provisions in the employment context, including avoidance of litigation costs.  And, in Gilmer, the Court

**Cheaper?**  Arbitration is expensive.  See Erin Mulvaney, Plaintiffs Lawyers Pressure Lyft to Pay Millions in Arbitration Fees, The Recorder (Dec. 14, 2018, 11:45 AM), https://www.law.com/therecorder/2018/12/14/plaintiffs-lawyers-pressure-lyft-to-pay-millions-in-arbitration-fees/?slreturn=20181117144915 ("In addition to the filing fee of $1,900 for each demand, there is a $750 case management fee per case and the arbitrator's compensation.").  Arbitration which, as here, contemplates pre-hearing discovery is markedly more expensive.  See MCSA 13 (authorizing discovery conducted with "reference [to] the rules of evidence of the Federal Rules of Civil Procedure").  Arbitration before a panel of three arbitrators is more expensive still.  Indeed, it's as expensive as the full panoply

---

determined that arbitration was a comparable alternative to litigation.  But it is not clear that, at the time those opinions were issued, there was data to support those assumptions.  In the years since, scholars have continued to test those assumptions and have seemingly unsettled the notion that arbitration is superior or even sufficiently comparable to litigation.  There is certainly some data suggesting that the arbitral forum's downsides may outweigh its benefits, at least for vulnerable workers.

Styczynski v. Marketsource, Inc., No. 18-2662, 2018 WL 6305839, at *10 (E.D. Pa. 2018) (McHugh, J.) (internal citations and quotations omitted); see also Mark D. Gough, The High Costs of an Inexpensive Forum: An Empirical Analysis of Employment Discrimination Claims Heard in Arbitration and Civil Litigation, 35 Berkeley J. Emp. & Lab. L. 91, 93 (2014); David Horton & Andrea Cann Chandrasekher, Employment Arbitration after the Revolution, 65 DePaul L. Rev. 457, 496 (2016).

of federal court litigation. See Tigges v. AM Pizza, Inc., Nos.
16-10136-WGY, 16-10474-WGY, 2016 WL 4076829, at *17 n.31 (D.
Mass. July 29, 2016) (citing Christopher R. Drahozal,
Arbitration Costs and Contingent Fee Contracts, 59 Vand. L. Rev.
729, 736-37 (2006)).  Expense comparisons are, of course,
tricky.  Since the federal courts are supported by the public,
the incidental costs of actual hearings are less expensive to
the litigants than a comparable hearing before arbitrators
(where the parties bear all the incidental costs).  Federal
court discovery, on the other hand, is especially expensive.
Here, of course, the agreement contemplates the arbitrators
authorizing discovery.  MCSA 13.  Moreover, under the Agreement
here, each of the arbitrators was expected to be familiar with
the industry.  Id. at 13-14.

      More to the point, the initial costs of finding, selecting,
and launching a three-person arbitration panel outstrip the
costs of filing a complaint in the federal district court.  So,
even before accounting for the real costs -- discovery -- which
comes later, parties have already spent more by choosing
arbitration.  See Nicola Faith Sharpe, Corporate Cooperation
Through Cost-Sharing, 16 Mich. Telecomm. & Tech. L. Rev. 109,
110 (2009) (observing that discovery is the major cost driver in
litigation); see generally Nicholas M. Pace & Laura Zakaras,
Where the Money Goes: Understanding Litigant Expenditures for

Producing Electronic Discovery (RAND Corp. 2012), https://www.ra
nd.org/content/dam/rand/pubs/monographs/2012/RAND_MG1208.pdf.

Genuine trial lawyers know all this. Doubtless, that's why
no party here actually has had recourse to arbitration though
five months have now passed. Federal Court litigation is
expensive as well -- too expensive. Coupled with other factors,
arbitration may be more desirable, yet it is a myth to think it
cheaper than a focused, well-conducted federal trial.

**Faster?** On this factor, the federal courts in
Massachusetts win hands down. Again, the trial lawyers know it.
When CellInfo sought to pick up the pace, it called for a
preliminary injunction and brought the Court into action as a
player. When the Court's contemplated pace outstripped the
lawyers' ability to keep up, they jointly negotiated a slowdown.
See Defs.' Unopposed Mot. Set Trial Date 1-2, ECF No. 49.
Indeed, had the parties genuinely wanted court adjudication they
could have agreed to it, and this case would have been resolved
before arbitration could get off the ground. This is not an
isolated phenomenon. It is applicable to all types of federal
civil litigation. Caroline Simson, Arbitration Could Benefit
from Litigation Rules: Ex-Judge, Law360 (Sept. 24, 2018, 6:41
PM), https://www.law360.com/articles/1085668/arbitration-could-
benefit-from-litigation-rules-ex-judge (acknowledging that "the
reality is that much of arbitration has become just as lengthy

and expensive as litigation, if not more"); Chris Villani, 3D
Printing Rivals Settle IP Dispute Just Days Into Trial, Law360
(Sept. 27, 2018, 7:29 PM), https://www.law360.com/articles/10872
19/3d-printing-rivals-settle-ip-dispute-just-days-into-trial.
So long as at least one party wants speed, federal courts in
Massachusetts clearly outpace arbitration.

**Confidentiality?**  Here, arbitration comes into its own.
While this Court will assiduously protect the parties' trade
secrets, see Protective Order, ECF Nos. 54-55, now that the
parties are headed for settlement or arbitration their affairs
will disappear entirely from public view.  Secret, private
tribunals carry with them a host of other societal ills, see
Laurie Kratky Doré, Public Courts Versus Private Justice: It's
Time to Let Some Sun Shine in on Alternative Dispute Resolution,
81 Chi.-Kent L. Rev. 463, 506 (2006); Benjamin P. Edwards,
Arbitration's Dark Shadow, 18 Nev. L.J. 427, 432-34 (2018); J.
Maria Glover, Disappearing Claims and the Erosion of Substantive
Law, 124 Yale L.J. 3052, 3065-66, 3075 (2015), but on these
policy issues the Congressional mandate in the Federal
Arbitration Act is crystal clear -- corporate secrecy is
preferable to public transparency.  Doubtless CellInfo and
America Tower have many business reasons for wishing to shield
their inter-corporate squabble from the eyes of competitors and
present and potential clients.

What may be most troubling about secret proceedings is the
lack of any oversight of the **process** itself.  Who is to know if
the arbitrators themselves commit improprieties, see, e.g., Crow
Constr. Co. v. Jeffrey M. Brown Assoc. Inc., 264 F. Supp. 2d
217, 224-26 (E.D. Pa. 2003) (vacating arbitration award where
arbitrators failed to disclose potential biases), or counsel are
lax, make missteps, or are frankly incompetent?  Instead,
corporations console themselves when paying their legal bills
with the myths that they have chosen a cheaper and faster means
of dispute resolution -- although neither is true.

Which is the better approach to adjudication?  I am not so
self-regarding (or confident) to stake a claim.  The honest
answer -- it depends.  As regards this case, the facts are
these:

The litigation costs will be roughly equivalent, though the
start-up costs of arbitration are greater.  So long as one party
wants speed, the Massachusetts federal courts are markedly
faster, 5-8 months start to finish.  In arbitration, CellInfo
and American Tower can cloak themselves in secrecy; in federal
court they cannot.  At the conclusion of arbitration, the
parties will receive an award but no explanation and will have
virtually no appellate rights.  At the end of a federal trial
the parties will get a thorough written decision and award.

Each will have full rights to appeal to one of the finest appellate courts in America.

Which course is better?  You be the judge.

**SO ORDERED.**


_William G. Young_
WILLIAM G. YOUNG
DISTRICT JUDGE