UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CELLINFO, LLC<br><br>        Plaintiff,<br><br>v.<br><br>AMERICAN TOWER CORPORATION, AMERICAN TOWER LLC, AMERICAN TOWER DO BRASIL – CESSAO DE INFRAESTRUTURAS LTDA, and ATC IP LLC.,<br><br>        Defendants. | Civil Action No. 18-11250-WGY |

**PLAINTIFF CELLINFO, LLC'S REPLY MEMO IN FURTHER SUPPORT OF CELLINFO, LLC'S MOTION TO REOPEN CASE AND SET TRIAL DATE**

Pursuant to the Court's Order during the September 3, 2020 hearing on this case (see Dkt. No. 93), Plaintiff CellInfo, LLC ("**CI**") hereby submits this reply memorandum in further support of its Motion to Reopen Case and Set Trial Date (Dkt. No. 68) (the "**Motion**").

**I.    ATC's Repeated Characterization of CI's Inability to Pay Further Arbitration Fees as a "Refusal" to Pay is (a) Predicated on an Incorrect Legal Standard and (b) Contrary to the Facts in Evidence, Which Show that CI Did Everything Within Its Power to Raise the Funds Needed to Pay the Fees.**

In its memo opposing the Motion (Dkt. No. 82) (the "**ATC Memo**"), ATC asserts that CI "refused to pay" the $207,900 September 5, 2019 AAA invoice, despite evidence that after expending more than $240,000 on arbitration fees, **CI was badly in debt**[1] and (i) had only $12,609.97 remaining in the bank as of October 1, 2019; (ii) did not have sufficient funds at any time between October 1, 2019 and March 31, 2020 (the final deadline set by the arbitrators); and (iii) had a bank balance of $11,882.33 as of July 7, 2020. Declaration of Victor Nathan Drouin In

---

[1] See discussion, infra §I.(b) and cited documents.

Page 1

Support of Plaintiff CellInfo, LLC's Motion to Reopen Case and Set Trial Date, ¶¶ 3-8. 15-20, attached hereto as **Exhibit A**. ATC's argument is predicated on errors of law and fact. Specifically, (a) ATC applies the wrong standard for "ability to pay," arguing that CI had an ability to pay if its creditors did, and (b) CI did everything it could to raise the funds needed to pay its required arbitration fees.

> **(a) The test for "ability to pay" arbitration fees asks (1) whether a claimant has sufficient assets and income to pay the fees and, if not, (2) whether the claimant has made "genuine efforts" to do so, not whether the claimant's creditors have sufficient assets and income to pay the arbitration fees.**

ATC's argument that CI had the ability to pay the September 5, 2019 $207,900 AAA invoice is predicated on an incorrect legal standard. ATC assumes that if CI's investors (who were also its creditors) had an "ability to pay" the September 5 invoice, then so did CI. Specifically, ATC alleges that CI's investors decided to stop funding CI's legal costs when they concluded that CI's case was not strong enough to warrant further investment.[2] ATC Memo at 2, 11-12. Even if this were true, it would not mean that CI had an ability to pay the September 5 invoice, **it would merely explain why CI did not have an ability to pay**.

ATC acknowledges that CI lacked the funds to pay the September 5 AAA invoice, but argues that CI's investors – specifically Twin Focus Capital Partners ("**Twin Focus**") – had sufficient funds to pay and that Twin Focus' ability to pay can be attributed to CI. ATC Memo at 2, 11-12. ATC falsely implies that CI and Twin Focus are in some way alter egos,[3] while explicitly

---

[2] The decision of CI's investors to stop funding its litigation expenses had nothing to do with the strength of CI's case. Rather, one of CI's investors, Paul Karger, failed to secure funds that he had planned to loan to CI and CI's other investors declined to loan more after CI's contingency deal with CI's then-lawyer, King & Spalding fell through. See Section I(b), infra.

[3] To pierce the corporate veil, ATC would need to demonstrate active and direct control of CI by representatives of Twin Focus going beyond shared leadership, a co-mingling of funds, and activities evidencing a substantial disregard of corporate formalities. None of these conditions are

claiming that Twin Focus was "effectively acting as CellInfo's private bank."[4] Even if this assertion were true, having secured loans from a private bank in the past does not guarantee that the bank will continue to make loans in the future. This situation is similar to that of *Tillman v. Tillman*, 2013 U.S. Dist. LEXIS 193817, *7 (C.D. Cal., July 12, 2013) (affirmed, 825 F.3d 1069, 1073-76 (9th Cir. 2016), wherein the plaintiff/claimant had already borrowed $10,000 to pay a portion of the arbitration fees invoiced, but could not secure any more loans. Declaration of Renee Chiccino Tillman, Case No. 2:09-cv-02017-VAP-RC, Dkt. No. 280-1, at ¶13(d), attached hereto as **Exhibit B**. Here, CI was unsuccessful in its efforts to borrow more to pay the September 5, 2019 AAA invoice after it had already borrowed $795,000 from investors, including $240,000 for arbitration fees. Ex. A ¶¶ 3-6, 16-19; Declaration of Victor Nathan Drouin In Support Of CellInfo, LLC's Reply Memo In Support of Plaintiff CellInfo, LLC's Motion to Reopen Case and Set Trial Date ¶¶ 31-32, 35, 58-62, attached hereto as **Exhibit C**; Paul Karger Declaration, ¶¶ 20-21, attached hereto as **Exhibit D**. ATC makes no claim that Twin Focus or any other party was under any obligation to pay CI's debts — or to provide funds to CI for any reason. In fact, ATC's only cited evidence — the Karger Deposition — does nothing to support ATC's assertion that CI had access to Twin Focus funds. On the contrary, the Karger Deposition merely evidences an intent to make further loans to CI, not an obligation to do so. As such, ATC's implied assertion that CI had an ability to pay the September 5 invoice lacks evidentiary support and is entirely inaccurate.

---

present here. *Birbara v. Locke*, 99 F.3d 1233, 1238-1240 (1st Cir. 1996) (quoting *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 233 N.E.2d 748 (Mass. 1968)).

[4] In reality, Twin Focus never invested in CI or loaned it any funds, though individuals affiliated with it did invest in CI and loan it funds through an investment vehicle, but not on behalf of Twin Focus. Ex. C ¶¶ 58-62; Ex. D ¶ 5.

Essentially, ATC's argument is that since CI had borrowed money from Twin Focus' partners in the past, CI had the ability to borrow more. But a Court evaluating whether a claimant has the ability to pay required arbitration fees should look only (1) to the claimant's assets and income and, if those are insufficient to pay required arbitration fees, (2) to the claimant's "genuine efforts" to make alternative payment arrangements. See Tillman, 2013 U.S. Dist. LEXIS 193817 at *7 (C.D. Cal., July 12, 2013) (affirmed, 825 F.3d at 1073-76 ("the Court is satisfied with her representations that the proceeds from the settlement in the Underlying Action have been exhausted and that she is unable to pay for her share of arbitration. (See Tillman Decl. at ¶¶ 1-12.)"); see also Ex. B. The plaintiff/claimant's "genuine efforts" in Tillman consisted of seeking to borrow the funds needed to pay the required arbitration fees. Ex. B ¶13(d). This is exactly what CI did. Having already borrowed $795,000, CI went back to its creditors and sought loans to pay the $207,900 AAA invoice, but the creditors declined to do so. See Section I(b), infra.

Under Tillman, an affidavit stating one's assets, income, and efforts to make alternative payment arrangements is sufficient to demonstrate inability to pay required arbitration fees. No hearing was required in Tillman because the court had sufficient evidence in the record to make a determination on the papers. The situation here is identical:  CI has submitted a declaration showing (1) that it has a bank balance that is far less than the amount of the September 5 invoice; (2) that it had only $77,576 in revenue during the pendency of this case and arbitration; and (3) that it sought to borrow funds sufficient to pay the required arbitration fees. ATC has failed to offer any contrary evidence. On these undisputed facts,[5] the Court should find that the arbitration was terminated because CI was unable to pay required arbitration fees.

---

[5] ATC relies on the deposition testimony of Paul Karger who discusses his intention to make further investments in CI, but never states that he (or anyone else) is under any obligation to do so.

(b) **CI made genuine efforts to raise the funds needed to pay the $207,900 September 5, 2019 AAA Invoice.**

In determining whether a claimant has the ability to pay required arbitration fees, courts look first to the claimant's assets and income, then – if such resources are insufficient – to the claimant's efforts to secure sufficient funds to pay those fees. Section I(a), supra. ATC does not dispute that CI lacked the resources to pay the September 5, 2019 $207,900 AAA invoice. Instead, ATC implies that CI failed to make genuine efforts to raise the required funds. But ATC cannot offer any evidence to support its position because CI did everything in its power to raise the required funds.

At the time CI received the September 5, 2019 $207,900 AAA invoice, it was cash poor and heavily in debt to the investor/creditors who had been financing its litigation and to its then-lawyers at King & Spalding ("**K&S**"). By that time, CI's investors had already told it that they were tapped out and that they could not loan it much more. Ex. D ¶¶ 11-13, 17, 21. The linchpin of CI's litigation funding strategy was a contingency agreement that it had worked out with K&S. Ex. C ¶ 27. So when in early October, 2019 K&S backed out of this contingency agreement, CI's ability to raise funds fell apart. Ex. D ¶ 21.

Well prior to receiving the $207,900 September 5, 2019 invoice, CI was struggling to pay litigation costs. Ex. C ¶ 26. As a direct result of ATC's contract breach and tortious acts, CI had very little revenue from the time it filed suit on June 15, 2018 through the termination of the arbitration, so it was forced to rely on borrowing to finance the litigation. Ex. C ¶¶ 58-63. As of August 22, 2019 (the date of the last invoice that CI received from K&S prior to the October 3, deadline to pay the September 5 invoice), CI owed K&S $1,241,343.12. Ex. C ¶ 26. As of Sep-

---

ATC Memo, at 11 citing DeVoogd Decl. ¶ 15 and Ex. H thereto. Neither Mr. Karger nor Twin Focus had any obligation (contractual or otherwise) to make any payment – loan, investment or otherwise – to CellInfo. Ex. D ¶¶ 27-28.

tember 5, 2019, CI had already borrowed $795,000 from investors to finance litigation and arbitration costs, including attorney's fees. Ex. C ¶¶ 58-62. CI had made repeated attempts to raise additional funding through litigation finance companies starting as early as June 2018 and continuing through June 2019 and had come close to securing millions of dollars in litigation financing four times — in September 2018, December 2018, March 2019, and April 2019 — but was stymied each time by the nondisclosure agreement in place in this matter, which prevented CI from providing the litigation financing companies with detailed information on the evidence in the case, which they required in order to provide financing. Ex. C ¶¶ 5-7, 9-10, 12, 15, 18-19, 20-21, 24-25. CI reached out to many other potential investors, but was not able to obtain financing from them. Ex. C ¶¶ 8, 16-17, 20, 22-23; Ex. D ¶ 24.

Faced with this inability to pay arbitration costs and legal fees, CI turned to K&S to see if the firm might be willing to take care of the remainder of the case on a contingency basis. Ex. C ¶ 27.  K&S agreed to do so on the condition that CI pay $300,000 in costs.[6] Ex. C ¶¶ 27, 33. On this understanding, CI secured commitments from its investors to loan the company a further $300,000. Ex. C ¶ 27; Ex. D ¶¶ 12-13, 17, 22. On August 30, 2019, CI received $130,000 in loans and then received another $50,000 on September 17. Ex. C ¶¶ 28, 34. On September 10 and 23, 2019, CI sent this $180,000 to K&S with the understanding that the funds would be used toward the payment of the $207,900 September 5 AAA invoice and that CI would only be required to pay K&S another $120,000 for the remainder of the arbitration, pursuant to the contingency agreement. Ex. C ¶¶ 31-34; Ex. D ¶¶ 15-16, 20. But on October 1, 2019, K&S informed CI that it would not be honoring the contingency agreement, that it had expended the $180,000

---

[6] K&S first set this figure at $250,000, but revised it to $300,000 after receipt of the September 5, 2019 AAA Invoice. Ex.C ¶¶ 27, 33; Ex. D ¶ 15.

for other purposes, and that CI would need to pay the AAA invoice itself. Ex. C ¶¶ 36, 41. CI then reached out to all of its investors asking them to loan it sufficient funds to pay the September 5 invoice, but they were unwilling to make further loans to pay the September 5 AAA invoice. Ex. A ¶ 16. Specifically, CI's CEO Victor Drouin and one of its member-managers, Paul Karger, solicited funds from the following individuals: Wes Karger, John Pantekidis,[7] John McGillian, James Berylson, and Jeff Parker. Ex. D ¶ 21. Paul Karger, had planned to make a loan to CI to cover the remaining $120,000 under the terms of the K&S contingency agreement, but was unable to do so because the funds that he had planned to use for this purpose (money that was due to him from another transaction) did not materialize. Ex. D ¶ 22.

CI made genuine efforts to raise the funds needed, but was unable to do so. Therefore, ATC's characterization of CI's inability to pay as a "refusal" to pay is inaccurate.[8]

## II.    ATC's Argument is Predicated on the False Assumption that CI's Motion to Reopen Relies Entirely on the Effective Vindication Doctrine.

The ATC Memo rests on the false assertion that "[t]he sole argument that CellInfo presents in support of its request to re-open this case, [is] that its arbitration obligation prevented access to justice" under the effective vindication doctrine. ATC Memo, at 1. On the contrary, **the effective vindication doctrine is only one of four independent bases on which the Motion to Reopen relies**. Even if, *arguendo*, this Court were to accept ATC's argument that the effective vindication doctrine does not apply here (which it should not for reasons discussed in Section III, Infra), CI would still be entitled to a trial on the merits of its claims against ATC (a) because the

---

[7] Paul Karger, Wes Karger, and John Pantekidis made their loans to CI through investment vehicles in which they were the only investors. Ex. D ¶ 5.
[8] In the interest of total transparency, CI is providing complete financial records showing all revenue, including loans, that it received from the commencement of the present action to present as **Exhibits 11, 21-22** to the Drouin Reply Declaration (Ex. C).

arbitration was concluded without resolving CI's claims through no fault of CI when CI was unable to pay further arbitration fees,[9] (b) because ATC waived its right to arbitrate the dispute when it declined to pay CI's portion of the remaining arbitration fees, and (c) if this Court finds that it has discretion whether to hear the case on its merits, the interest of justice and the public interest weigh in favor of trying the case. See Plaintiff CellInfo's Memorandum in Support of Its Motion to Reopen Case and Set Trial Date, at Sections IV.B.1, IV.B.3, and IV.C.

### III. Contrary to ATC's Assertion, the Effective Vindication Doctrine Applies Here.

ATC's attack on the applicability of the effective vindication doctrine to the present matter rests on ATC's erroneous interpretation of the Supreme Court's decision in *American Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 238-39 (2013). ATC claims that under *Italian Colors*, the effective vindication doctrine "may excuse a party from arbitration only in the limited circumstances where the parties have unequal bargaining power, and where the dominant party has the ability to impose or dictate an arbitration provision at the time of the contract that, as a practical matter, denies the other party any real access to arbitration." ATC Memo, at 11, citing *Italian Colors* at 235-236. But *Italian Colors* says nothing of the sort. Relative bargaining power, though relevant to claims of unconscionability, has nothing to do with the effective vindication doctrine.[10] On the contrary, *Italian Colors* holds that the effective vindication doctrine does not apply where "the prospective litigant effectively may vindicate its statutory cause of action in the

---

[9] The arbitration clause cannot act as a waiver of CI's right to a jury trial, since the arbitration was terminated and arbitration clauses only waive a right to a jury trial **during arbitration**, while a jury waiver waives the right to a jury trial **if the case proceeds in court**. *RREF RB-AL SLDL, LLC v. Saxon Land Dev., LLC*, 2012 U.S. Dist. LEXIS 54701, *7 (M.D. Ala. Apr. 19, 2012) ("It is well-settled that arbitration clauses and jury trial waivers present different issues…These are separate contractual provisions and may be enforced or waived separately.").
[10] See *Awuah*, 554 F.3d at 12-13; *Curtis v. Contractor Mgt. Servs.*, LLC, No. 1:15-cv-487-NT, 2018 U.S. Dist. LEXIS 197435, at *27 (D. Me. Nov. 20, 2018); *Escobar v. Celebration Cruise Operator, Inc.*, 805 F.3d 1279, 1291 (11th Cir. 2015).

arbitral forum." 570 U.S. at 235. Such vindication of rights is not possible where inability to pay required arbitration fees prevents access to the arbitral forum. But one of the firmly established sets of circumstances under which a prospective litigant cannot "vindicate its statutory cause of action in the arbitral forum" is when the litigant cannot afford arbitration fees. See, e.g., *Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 15 (1st Cir. 2009). The Supreme Court explicitly observed that the plaintiff/claimant in *Italian Colors* **could** afford arbitration fees, but that it was "not worth the expense" of those fees to pursue the small amount at issue. 570 U.S. at 236. Contrary to ATC's interpretation, "the existence of large arbitration costs [can] preclude a litigant . . . from effectively vindicating [its] federal statutory rights[.]" *Italian Colors* at 236, citing *Green Tree Financial Corp.-Ala. v. Randolph*, 531 U. S. 79, 90 (2000)).[11]

ATC also misstates the holding of *Awuah*, 554 F.3d 7, citing that case in support of its contention that the effective vindication doctrine is only available in a "forced arbitration." ATC Memo, at 12. But the *Awuah* court considered the question of whether the case involved a "forced arbitration" in the context of its analysis of the scope and validity of the arbitration clause, not in the context of whether the effective vindication doctrine applied. *Awuah*, 554 F.3d. at 12. Contrary to ATC's assertions, *Awuah* is instructive here: if arbitration fees are "structured so as to prevent a litigant from having access to the arbitrator to resolve claims…a court should. . . decide the entire dispute itself." 554 F.3d. at 15.

---

[11] In an apparent attempt to imply that *Italian Colors* overturned established law on the applicability of the effective vindication doctrine, ATC observes that "all of CellInfo's effective vindication cases pre-date the Supreme Court's decision in *American Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013)." But *Italian Colors* did not address the situation discussed in cases relied upon by CI in which a claimant's inability to pay arbitration fees renders the arbitration illusory. The explanation for CI's reliance on pre-2013 cases is not that these cases were overturned (one need only Shepardize them to determine that they were not), but rather that the effective vindication doctrine is established law, rarely disputed at the appellate level, at least in situations where a claimant's inability to pay arbitration fees renders the arbitration illusory.

IV. **ATC Inaccurately Claims that the Court Previously Ruled Against the Applicability of the Effective Vindication Doctrine to this Case.**

ATC claims that the Court already ruled that the effective vindication doctrine does not apply to this case. ATC Memo, at 1 ("The Court, however, has already concluded that such an argument is not available to CellInfo."). While the Court's decision touches on unconscionability,[12] it does not so much as mention the possibility of the effective vindication doctrine applying to this case, let alone ruling it out. Nor could the Court have rendered an opinion on this question, since the issue was not yet ripe. At the time, CI had no way of knowing that the arbitration would be so expensive or how much revenue and investment it would generate. See Ex. A ¶ 23.

V. **ATC Mischaracterizes the Tribunal's Decision on Its Motion For Relief Under Rule R-57, Inaccurately Claiming that the Court Ruled Against the Applicability of the Effective Vindication Doctrine.**

ATC asserts that the Tribunal ruled that the effective vindication doctrine does not apply to this case. ATC Memo at 10. But the Tribunal made no such ruling. Rather, it invited CI to seek any further relief relating to this matter "in any other forum," including this Court. Opinion and Order, March 4, at 7. The Tribunal explicitly found that AAA rules provided for the termination of the arbitration without looking into the applicability of the effective vindication doctrine. Opinion and Order, March 4, at 5, 7.

## CONCLUSION

For these reasons and as discussed in Plaintiff CellInfo. LLC's Memorandum in Support of it Motion to Reopen Case and Set Trial Date, the Court should grant CI's Motion.

---

[12] Unconscionability is not at issue here and has no prong in common with the effective vindication doctrine. While unconscionability looks to whether a party was forced into arbitration by a more powerful counterparty, the effective vindication doctrine asks whether the arbitral forum is able to resolve the plaintiff/claimant's claims or if the arbitral forum is "illusory" because it cannot do so. See *Curtis v. Contractor Mgt. Servs.*, LLC, No. 1:15-cv-487-NT, 2018 U.S. Dist. LEXIS 197435, (D. Me. Nov. 20, 2018).

DATED: September 10, 2020

CellInfo, LLC
By Its Attorneys,

/s/ Kenneth R. L. Parker
Kenneth R. L. Parker (BBO #688987)
Shaun P. Keough (BBO # 688868)
PARKER KEOUGH LLP
*Street Address:*
  51 Winchester St., Suite 205
  Newton, MA 02461
*Mailing Address:*
  P.O. Box 590006
  Newton, MA 02459
Tel.: (617) 841-2418
Fax.: (617) 963-8315
E-mail: kparker@parkerkeough.com

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF and paper copies will be sent to those indicated as non-registered participants on this September 10, 2020.

/s/ Kenneth R. L. Parker
Kenneth R. L. Parker (BBO #688987)