1                UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS (Boston)

3                          No. 1:18-cv-11250-WGY

4

5     CELLINFO, LLC,
                  Plaintiff
6

7     vs.

8

9     AMERICAN TOWER CORPORATION, et al
                  Defendants
10

11                         *********

12

13

14                    For Zoom Hearing Before:
                      Judge William G. Young

15

16                     Evidentiary Hearing

17                  United States District Court
                    District of Massachusetts (Boston)
18                  One Courthouse Way
                    Boston, Massachusetts 02210
19                  Thursday, September 17, 2020

20

21                         ********

22

23            REPORTER: RICHARD H. ROMANOW, RPR
                      Official Court Reporter
                    United States District Court
24       One Courthouse Way, Room 5510, Boston, MA 02210
                     bulldog@richromanow.com

25

```
 1                A P P E A R A N C E S

 2


 3   KENNETH R. L. PARKER, ESQ.
        965 Walnut Street
 4      Newton, MA 02461
        (617) 275-3040
 5      Email: Ken@kennethparkerlaw.com
     and
 6   NATHANIEL J. LICHTIN, ESQ.
        Parker Keough, LLP
 7      51 Winchester Street, Suite 205
        Newton, MA 02461
 8      (857) 231-3192
        Email: Nlichtin@parkerkeough.com
 9      For Plaintiff

10

11   JAMES M. WODARSKI, ESQ.
     THOMAS H. WINTNER, ESQ.
12   ANDREW DeVOOGD, ESQ.
     DANIEL B. WEINGER, ESQ.
13      Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
        One Financial Center, 42nd Floor
14      Boston, MA 02111
        (617) 348-1855
15      Email: Jwodarski@mintz.com
        For Defendants

16

17

18

19

20

21

22

23

24

25
```

```
1                    I N D E X

2

3  PRELIMINARY MATTERS...........................    4

4  OPENING STATEMENT BY MR. PARKER................    5

5  OPENING STATEMENT BY MR. WODARSKI..............   12

6

7  WITNESS                DIRECT  CROSS  REDIRECT  RECROSS

8

9  VICTOR N. DROUIN

10    By Mr. Parker:        20              100

11    By Mr. Wintner:            65

12

   JOHN PANTEKIDIS
13
      By Mr. Parker:       111
14
      By Mr. Wodarski:
15

16  WESLEY KARGER

17    By Mr. Parker:       117

18    By Mr. Wodarski:

19

20                    E X H I B I T S

21                   (All premarked.)

22

23

24

25
```

```
 1          P R O C E E D I N G S
 2          (Begins, 9:00 a.m.)
 3          THE CLERK:  Now hearing Civil Matter 18-11250,
 4   CellInfo versus American Tower Corporation, et al.
 5          THE COURT:  Good morning, counsel.  This is a
 6   hearing held on our zoom platform.  It's hosted by
 7   Courtroom Deputy Clerk, Jennifer Gaudet.  On the line is
 8   our Official Court Reporter, Rich Romanow, and my law
 9   clerk.  This is an official proceeding of the court and
10   therefore it is open to the press and public and we'll
11   keep that in mind.  I have no way of knowing whether any
12   members of the press or public are present, but if they
13   are, I must tell them to keep their microphones muted
14   and that the rules of court remain in full force and
15   effect, that is there is no rebroadcast, streaming,
16   taping, or other transmission of this proceeding.
17          With that taken care of, would counsel introduce
18   themselves and who they represent.
19          MR. PARKER:  Good morning, your Honor, my name is
20   Ken Parker and I represent the plaintiff in this matter,
21   CellInfo, LLC.
22          THE COURT:  Thank you.
23          MR. WODARSKI:  Good morning, your Honor, this is
24   Jim Wodarski representing the American Tower defendants,
25   and with me today on the video conference is Tom
```

1    Wintner, Andy DeVoogd and Dan Weinger.

2         THE COURT:  And you are all welcome.

3         MR. WODARSKI:  Thank you.

4         THE COURT:  All right.  I'm going to have --

5         MR. PARKER:  Oh, I neglected to mention I'm joined

6    by a colleague as well, Nathaniel Lichtin is also here.

7         THE COURT:  Thank you.  All of you are welcome.

8         Now while I've read all of the materials, I do not

9    have -- though mention has been made, I understand, of a

10   packet of exhibits.  I don't think that should slow us

11   down, but I'm going to have to have the exhibits -- at

12   least those that we enter in evidence in this hearing,

13   I'm going to have to have them in hand.  But that ought

14   not slow us down in taking evidence this morning.

15        Even though I've reflected on this and talked it

16   over with the law clerk and prepared myself for this

17   hearing, I think I would be aided by brief openings, not

18   to exceed 10 minutes.  No one has to do that, but I

19   offer you that chance.

20        And, Mr. Parker, the burden of proof here is on

21   you and I will hear you.

22        MR. PARKER:  Thank you, your Honor.

23

24   OPENING STATEMENT BY MR. PARKER:

25        CellInfo provided services under a contract to

1    American Tower Corporation and the other defendants.

2    Included in this contract was a confidentiality

3    provision.  The defendants took the -- breached the

4    contract, misappropriated the trade secrets, and then

5    proceeded to, um -- while they were still under contract

6    with CellInfo, your Honor, they set up a secret working

7    group to copy CellInfo's technology.  That working group

8    had substantial overlap, your Honor, with the people who

9    were supposedly working with CellInfo to use the

10   technology -- their technology, in fact it was a

11   majority of the people who overlapped.

12         After misappropriating the trade secrets and

13   breaching the contract, um, CellInfo -- after, I should

14   say, the defendants misappropriated CellInfo's trade

15   secrets and breached the contract, they were -- the

16   defendants were in a very -- I'm sorry, CellInfo was in

17   a very difficult position because it had designed its

18   business to accommodate the service needs of American

19   Tower.  And so it has very little revenue from other

20   sources.  In fact there's really only one other revenue

21   source it has remaining during the course of this

22   litigation and it brought in about $40,000 a year, it

23   totaled about $77,000 from that source.  And so during

24   the litigation it had very little income and was very

25   cash-poor having tens of thousands, but not hundreds of

1    thousands of dollars in the bank.

2         The litigation was very expensive, your Honor.

3    King & Spaulding charged approximately $2 million --

4    actually I believe -- no, sorry, I believe the total

5    charges of King & Spaulding were about $1.5 million, and

6    then there were hundreds of thousands in arbitration

7    fees on top of that.  Over the course of the litigation

8    CellInfo attempted to raise money from litigation

9    financing companies, but the protective order that was

10   in place prevented CellInfo from raising money, so

11   instead it was forced to rely on borrowing.  It borrowed

12   funds from several individuals, primarily -- well mostly

13   from --

14        THE COURT:  Well let me interrupt you because one

15   aspect I don't follow.  When you say the protective

16   order prevented it from going to the market, what

17   protective order do you mean?

18        MR. PARKER:  There is a protective order in place

19   in the case and we have lots of correspondence from King

20   & Spaulding saying "Oh, we went" -- right now my clients

21   are not even able to see most of the documents.  In

22   other words, CellInfo doesn't get to see a lot of what

23   ATC disclosed, because it's highly confidential.  Those

24   highly-confidential documents were not available to

25   prospective litigation finance companies.

1          And you'll hear in the evidence, your Honor, that

2     they went to five different litigation finance companies

3     and in most cases the litigation finance company said

4     "We'll give you million of dollars to finance this

5     litigation," but of course they wanted something in

6     return.  But all the -- and the deals, all but one got

7     to that point of "Okay, we need to do our due diligence,

8     we need now to get the documents that will let us see

9     your case.  We want to see all the documents," and

10    unfortunately the protective order prevented that from

11    happening.  And you'll see correspondence from several

12    of these litigation finance companies in evidence where,

13    um, Nate Drouin, Victor Nate Drouin --

14          THE COURT:  Let me try, Mr. Parker, to cut to the

15    chase here, though you're addressing it and addressing

16    it very well.  But here's what my reading, um -- here's

17    what's on my mind as we start.  And I try to be

18    transparent.  My mind is open, but here are the issues

19    I'm wrestling with and I think these are the appropriate

20    issues.

21          You, that is CellInfo, probably has the better of

22    it if we're looking at the economic wherewithal if I

23    look just to the corporation, that was your last point

24    when we were discussing the matter before.  Probably

25    that's right.  And the financial resources of various

1    investors and what they were willing to put up and the

2    like, probably isn't going to make much difference here.

3    It's funds that CellInfo had or could raise because it's

4    the good faith of CellInfo, the corporate entity, that's

5    key here.

6         I'll give you my impression.  CellInfo was in a

7    hopeless position from the get-go when they agreed to

8    this arbitration agreement.  And I'll be interested to

9    know, um, whatever led them into this.  Arbitration is

10   expensive.  So I don't see how, um, absent litigation

11   financing, I don't see how they're going to get money to

12   support three-person private arbitration at any stage.

13        So at the point where the corporation recognized

14   they no longer could finance it, um, in judging whether

15   they were in good faith, I suppose the argument could be

16   made that they went into this thing eyes open and with

17   the idea that they could always pull out and get back

18   into court, and that doesn't -- that isn't supported by

19   the controlling cases.  I just want you to know that's a

20   matter of concern to me.  So maybe you could briefly

21   address that -- address that in your opening.

22        MR. PARKER:  Yes, your Honor, I will.  Thank you

23   for that.

24        CellInfo went into this believing that it would

25   have no problem financing the arbitration for two

1    reasons.  Reason Number 1 is they expected to get

2    litigation financing, and in fact they were supported in

3    that belief by their law firm, King & Spaulding.  There

4    are e-mails from Jim Brogan in the evidence we produced,

5    attached to the reply memo, in which he talked about how

6    he expects litigation financing to be in place.

7        Second, they expected to be able to do the case on

8    contingency.  Lawyers were very enthusiastic about the

9    case and were not charging -- and were hoping for

10   contingency.  In fact, King & Spaulding took the

11   position that they did not require any initial detainer,

12   they were so confident that this was a slam-dunk case.

13   They were saying, "We'll let the invoices accumulate and

14   get paid at the end."  That was not the formal

15   arrangement, but they didn't -- and as you'll see from

16   the evidence, as of August of 2019 -- in other words the

17   month before they received this $208,000 arbitration

18   invoice, CellInfo had a debt to King & Spaulding of

19   approximately $1.25 million -- I think more precisely

20   $1.26 million it owed to King & Spaulding, and King &

21   Spaulding was not chasing them for that.

22       King & Spaulding, in fact, in August of 2019,

23   said, "You know what?  All we want you to pay for the

24   entire rest of the case is another $250,000 in hard

25   costs."  And Nate Drouin, the CEO of CellInfo, sent an

1  e-mail saying, "We've got to raise another $250,000,"

2  and they got the commitment for that.  They then

3  transferred 180 of that to King & Spaulding to pay costs

4  and were in the process of raising -- King & Spaulding

5  subsequently increased that number to $300,000, after

6  they saw the September 5th invoice, and CellInfo was in

7  the process of raising the remaining $120,000 that was

8  needed to get over --

9       Just keep in mind, your Honor, the arbitration

10 trial was scheduled two months out.  So we were ready to

11 go.  They thought they were in the home stretch.  All

12 discovery was completed.  And it is completed, your

13 Honor, as the other side has acknowledged.  We're ready

14 to go to trial.  Um --

15      THE COURT:  Well that's 10 minutes.  Let me give

16 Mr. Wodarski a chance.

17      If you -- there's no requirement that you open at

18 all, Mr. Wodarski, and certainly no requirement that you

19 open now, but as I've afforded Mr. Parker 10 minutes,

20 I'll give you the same at this time, if you wish.

21      MR. WODARSKI:  Thank you, your Honor, I'll take a

22 few moments.

23      THE COURT:  Yes.

24      MR. WODARSKI:  I appreciate the opportunity to

25 speak with you today, your Honor.

1

2    OPENING STATEMENT BY MR. WODARSKI:

3         Today we're going to use this evidentiary hearing

4    to show you that CellInfo is and always has been in

5    reality a business that is co -- that was co-founded and

6    was always co-managed by a tight group of high-networked

7    individuals.  They have the funds, your Honor, and

8    they've shown over time that they can raise funds for

9    CellInfo whenever they want, for whatever purpose,

10   except for one thing, the remaining Triple A arbitration

11   fees.

12        No law, including *Tillman,* allows a corporation,

13   largely supported by wealthy investors, to pick and

14   choose what litigation expenses they'll pay for, whether

15   that's for strategic reasons or otherwise.  But here,

16   your Honor, I think we'll be able to demonstrate for you

17   that it's clearly a strategic reason, avoiding

18   arbitration.

19        The gravamen of their argument is to try and hide

20   behind CellInfo's checking account and the lack of funds

21   deposited in it, but, your Honor, the reality is that

22   has never been the place anyone has looked to to figure

23   out whether CellInfo could pay for the litigation costs,

24   it has always been exclusively up to CellInfo's friends

25   and family investors.  And that's why the arbitration

1    panel, your Honor, in their last order, referred to the

2    CellInfo litigation financers as the real party in

3    interest, your Honor.

4         Where everyone has always looked is this tight

5    group of friends and family investors, your Honor, and

6    they have the funds, and they have shown, by their own

7    conduct, a capacity to pay litigation expenses, and

8    that, under any case law, should end the analysis.

9    CellInfo's argument, in the end, is simply an attempt to

10   gain the system, your Honor, and you shouldn't allow it.

11        If the law is permitted to over-extend to cover a

12   scenario like this, it produces troubling consequences,

13   as you alluded to in the exchange you just had with

14   Attorney Parker.  These are sophisticated parties, as

15   you've already determined as the law of the case, they

16   negotiated at arm's length with the assistance of

17   counsel, and they went, to use your words, into

18   arbitration with "eyes wide open."

19        So sensitive to your comments, your Honor, I will

20   end with, um, acknowledging and agreeing with you that

21   if you look solely to CellInfo's checking account, it is

22   a hopeless position from the outset.  But, your Honor,

23   that raises the additional problem that we have argued

24   and that the panel acknowledged in arbitration, that if

25   that is really the case and this argument existed and

1    was appropriate to raise, the time to raise it was in

2    October of 2018 when they were before you originally

3    prior to this case going to arbitration.  To raise it

4    now is an artifice and attempt to accomplish an

5    impermissible strategic objective, and the prejudice

6    that results is manifest for CellInfo.

7         And so, your Honor, we will not present any

8    witnesses today but we look forward to crossing the

9    witnesses and would ask, at the conclusion, that you

10   make the facts consistent with my opening comments and

11   deny the motion to reopen.

12        THE COURT:  Thank you.  I understand that and

13   that's a logical position and we'll see, the facts may

14   warrant that determination.  I will tell you though that

15   if I were to find that they were in good faith here, um,

16   then it does seem that there has to be some remedy.

17   Arbitration, perhaps sought in good faith, if that fails

18   because of, um, the impecunious situation of CellInfo,

19   to leave them remediless does not commend itself to the

20   Court.  But we'll see where we go.

21        Very well, Mr. Parker.  But there is one

22   housekeeping matter at the beginning.  You submitted a

23   list of witnesses and that's helpful, but you're on it.

24   I'm not going to hear any evidence from you.

25        MR. PARKER:  No, I'm not on the list of witnesses,

1    your Honor.
2         THE COURT:  Who is Jeffrey Parker?
3         MR. PARKER:  Jeffrey Parker is an investor in
4    CellInfo.
5         THE COURT:  Oh, I'm sorry.
6         MR. PARKER:  He's 77 years old, your Honor, and I
7    am not he.
8         THE COURT:  All right, thank you.  You've answered
9    my question.  You may call your first witness.
10        MR. PARKER:  Thank you, your Honor.  I'd like to
11   call --
12        MR. WODARSKI:  Your Honor, may I?  I hate to
13   interrupt you, Attorney Parker, but may I ask the Court
14   to address some housekeeping issues?
15        THE COURT:  Sure.
16        MR. WODARSKI:  Okay.  Your Honor, I have three I'd
17   like to quickly discuss with you.
18        First, your Honor, today, during our cross-
19   examinations, you'll hear us, um, speak with Mr. Jim
20   Doyle, he's a graphics vendor who's signed a protective
21   order undertaking and he'll help us with exhibits today.
22        Second, your Honor, um, today we may make
23   reference, during cross-examination, to some sealed
24   documents and we had an exchange by e-mail to Attorney
25   Parker and I think the outcome of that is for us to

 1    raise it with you and see what your guidance might be.

 2         And third, your Honor, um, the defendants would

 3    like a sequestration order from you that, um, because

 4    this is a zoom platform, that we have witnesses yet to

 5    testify, that they exit the zoom platform until they're

 6    invited to return, and have the sides agree that there

 7    will be no realtime communication through other media,

 8    um, with witnesses before they testify.

 9         THE COURT:  Let's take the last one first.  I'm

10    disposed to grant that.

11         No objection, Mr. Parker?

12         MR. PARKER:  We don't think sequestration is

13    appropriate here, your Honor, because this isn't a

14    high-publicity civil trial with --

15         THE COURT:  That's not the point, this is a --

16    sequestration protects the integrity of the testimony of

17    the witnesses.  And while you are entitled, it seems to

18    me, to have your -- and you can pick one of these

19    people, your CEO would be the logical one, with whom you

20    can consult as the hearing goes on, it does seem to me

21    that I ought order everyone else off the platform,

22    unless they are testifying, and further order that there

23    be no communication between these witnesses about their

24    testimony.  And I do so order.

25         Who are you going to keep close at hand,

```
 1    Mr. Parker?

 2          (Pause.)

 3          THE CLERK:  Mr. Parker, you're on mute.

 4          MR. PARKER:  I am?  I did not mute.

 5          THE CLERK:  Yes, you're unmuted now.

 6          THE COURT:  Now you're not.

 7          Who are you going to keep close to hand?

 8          MR. PARKER:  Victor Nate Drouin, your Honor, the

 9    CEO of CellInfo.

10          THE COURT:  That's fine.  The others are

11    sequestered.

12          With respect to --

13          MR. PARKER:  Your Honor, as a practical matter how

14    are we to notify the others that you'd like them to come

15    on?

16          THE COURT:  They're in the -- they simply leave

17    the -- well I'll confer with Ms. Gaudet, but I assume

18    they leave the meeting but remain in the waiting room.

19    You say you'll call the next witness, Ms. Gaudet, um,

20    connects them in.

21          Let me ask her if that works?

22          THE CLERK:  That will work, Judge, yes.  They'll

23    need to leave the meeting first and then rejoin it and

24    wait in the waiting room.

25          THE COURT:  Right.
```

1       Did you get those instructions?

2       MR. PARKER:  Your Honor, not all of our witnesses

3   could have heard those instructions as not all of our

4   witnesses have joined the call yet.

5       THE COURT:  You have colleagues, inform them.

6   That's the order of the Court.

7       MR. PARKER:  Thank you, your Honor.

8       THE COURT:  All right.

9       Now with respect to sealed documents, I, um -- I

10  am skeptical.  Of course trade secrets must be held as

11  sealed, but beyond that I'm not clear what will be

12  sealed.  But I propose to give both sides the greatest

13  latitude to develop their case and we'll go document by

14  document.

15      As to the first issue, Mr. Wodarski, of course you

16  may confer with your document presenter, um, he's under

17  the protective order.

18      Does that answer your question?

19      MR. WODARSKI:  It does, your Honor.  And just on

20  the point of, you know, the documents, it would be

21  defendants' position that we're fine, before we even get

22  started, with a blanket agreement that whatever the

23  parties want to refer to today is fine on our side.

24      THE COURT:  I assume that Mr. Parker agrees and

25  we'll go forward with that understanding.

1          MR. PARKER:  I'm not sure I understood what he

2     said, your Honor?  Any document -- I missed a word

3     there.

4          THE COURT:  That you have no objection to

5     reference being made to any documents of which

6     disclosure has been made during the course of this

7     proceeding.

8          MR. PARKER:  So just to be clear, the documents

9     we're presenting are all of a financial nature, those

10    are the sealed documents, the finances of CellInfo, and

11    we do not have an objection to references being made to

12    those documents.

13         THE COURT:  Thank you.  You may call your first

14    witness.

15         MR. PARKER:  Thank you, your Honor.  I would like

16    to call to the stand Victor Nathan Drouin.

17         THE COURT:  He may be called and the Clerk will

18    swear him.

19         THE CLERK:  Judge, I do see a couple of people

20    that are still on the call that are on the witness list,

21    um, Jeffrey Parker, Paul Karger, are still visible to

22    me.

23         THE COURT:  Thank you.

24         Mr. Parker, Mr. Karger, I've entered a

25    sequestration order.  You must leave the call at this

1    time and, um, counsel will instruct you when you are

2    needed, and then you can join this proceeding again and

3    we'll let you in.  Thank you for your cooperation.

4           All right.  Let's swear the first witness.

5           THE CLERK:  I do not see the witness, Judge -- Oh,

6    okay.

7           THE COURT:  Okay.

8           (VICTOR N. DROUIN, sworn.)

9           MR. PARKER:  Thank you.

10

11          * * * * * * * * * * * * * * * *

12          VICTOR N. DROUIN

13          * * * * * * * * * * * * * * * *

14

15

16   DIRECT EXAMINATION BY MR. PARKER:

17   Q.   Would you please state your full name for the

18   record.

19   A.   Victor Nathan Drouin.

20   Q.   And what is your role in CellInfo?

21   A.   I am the founder, President, and CEO.

22   Q.   When did you found CellInfo?

23   A.   Around 2014, 2015.

24          THE COURT:  How do you spell your last name,

25   Mr. Drouin?

1          THE WITNESS:  D-R-O-U-I-N.

2          THE COURT:  Thank you.

3    Q.    So I'd like to start, Mr. Drouin, in August of

4    2019, the month before you received the infamous

5    $208,000 Triple A invoice.

6          What was the financial condition of CellInfo at

7    that time?

8    A.    Terrible.

9    Q.    How much money did you have in the bank when you

10   received that invoice?

11   A.    I believe around $20,000.

12   Q.    I'd like to call your attention to Exhibit Number

13   1, please.

14   A.    (Looks.)

15         THE COURT:  You're speaking as though the parties

16   have agreed upon these exhibits, and it makes sense if

17   you have and we'll proceed that way.  I'll take my notes

18   as though it's agreed upon.  And I leave it to both of

19   you, if it's not agreed, um, to let me know.  But we'll

20   assume that Exhibit Number 1 is before the Court.  And

21   so I will review it carefully before entering any

22   findings or rulings.  Exhibit 1.  Go ahead.

23   Q.    Can you identify this document, Mr. Drouin?

24   A.    Yes, it appears to be a general ledger of January

25   to December 2019.

1    Q.    And can you look -- and look at August 22nd, 2019,

2    the date you received the King & Spaulding invoice, um,

3    and tell me how much money CellInfo had in the bank at

4    that time?

5    A.    (Looks.)  It appears as if it was $23,881.02.

6    Q.    Okay.  Now I'd like you to take a look at Exhibit

7    Number 9, please.

8    A.    (Looks.)  Okay.

9    Q.    Can you identify that document?

10   A.    Yes, it's an invoice sent to us from King &

11   Spaulding for work, it appears, from July of 2019 and a

12   list of outstanding invoices as well.

13   Q.    All right.  And in preparation for this hearing

14   did you total up the amount of the outstanding invoices

15   listed on that?

16   A.    I did.

17   Q.    And what is that total?

18   A.    Approximately $1.25 million.

19   Q.    And did you have the ability to pay that invoice

20   at that time?

21   A.    No.

22   Q.    What was your understanding from King & Spaulding

23   as to their expectation as to whether you would need to

24   pay that invoice at that time?

25   A.    When this invoice came out, um, Paul and I spoke

1   with Jim Brogan.  We recently had another litigation

2   finance firm that we were counting on back out due to

3   the protective order and, um, King & Spaulding, Jim

4   Brogan had informed us that his management and he agreed

5   that they would take the case on contingency, um,

6   provided that we pay the $250,000, um, of "expense

7   funds," if you will, and that these fees would be

8   deferred until after the case was over.

9          THE COURT:  Who is Jim Brogan?

10         THE WITNESS:  Jim Brogan was our former attorney

11  from King & Spaulding.

12         THE COURT:  Thank you.

13  Q.    And so, um, after Jim Brogan agreed to the

14  $250,000 cap, you received the invoice at some point

15  thereafter on September 5th from the, um -- from the

16  Triple A arbitration panel, is that correct?

17  A.    That's correct.

18  Q.    And, um, when you received that invoice, do you

19  remember the amount of that invoice?

20  A.    Yes, I believe it was $207,800 or 900 dollars.

21  Q.    And, um, did you have the funds to pay that

22  invoice?

23  A.    The invoice was due in two parts, half of it was

24  due on October 3rd and I believe the other half was due

25  on October 31st.  We had -- after we had come to the

1    arrangement with King & Spaulding for $250,000, we went

2    to our investors and told them that this was the last

3    check that they would have to write, um, and, um,

4    they -- I believe at the time the invoice came in, we

5    had around $130,000 in the bank and we did have, at that

6    time, the ability to pay the 50 percent, um, payment to

7    Triple A.

8    Q.    And did you pay the 50 percent payment to the

9    Triple A?

10   A.    No.

11   Q.    Why not?

12   A.    Um, I forwarded the -- Jim Brogan forwarded it to

13   us, to Paul Karger and I, and he said, "Let's have a

14   call on this," and, um, he said, "Send the money to me

15   instead, it will count towards your $250,000, and we

16   will pay Triple A."

17   Q.    All right.  Could you please turn to Exhibit 15.

18         THE COURT:  There's another name.  Who else is

19   supposed to be on this call, a person by the name of

20   "Carter."  Who's that person?

21         MR. PARKER:  "Karger," your Honor, K-A-R-G-E-R.

22         THE COURT:  Thank you.  Well I'll ask the witness.

23         MR. PARKER:  Sorry, your Honor.

24         THE COURT:  Who is Mr. Karger, Mr. Drouin?

25         THE WITNESS:  Excuse me?

1           THE COURT:  Who is Mr. Karger?

2           THE WITNESS:  Mr. Karger is Paul Karger, one of my

3     creditors and also an equity owner in CellInfo.

4           THE COURT:  Thank you.

5           You'll understand that while I have affidavits and

6     briefing and the like, this is an evidentiary hearing

7     and so I like to hear things from the witnesses who are

8     under oath, that's why I proceed in this fashion.  So if

9     I ask questions, unless I make it clear that I'm asking

10    the attorney some legal question, I'm asking you.  And

11    you did just right.  Thank you.

12          THE WITNESS:  I understand, your Honor.  Thank

13    you.

14          THE COURT:  All right.

15    Q.    So, Mr. Drouin, could you please take a look at

16    Exhibit 15.

17    A.    Yes. (Looks.)

18    Q.    Do you recognize this document?

19    A.    I do, yes, sir.  Yes.

20    Q.    Would you identify it for the Court, please.

21    A.    This is a -- this is -- I had forwarded, um, the,

22    um -- this is an e-mail, sorry, that appears that Jim

23    Brogan had sent myself and Paul Karger and I, which was

24    a copy of the Triple A invoice.  Paul Karger responded

25    to myself, Wes Karger, and John Pantekidis, and said,

1  um, "208,000, we owe half now.  We have it."  Wesley

2  Karger said, um -- yes?

3  Q.  Can we start by reading from the beginning of this

4  chain with the person at the bottom.  There's an e-mail,

5  um, and if you would look at Page 2 and look at the

6  first e-mail in the chain.

7  A.    Yes.

8  Q.    Who is that e-mail from?

9       THE COURT:  Mr. Parker, in the interests of time,

10  we'll understand you've referred to this by number, I

11  take it there's no objection, Exhibit 15 is before the

12  Court.  Though literally I don't have it, but I'm going

13  to have it before I make findings and rulings.  So you

14  don't have to have him read it.  Just go from there.

15       MR. PARKER:  Thank you, your Honor.

16  Q.    All right.  So you were saying then that this is

17  an e-mail from the Triple A -- and can you please

18  identify what was the Triple A saying on Page 2 of this

19  e-mail?

20  A.    The Triple A had attached an attachment which was

21  in fact the invoice of $207,000 and some change, um, and

22  this e-mail was forwarded to us from our attorney with

23  that invoice.

24  Q.    And then at the beginning of the chain there's an

25  e-mail from Mr. Brogan to Mr. Karger and cced to you,

1   you were a recipient of this.  What did Mr. Brogan, um,

2   say in that e-mail?

3   A.    Um, I don't believe he says anything -- he didn't

4   say anything.

5   Q.    Can you just read the top line of that e-mail,

6   please.

7   A.    Which page?

8   Q.    On Page 1.

9   A.    On Page 1 the top line is "Agree as well."

10  Q.    I might be looking at the wrong exhibit then.  Oh,

11  okay.  Sorry.

12        All right.  Please read below the e-mail from Paul

13  Karger to, um -- I have pages stuck together.  My

14  apologies.  The e-mail from Paul Karger to the -- to you

15  and others.

16  A.    He said, "208,000, we owe half now.  We have it."

17  Wesley replied, "Agree, let's satisfy."  John Pantekidis

18  said, "Agree," as well.

19  Q.    Okay.  And did you in fact pay half that invoice

20  then?

21  A.    No.

22  Q.    Why not?

23  A.    Because before we could Jim Brogan enticed us to

24  send him the money that we had in the bank to his IOLTA

25  account as part of our contingency agreement with him.

1    Q.    You say -- no, go ahead.

2    A.    He would forward the money to the Triple A.

3    Q.    How much?

4          THE COURT:  How much did you pay Brogan?

5          THE WITNESS:  At that time we paid $130,000, and

6    about a week or 10 days later we paid him another

7    $50,000, for a total of $180,000, your Honor.

8          THE COURT:  Thank you.

9    Q.    So what did you expect Jim Brogan and King &

10   Spaulding to do with this $180,000 you sent them?

11   A.    Exactly what they said they were going to do, is

12   to pay arbitration fees.

13   Q.    And so am I correct that if they paid $180,000 of

14   the arbitration fees using this money, they would --

15   well how is the rest -- my question is how would the

16   remaining $29,000 have gotten paid?  The 28,000 had

17   gotten paid.

18   A.    Paul Karger had committed to putting up the

19   balance of the money to get us to $250,000.

20   Q.    And you say $250,000 was the contingency amount

21   that, um, King & Spaulding agreed to.  Did they ever

22   change that number?

23   A.    Yes, they did.  From the time that -- in August

24   when that $1.25 million invoice came out when they told

25   us they were taking it on contingency, by the time we

1    actually got the paper that said, you know, "Here is

2    your contingency agreement," et cetera, um, that number

3    had changed to $300,000.

4    Q.    And when you say it had changed, in what form did

5    they change that number to $300,000?

6    A.    They -- they told us we needed to pay $250,000 and

7    now they told us that we had to pay $300,000.  They

8    argued that it was because the Triple A bill was higher

9    than they expected.

10   Q.    Let me ask more clearly.  Did they put that in a

11   document, was there an agreement that they sent you with

12   that $300,000 figure?

13   A.    Yes, there was.

14   Q.    Can you describe that document?

15   A.    It was a revised engagement agreement with King &

16   Spaulding.

17   Q.    (Pause.)  Let's take a look at Exhibit 10 for a

18   moment.  Can you pull up Exhibit 10 and hopefully I'll

19   pull up the right exhibit too?

20   A.    Yes.

21   Q.    Can you identify Exhibit 10, please.

22   A.    This is an e-mail from myself to Paul Karger, Wes

23   Karger, John Pantekidis, James Beryson, Jeffrey Parker,

24   and John McGillian.

25   Q.    Okay.  Can you read me the third paragraph of the

1   e-mail, please.

2   A.   "Our expenses" --

3   Q.   Yes, that one.

4   A.   "Our expenses to finish this case are projected at

5   $250,000.  Paul has personally pledged $100,000 of this,

6   so we need $150,000."

7   Q.   And after you sent that e-mail, did the investors

8   respond and agree to fund that additional $150,000?

9   A.   Yes.

10   Q.   Can you tell us who came up with money at that

11   point?

12   A.   James Berylson, Jeffrey Parker, and John McGillian

13   -- and Paul Karger's commitment.

14   Q.   Okay.  And of those, who actually provided that

15   $180,000, do you remember?

16   A.   I believe it was James Berylson, Jeffrey Parker,

17   and John McGillian.

18   Q.   And did Jeffrey Parker pay his commitment of

19   $100,000?

20   A.   No.

21   Q.   Did he say why he didn't?

22   A.   Yes, he was waiting on liquidity from an

23   investment.

24   Q.   When you say he was "waiting on it," what would

25   happen with that investment to the best of your personal

1   knowledge?

2   A.    To the best of my personal knowledge he had an

3   investment that had, um -- that had promised to be

4   sending him a distribution, um, or a repayment, I'm not

5   sure which one, um, in the amount of, I believe,

6   $120,000.  I believe the investment name was "Acapela."

7   He was getting regular e-mails that "Funds are coming,"

8   "Funds are coming," um, and Paul Karger claims that

9   those funds never came.

10  Q.    And, um, can we turn back to Exhibit 1, please.

11  Can you pull that up, please.

12  A.    (Looks.)  Okay.

13  Q.    And can you identify in this, um, document the

14  amounts the $130,000 transfer to -- on September 10th

15  that you referenced earlier to King & Spaulding?

16  A.    (Looks.)  Okay.

17  Q.    Do you see it?

18  A.    I do.

19  Q.    Okay.  And is it your testimony -- what day do

20  you -- is it your testimony that you wired that $130,000

21  on that date?

22  A.    It is.

23  Q.    And do you know when you wired the remaining

24  $50,000, um, from this document?

25  A.    Yes, um, September 23rd, 2019.

1   Q.    All right.  Let's go back to your other efforts to

2   raise funds to finance the litigation prior to receiving

3   this September 5th invoice.

4        Can you tell us -- you mentioned that you had

5   reached out to litigation finance companies to help fund

6   the litigation.  Actually even before we get to that,

7   when you started the litigation, what was your

8   expectation for how expensive arbitration would be?

9   A.    Um, I don't think I had an expectation.  I didn't

10  think it would be materially more expensive than a

11  regular trial.  I knew that you had to pay the

12  arbitrator, but I had absolutely -- I could have never

13  foreseen it would have been, you know, total billings of

14  about half a million dollars.

15  Q.    So in other words you didn't think it would be

16  this expensive?

17  A.    To put it simply, yes.

18  Q.    Okay.  Did you have an idea of how long the

19  process would take?

20  A.    No.

21  Q.    When did you first start seeking financing for the

22  litigation?

23  A.    As early as August 2018.

24  Q.    And what did you do to find financing for the

25  litigation?

```
 1   A.    Um, first, my attorney, Jim Brogan at the time,
 2   King & Spaulding, had relationships with litigation
 3   finance firms, so they had reached out on their own, um,
 4   and, um, talking to some folks at Burford Litigation
 5   Finance, a large litigation financier, um -- King &
 6   Spaulding brought them in earlier in the case, um, and
 7   then I did my own efforts as well.
 8   Q.    Let's start with Burford then.  Could you look at
 9   Exhibit 3, please.
10   A.    (Looks.)  Sure.
11   Q.    Please let me know when you've had a chance to
12   look at it.
13   A.    (Looks.)  I have had a chance to look at it.
14   Q.    Okay.  Can you read me the subject line of that
15   e-mail.
16   A.    Um, "RE:  CellInfo v. American Tower -- help, RE
17   damages and irreparable harm."
18   Q.    Okay.  And who's it from?
19   A.    (Reads.)  Um, from myself.
20   Q.    And who is it to?
21   A.    One of my attorneys at King & Spaulding, Brian
22   Eutermoser, um, Jim Brogan, another attorney, David
23   Rich, Paul Karger, and John Pantekidis.
24   Q.    Could you identify who David Rich -- um, identify
25   those people just for the benefit of the Court.
```

1        First of all, you've already identified Jim Brogan

2   as the lead attorney at King & Spaulding, is that

3   correct?

4   A.    Yes.

5   Q.    Representing you in this matter?

6   A.    Yes.

7   Q.    Who is this "Rich"?

8   A.    David Rich from Todd & Weld, another attorney that

9   we had retained.

10  Q.    Okay.  And you've already identified Paul Karger

11  previously as a creditor and investor.  Who is John

12  Pantekidis?

13  A.    A creditor and investor.

14  Q.    All right.  So you sent this e-mail -- and what

15  was the date of the e-mail?

16  A.    August 12th, 2018 at 8:31 p.m.

17  Q.    And in that e-mail -- it's only two short

18  sentences, okay?  Could you please just read the entire

19  e-mail for the benefit of the Court.

20  A.    "Jim, Brian, and David, when do you feel

21  comfortable getting on the phone with Kelly from

22  Burford?  It would be nice to get it on the books."

23  Q.    And what was the "it" that you were talking about

24  there?

25  A.    The conference call with Kelly from Burford, the

1    litigation finance firm.

2    Q.    And what would be the subject matter of that

3    conference call?

4    A.    Um, obtaining litigation financing.

5    Q.    And what, to the best of your recollection,

6    happened with the Burford litigation financing?

7    A.    Um, it didn't come to fruition.

8    Q.    Why not?

9    A.    I'm not entirely sure that that was, um -- Jim

10   Brogan was in charge of that relationship.

11   Q.    So your then attorney, Jim Brogan, was working on

12   that, but did not come up with the litigation financing

13   you were looking for, is that correct?

14   A.    That's correct.

15   Q.    Okay.  Did you reach out to anyone else in August

16   of 2018 that you can recall?

17   A.    Um, I believe that I did.  I believe that I did.

18   Q.    Do you recall who you reached out to then?

19   A.    Um, I'm drawing a blank.

20   Q.    Do you recall reaching out to LexShares in August

21   of 2018?

22   A.    Yes.

23   Q.    And Andrew O'Shea?

24   A.    I did reach out to Andy O'Shea, yes.

25   Q.    Who is Andy O'Shea?

1    A.    A wealthy individual that I knew.

2    Q.    And let's go through those two.  What happened

3    with LexShares?  Actually, well let's take care of Andy

4    O'Shea first.

5          Did this wealthy individual, Andy O'Shea, agree to

6    invest or help finance the litigation?

7    A.    Um, he did not.

8    Q.    Did he say why not?

9    A.    Um, I believe the protective order was the main

10   issue, it was our biggest issue in financing our case.

11   My attorneys had to say "Take my word for it," I had to

12   say that to investors, and, um, you know, around simple

13   issues like "Show us the evidence that shows a breach."

14   And, um, I couldn't even see the document myself.

15   Q.    What do you mean you couldn't see the document

16   yourself?

17   A.    I was not allowed to see the document myself.

18   Q.    So you're saying there were documents in the case

19   that were produced by the defendant that you were not

20   allowed to see because they were marked "Highly

21   Confidential," is that correct?

22   A.    Yeah.

23   Q.    And you were not allowed to share those with

24   potential litigation client customers, is that correct?

25   A.    Correct.

```
 1   Q.    Um, let's talk a little bit more about this
 2   LexShares.  Could you please turn to Exhibit Number 12.
 3   A.    (Looks.)  Okay.
 4   Q.    Can you identify this exhibit?
 5   A.    (Looks.)  This is a term sheet that, um, LexShares
 6   sent to us.
 7   Q.    Could you read the subject line of the e-mail to
 8   us, please.
 9   A.    "Final Terms, LexShares."
10   Q.    And what date was it sent on?
11   A.    September 24th, 2018.
12   Q.    And who is the sender of this e-mail?
13   A.    A gentleman named Matt Reason.
14   Q.    Do you know who Mr. Reason is?
15   A.    Yes, he's the Vice-President of Investments and
16   Partnerships at LexShares.
17   Q.    How do you know that?
18   A.    Um, I spoke with him and I worked with him, and
19   it's also in the lower quarter of this e-mail.
20   Q.    And what -- and whom did Mr. Reason send this
21   e-mail to?
22   A.    He sent it to me.
23   Q.    Could you just read me the second sentence, which
24   is also the second paragraph of this e-mail.
25   A.    "I spoke to the team"?
```

1   Q.    That one, yes.

2   A.    "I spoke to the team a minute ago and confirmed --

3   they confirmed the 3X/sliding scale structure."

4   Q.    What did he mean by that, do you know?

5   A.    I believe he's referring to a 3X preferred return

6   on investment, or loan.

7   Q.    Okay, so this is -- he's describing a loan

8   structure.  Now please read the next paragraph, which is

9   just two sentences.

10  A.    "I know that you're flying later, so I wanted to

11  get you this right away.  If you could execute later

12  today, that would be much appreciated, and we could

13  finally move this to next steps."

14  Q.    What did he want you to execute?

15  A.    This term sheet.

16  Q.    And, um, what would be the effects of executing

17  the term sheet?

18  A.    We would agree to terms and we would proceed to

19  due diligence and eventually hopefully a closing.

20  Q.    Do you recall what amount of litigation finance

21  money you would have gotten for this?

22  A.    I do not remember exactly the number for this

23  particular one.

24  Q.    Let's look at Exhibit 2.

25  A.    (Looks.)

1   Q.    Actually let's see, um -- you know what?  Let's

2   not go to Exhibit 2 yet.  Let's go to, um -- let's go to

3   Exhibit 5, that will be right on point, I think.

4   A.    (Looks.)

5   Q.    Can you pull that up?

6   A.    Yes, it's pulled up.

7   Q.    And what is Exhibit 5?

8   A.    Exhibit 5 is an e-mail from Jim Brogan to myself

9   with a term sheet from our litigation finance firm named

10  Therium.

11  Q.    Okay, and can you, um -- can you read just -- So

12  this is from Jim Brogan to yourself, you said.  What's

13  the date of the e-mail?

14  A.    Wednesday, September 26th, 2018.

15  Q.    Could you just -- it's a very short e-mail.  Could

16  you just read the body of the e-mail, please.

17  A.    "Hi, all.  Circling back to our conversation from

18  a couple of weeks ago about litigation funding for the

19  CellInfo matter, attached for you and your client's

20  consideration is a term sheet outlining our funding

21  proposal.  Please let us know if you would like to

22  discuss once you've had a chance to digest this."  That

23  was forwarded to me by Jim Brogan.  And he said, "Just

24  received on a plane.  Jim."

25  Q.    All right.  Now, do you have any recollection as

1    to the amount that these litigation finance companies,

2    LexShares, Buford, Therium, these companies, are we

3    talking about tens of thousands, hundreds of thousands,

4    or millions of dollars, that they were, um, talking

5    about loaning to pay for the litigation?

6    A.    I believe that Therium was around $2 million.

7    Q.    (Pause.)  And, um, so you had in hand at this

8    point, um, apparently two different proposals, um, and

9    you had -- you were obviously faced with a choice.  You

10   didn't work with both litigation financing companies,

11   did you?

12   A.    Well when you sign a term sheet, there's an

13   exclusivity component to the term sheet.

14   Q.    So did you make a decision as to which one of

15   those two, LexShares and Therium, at this point?

16   A.    I believe we chose Therium.

17   Q.    Do you remember why?

18   A.    I believe it was better terms, I believe it was

19   more money, and, um, it was brought to us from Jim

20   Brogan's efforts.  I believe for those reasons we chose

21   Therium.

22   Q.    And did you take any steps to secure this loan

23   from Therium?

24   A.    Yes, of course I tried to comply with everything

25   they asked for.

1    Q.    Did you meet with anyone at Therium?

2    A.    I believe I did, yes.

3    Q.    Do you recall when you did that or -- you don't

4    necessarily remember things from a couple of years

5    ago --

6    A.    I believe it was in November of 2018.

7    Q.    Do you remember who you met with?

8    A.    Um, not off the top of my head.

9    Q.    Fair enough.  Let's look at Exhibit Number 4 now,

10   please.

11   A.    (Looks.)

12   Q.    Can you identify Exhibit Number 4, please.

13   A.    Yes.

14   Q.    What is Exhibit 4?

15   A.    An e-mail chain forwarded to me from Jim Brogan.

16   Q.    Okay.  And if you look down to the bottom of the

17   e-mail chain, the first e-mail that was sent in the

18   chain, who was it from?  About halfway down the page.

19   A.    (Looks.)  Um, the first e-mail, it appears, was

20   from Jim Brogan to Elizabeth Corkson.

21   Q.    Okay.  And, um, then the next one seems to be

22   blank.  So let's look at the first substantive line.

23   Um, I guess that must have been an attachment.  So let's

24   look at the first substantive one that's above that,

25   please.

1    A.    Okay.  "Thanks, Jim.  In meetings all day, but

2    will give you a call later."  And that was from

3    Elizabeth Corkson to Jim Brogan.

4    Q.    Okay.  Who is Elizabeth Corkson?

5    A.    She was, I believe, somebody at Therium that was

6    doing underwriting or something of the sort.

7    Q.    Can you take a look at the e-mail address and look

8    at what domain it's from?

9    A.    Therium.com.

10   Q.    So based on that are you confident it was someone

11   at Therium who sent this e-mail?

12   A.    Yes, I am.

13   Q.    Okay.  And so that was -- what was the date of

14   that e-mail from Therium?

15   A.    November 20th, 2018.

16   Q.    And, um, did Therium financing work out?

17   A.    It did not.

18   Q.    Do you know why?

19   A.    The protective order.

20   Q.    How do you know that?

21   A.    They told us that.

22   Q.    Do you remember when they told you that?

23   A.    Somewhere around this time.

24   Q.    Somewhere around this time?

25   A.    Yeah.

1    Q.    And did they say specifically why -- what they

2    were looking for that they couldn't get?

3    A.    Anything substantive on the case beyond my

4    attorney's word.

5    Q.    After the Therium financing deal fell through, um,

6    what steps did you and CellInfo take to get other

7    funding?

8    A.    We continued to reach out to other litigation

9    finance firms and also individuals, anybody that we knew

10   that we thought would have the capacity to fund the

11   case.

12   Q.    Okay.  Do you remember reaching out to a

13   litigation financing firm called Legalist?

14   A.    Yes.

15   Q.    Can you, um, take a look at Tab 11, please.

16         THE COURT:  Well the Tab 11 is?

17         MR. PARKER:  Yes, I'm sorry, your Honor, I'm

18   returning to the -- Tab 11 is in my binder.  It's

19   Exhibit 11.  I'm sorry, your Honor.

20   A.    (Looks.)  Yes, I have the exhibit.

21   Q.    Please take a look at Exhibit 11.  Can you

22   identify Exhibit 11?

23   A.    It's an e-mail from Eva Shang from Legalist to

24   myself.

25   Q.    And who is copied on the e-mail on the cc line?

1    A.    Jim Brogan.

2    Q.    And that's Jim Brogan from King & Spaulding,

3    correct?

4    A.    Right.

5    Q.    Okay.  And what is the date of this e-mail?

6    A.    November 27th.

7    Q.    So almost immediately -- so almost immediately

8    after the, um -- after the previous deal fell through

9    with Therium, you reached out to Legalist, is that

10   correct?

11   A.    Legalist reached out to me.

12   Q.    How did they reach out to you?

13   A.    I believe they were going to be co-investors with

14   Therium.

15   Q.    And after the Therium deal fell through, were they

16   still interested in participating?

17   A.    They were.

18   Q.    All right.  What happened with that?

19   A.    Ultimately it fell through.

20   Q.    Do you remember why or --

21   A.    I believe that we -- I believe that by the time

22   that came around, we actually -- Legalist didn't have

23   enough money at the time and I believe we, um -- I

24   believe we had a term sheet, but it was before we were

25   to execute our term sheet with Legalist for the amount

1    that we needed.

2    Q.    Do you remember who that term sheet was with?

3    A.    I do not.

4    Q.    Do you remember around what time you reached out

5    to Lake Whillans -- "Whillans"?  I don't know how to

6    pronounce that.

7    A.    "Lake Whillans."

8    Q.    "Whillans."  Thank you.  Do you remember reaching

9    out to Lake Whillans for litigation financing?

10   A.    I do.

11   Q.    And can you tell us what happened with that?

12   Well, first of all, when was that?  Was this around that

13   time?

14   A.    I believe so.

15   Q.    And, um, do you recall, um, what was involved in

16   their proposal?  First of all, was it enough money to

17   finance the litigation?

18   A.    Yes, I believe so.

19   Q.    Was it over $2 million like you said most of these

20   were?

21   A.    I believe so.

22   Q.    And did they, um -- and what happened with the

23   Lake Whillans financing proposal?

24   A.    It ultimately fell through.

25   Q.    Do you remember why?

A.     The protective order.

Q.     Can you elaborate, why did the protective order prevent you from getting financing with Lake Whillans?

A.     We couldn't share any documents with them.  We couldn't share any -- we were unable to complete their due diligence requests because the protective order prohibited us from doing so.

Q.     Let's go to Exhibit Number 6, please.

A.     (Looks.)  Okay.

Q.     Okay.  So would you identify this document, please.

A.     It's an e-mail sent from Jim Brogan to myself, Paul Karger, Wes Karger, and John Pantekidis.  And Brian Eutermoser.

Q.     And could you remind us who those people are, please.

A.     Jim Brogan and Brian Eutermoser were my former attorneys at King & Spaulding.  Paul Karger, Wes Karger, and John Pantekidis are creditors and investors in CellInfo.

Q.     And so you were -- the top of this e-mail chain is a response, so let's start with the e-mail being responded to, the one that says "Jim," can you identify -- who is the sender of that e-mail?

A.     Myself.

1   Q.    And when was that e-mail sent?

2   A.    December 18th, 2018 at 1:55 p.m.

3   Q.    And can you just read the first sentence of that

4   e-mail, please.

5   A.    "We went ahead and signed a term sheet with Lake

6   Whillans for $2.1 million.  They agreed to come in with

7   our funds and at the last minute Eva wouldn't let us --"

8   Q.    All I need is the first sentence.  The first

9   sentence is fine.  So the first sentence was "Signed a

10  term sheet with Lake Whillans for $2.1 million."

11  Now let's look at the last sentence of the e-mail before

12  the "You let me know if you have any questions."  The

13  one that begins "I think."  Can you read that, please.

14  A.    "I think the best next step is for you to review

15  the DD requests for Lake Whillans and circle off" --

16  Q.    Okay, what are "DD requests," what does that mean?

17  A.    "Due diligence."

18  Q.    And so you were asking your attorney, Jim, to

19  review the due diligence requests?

20  A.    Yes.

21  Q.    Is that right?

22  A.    That is correct.

23  Q.    And, um, what was his response?  And just go to

24  the top of the e-mail, please.

25  A.    His response was "I'm on a flight to D.C., can

1    talk later today or tonight.  Main issue will be
2    compliance with the protective order.  Specifically not
3    sharing ATC confidential information in a manner that
4    violates the order."
5    Q.    Um, let's turn to the very next exhibit -- well
6    actually we're going in order for a moment.  Um, Exhibit
7    7, please.
8    A.    (Looks.)
9    Q.    Can you identify that exhibit for the Court,
10   please.
11   A.    Yes.  It's an -- it's an e-mail from Christopher
12   Hagle from Lake Whillans Litigation Finance to myself.
13   Q.    And, um, it's a very short e-mail.  Can you just
14   read what he says.
15   A.    "Nate, we have been through the materials that
16   Brian sent to us, unfortunately we are unable to proceed
17   with this transaction.  If you would like to discuss, I
18   would be happy to jump on a call.  Thanks very much for
19   all your time discussing the case with us.  Chris."
20   Q.    And you said this is -- oh, sorry, did you tell me
21   the date of this e-mail?  When was it?
22   A.    January 23rd, 2019.
23   Q.    So on January 23rd, 2019, that financing deal fell
24   through?
25   A.    January 3rd.

```
 1    Q.    January 3rd, 2019, that's when that financing deal
 2    fell through?
 3    A.    Yes.
 4    Q.    Did you continue to look for other sources of
 5    financing?
 6    A.    I did.
 7    Q.    (Pause.)  What did you do, what other sources did
 8    you look to?
 9    A.    I believe I continued to look for litigation
10    financing firms and I continued to try to raise money on
11    my own.  I --
12    Q.    Did you --
13    A.    Oh, sorry.
14    Q.    All right.  So can you tell me, um, about, um, a
15    company called Woodsford Litigation Funding, did you
16    reach out to them?
17    A.    I did.
18    Q.    And was that the successful, did you get
19    litigation financing from them?
20    A.    No.
21    Q.    Do you remember why you didn't?
22    A.    The same reason.
23    Q.    Can you, just for the benefit of the Court, state
24    what that reason was?
25    A.    The protective order prevented us from sharing any
```

 1    items that would satisfy their due diligence requests.

 2    Q.    And without going through every one of these in

 3    excruciating detail, was -- in every one of these

 4    e-mails, were -- did the e-mails show that that was on

 5    March 11th, 2019, um -- if you look at that e-mail from,

 6    um -- actually you know what?  Let's just move on to the

 7    next one, because I don't want you to lead the witness

 8    there by -- and let's just go to, um -- well what about

 9    Law Finance Group, do you remember when you reached --

10    well let me just say.

11        Do you remember approximately when you reached out

12    to Woodsford Litigation Funding?

13    A.    I -- after January 23rd, 2019, but I don't

14    remember exactly when.

15    Q.    Okay, and they fell through because of the

16    protective order.

17        Did you, um, continue to attempt to find

18    litigation financing?

19    A.    I have not stopped trying to find litigation

20    financing for this case.

21    Q.    Okay.  Do you recall reaching out to an entity

22    called Law Finance Group?

23    A.    Yes.

24    Q.    And do you recall signing a term sheet with them?

25    A.    I believe I did.

1    Q.    And do you recall why that didn't work out?

2    A.    The protective order prevented us from sharing any

3    information to satisfy their due diligence requests.

4    Q.    And so the defendants have suggested that you had,

5    um, access to money whenever you wanted to.  Would you

6    have reached out to all these financing companies if you

7    had access to money whenever you wanted it?

8          MR. WINTNER:  Objection, leading.

9          THE COURT:  The objection is sustained.

10   Q.    Let me rephrase.

11         THE COURT:  The question is not so much it's

12   leading, it's hypothetical.

13         MR. PARKER:  Okay.

14         THE COURT:  And you can make the argument at the

15   appropriate time.

16         Anything else for this witness?

17         MR. PARKER:  Oh, yes, a number of additional

18   exhibits, your Honor.

19         THE COURT:  Well go ahead.

20         MR. PARKER:  Okay.  Thank you.

21   Q.    Let's go to Exhibit Number 18.

22   A.    (Looks.)  Okay, I'm there.

23   Q.    All right.  Can you please identify this document.

24   A.    It's an e-mail chain between Jim Brogan, Paul

25   Karger, Wesley Karger, John Pantekidis, and myself.

1    Q.    And, um, can you, um -- starting from the first,

2    um, e-mail in the chain, can you, um, let's just go down

3    to the bottom of the chain and see where it starts.

4    A.    (Looks.)

5    Q.    You know what?  Before we get to this, let's talk

6    about the e-mail -- sorry, let's go to Tab -- no, sorry,

7    to Exhibit 19.  Then we'll come back to this one.  So

8    Exhibit 19.

9    A.    Yes.

10   Q.    Can you identify Exhibit 19, please.

11   A.    This is an e-mail from Jim Brogan to myself, Paul

12   Karger, John Pantekidis.

13   Q.    And can you, um -- I'm sorry, who is the sender of

14   Exhibit 19?

15   A.    Jim Brogan.

16   Q.    And he sent it to you, to Paul Karger, and John

17   Pantekidis.  And when did he send it?

18   A.    Tuesday, October 1st, 2019 at 6:31 p.m.

19   Q.    And, um, can you just read me the second paragraph

20   of that e-mail.

21   A.    "For this reason CellInfo will need to make the

22   payment to the Triple A that is due tomorrow.  While we

23   may have some money left to pay to Triple A, after we

24   pay our incurred-deposition expert-report-related

25   expenses, that will not come close to meeting the amount

1   needed for the Triple A."

2   Q.   So you would have this contingency deal you

3   mentioned earlier in which the Triple A was going to

4   be -- the Triple A expenses were going to be paid out of

5   these funds that you had paid to -- into the, um -- well

6   you paid --

7        You testified earlier that you paid $180,000 into

8   the IOLTA account, into the trust account at King &

9   Spaulding, and that those funds were to be used to

10   pay -- to pay the Triple A invoice, to pay part of that

11   $208,000" --

12        THE COURT:  Mr. Parker, that question's been asked

13   and answered.

14        MR. PARKER:  I'm just establishing the basis

15   for --

16        THE COURT:  No, respectfully, move on.  I'm taking

17   notes.  I know what he's testified to.

18        MR. PARKER:  Okay.  Thank you, your Honor.

19   Q.   What did you -- what did you understand this

20   e-mail to mean, from Jim Brogan, that -- with relation

21   to his agreement to use those funds and -- well let me

22   just ask you more basically.

23        Did King & Spaulding use the $180,000 to pay the,

24   um, Triple A invoice?

25   A.   Nope.

```
1    Q.    Did they use any of the money from that $180,000

2    to pay the Triple A invoice?

3    A.    Nope.

4    Q.    Do you know why they didn't?

5    A.    I wish I did.

6    Q.    Well what did they say in this e-mail as the

7    reason why they didn't?

8    A.    "We budgeted $300,000 and expenses for this

9    process and understood that CellInfo would pay that as a

10   prerequisite to moving forward.  We have received only

11   $180,000 of that commitment and received a bill from the

12   Triple A of roughly $200,000 that exceeded our Triple A

13   estimated expense by almost $100,000."

14   Q.    And, um, can you read the next sentence after

15   that, please.

16   A.    "Absent payment to the Triple A, the tribunal may

17   suspend or terminate the proceedings."

18   Q.    What did you understand this e-mail to mean with

19   relation to the commitment that King & Spaulding had

20   made to use those funds to pay arbitration expenses?

21   A.    That they were backing out, that they were -- that

22   they weren't going to honor the agreement.

23   Q.    And how did you react to that?

24   A.    I tried to implore them to honor the agreement as

25   much as humanly possible and then scrambled and tried to
```

```
 1    get money together to fulfill the obligation.
 2    Q.    When you say you "scrambled" to try get money
 3    together, where did you go and whom did you ask?
 4    A.    Our investors, our lenders, creditors, Paul
 5    Karger, Wes Karger, John Pantekidis, John McGillian and
 6    Jeffrey Parker.  Um, Jimmy Berylson.
 7    Q.    And what did they tell you?
 8    A.    I had no credibility, they told me absolutely not.
 9    Q.    Did they say -- when you say you had no
10    credibility, why didn't you have credibility?
11    A.    I told them about 30 days prior was the last check
12    they had to write and that I had a contingency agreement
13    with King & Spaulding, um, and that was the end of it.
14    And I had to tell them that King & Spaulding wasn't
15    honoring that agreement and I had 48 hours to raise
16    200-and-something thousand dollars.
17    Q.    And so they said "No."  Did you -- did you
18    continue, after the 48 hours were over, to try to raise
19    those funds?
20    A.    Of course, but I had -- you know four or five days
21    later I had an attorney back out.  I had -- I had
22    nothing.
23    Q.    When you say you had an attorney back out, you
24    said that King & Spaulding backed out of the contingency
25    agreement on October 1st.  What attorney backed out four
```

1    or five days later?

2    A.    Jim Brogan informed, um, I believe Paul Karger and

3    myself, that he would be withdrawing, um, seeking to

4    withdraw from the case.

5    Q.    (Pause.)  Did he say why he was withdrawing from

6    the case?

7    A.    For nonpayment of fees.

8    Q.    Did he say how much money he needed to continue

9    doing the litigation?

10   A.    Um, later on in October he said if we paid the --

11   if we paid the full amount outstanding, um, that they

12   would reconsider their position.

13   Q.    Can you take a look at Exhibit 22, please.

14   A.    (Looks.)  Okay.

15   Q.    Can you identify this exhibit for me, please.

16   A.    (Looks.)  It's an invoice sent to myself from a

17   woman named Mindy McCree, who's a billing payroll

18   analyst at King & Spaulding.

19   Q.    So it's an e-mail invoice from King & Spaulding.

20   Can you just read that first paragraph, please.

21   A.    "Attached is our Invoice Number 10299821 for fees

22   and expenses through September 30th, 2019 regarding the

23   above-referenced matter.  Please place this invoice in

24   line for payment at your earliest convenience.  Also

25   please note that the following invoices remain

1    outstanding as of today, totaling over 1.3 million."

2    Q.    So it was over $1.3 million you owed.  And they

3    were asking for that whole lump sum at once?

4    A.    They were, after they had told us that they were

5    withdrawing, of course.

6    Q.    And did you have -- what about your revenue?

7    CellInfo is a company that had revenue over the years.

8    At its peak how much annual revenue did CellInfo have?

9    A.    A million.

10   Q.    What year did it have a million dollars in

11   revenue?

12   A.    I believe in 2015, and I believe around a million

13   in 2017.

14   Q.    All right.  At -- during the course of this

15   litigation, over the entire course of the litigation,

16   starting with 2018 to the present, how much revenue does

17   CellInfo have?

18   A.    About $75,000.

19   Q.    About $75,000.  So not enough to pay off --

20   obviously not enough to pay that invoice, let alone on

21   the bill.

22        What about how much borrowing did CellInfo do to

23   pay, um -- assuming that it did pay anything to

24   Spaulding.  Well let's start with this.

25        How much did CellInfo pay King & Spaulding over

1    the course of the litigation?

2    A.    I believe around $600,000 to $700,000.

3    Q.    And does that include the amount for the, um --

4    that was put into trust for Triple A for the payment of

5    expenses, including this Triple A invoice?

6    A.    I believe so.

7    Q.    And what's the total that was raised to

8    finance the litigation?

9    A.    As of what date?

10   Q.    As of the time of the, um -- okay well let's start

11   with as of -- as of August --

12         At the time you received the August 22nd invoice

13   from King & Spaulding, how much have you raised from

14   your investors in loans, from your "investors/creditors"

15   as you call them, by that point in time?

16   A.    I believe around a half a million dollars.

17   Q.    And since you got that invoice, um -- well we know

18   you raised another $180,000 that you sent to King &

19   Spaulding.  Since you sent that to King & Spaulding,

20   what is the grand total --

21             (Noise.)

22             MR. PARKER:  A little feedback.

23   Q.    What is the grand total that you raised since

24   then?

25   A.    About $100,000.

```
1    Q.    Okay.  And where did you raise that money from?

2    A.    From Paul Karger, Wes Karger, John Pantekidis, um,

3    Jimmy Berylson -- um, James Berylson, and Jeffrey

4    Parker.

5    Q.    And did you ask them for more than that?

6    A.    Of course.

7    Q.    And what happened when you asked them for more?

8    A.    "No."

9    Q.    Did you ask anybody else, um, for funds?  Did you

10   ever ask your parents for help in financing this?

11   A.    Yes.

12   Q.    And, um, what did they tell you?  Well let's start

13   from when you had -- during the time period in early

14   October when you were faced with King & Spaulding, as

15   you say, "backing out of the agreement" to finance this

16   --

17       MR. PARKER:  I'm sorry, I'm hearing some

18   background noise somewhere.  So whoever it is, would you

19   mute your microphone, please.

20       THE WITNESS:  It may be me.  I have some

21   construction outside.

22       MR. PARKER:  Okay, well I guess we'll have to live

23   with it then.

24       THE WITNESS:  If you'd allow me a moment, I can

25   ask them to try and stop.
```

1          MR. PARKER:  Is this distracting other people or

2     just me?  If it's just me, I can --

3          THE COURT:  I'm fine, but if you would like to

4     take a moment, that is also fine.

5          MR. PARKER:  Let's take a moment and see if we can

6     get the background noise cut out.

7          THE WITNESS:  Okay, thank you.

8          (Pause.)

9          (Resumed, 5 minutes later.)

10         THE WITNESS:  Hi, I'm back.

11         THE COURT:  And thank you.

12         MR. PARKER:  Your Honor, just one procedural

13    question.  There are a number of financial documents

14    that the Court requested -- that the Court requested for

15    this litigation that we attached to our reply memo.

16         (Noise.)

17         MR. PARKER:  Now I'm hearing a lot of feedback.

18         THE CLERK:  Attorney Parker, is anyone else on

19    this call that's close by you?

20         MR. PARKER:  No, I'm absolutely silent here.  It's

21    coming from my computer.  It's coming from someone on

22    the phone.

23         (Pause.)

24         MR. PARKER:  Okay, it's better now.

25         Just for the Court, please, there are a number of

1    documents that we attached to our reply memo that we

2    would like entered into evidence.  Should we just, in a

3    blanket fashion, ask the Court to consider all of them

4    or do I need to walk through them one at a time?

5         THE COURT:  Well you don't need to walk through

6    them one at a time.  But have you premarked them, have

7    they got numbers?

8         MR. PARKER:  All the exhibits were numbered and

9    tabbed that we provided.  Well we provided excerpts in

10   the tab format to the Court.  We could provide the full

11   documents with additional tab numbers following the

12   hearing.  They were also attached to the reply brief,

13   however.

14        Is that acceptable or should I just --

15        THE COURT:  The question is, is it acceptable to

16   Mr. Wodarski?

17        No objection to receiving these documents as part

18   of the record, Mr. Wodarski?

19        MR. WODARSKI:  Um, thank you, your Honor.  I think

20   we're going to assign Mr. Wintner to take responsibility

21   for this witness, but I just -- just to expedite it,

22   I'll say "No objection."

23        THE COURT:  That's -- Mr. Wintner, nothing that

24   you can think of right now?

25        MR. WINTNER:  No.  So long as these are exhibits

1    that were submitted in part of their reply, it's fine.

2            THE COURT:  Very well.  With that limitation.

3            And you'll inform me and counsel of the numbers

4    we've assigned to them.  They're in evidence,

5    Mr. Parker.  Move along.

6            MR. PARKER:  Thank you, your Honor.

7    Q.    All right.  We were asking about your parents.

8    Did you ask your parents to participate in the financing

9    of this litigation?

10   A.    I did.

11   Q.    And when did you ask them?

12   A.    Many times.

13   Q.    And what was their -- what was their first answer?

14   A.    "No."

15   Q.    Did they say why not?

16   A.    Um, I don't remember -- what was the first time?

17   I don't remember why not.

18   Q.    You don't remember after -- let's talk about in

19   October of 2019, do you remember what they said to you

20   at that point?

21   A.    They told me I needed to get a lawyer first.

22   Q.    Because -- why didn't you have a lawyer?

23   A.    King & Spaulding withdrew.

24   Q.    And so they were unwilling to help you pay --

25            (Phone rings.)

```
 1              THE COURT:  Hold off a minute.
 2              (Judge answers phone.)
 3              THE COURT:  Go ahead.  Proceed.
 4    Q.    So your parents said that they were unwilling to
 5    participate in paying the $208,000 Triple A invoice
 6    during that first week in October time frame, is that
 7    correct?
 8    A.    Correct.
 9    Q.    Because your attorney had backed out, is that your
10    testimony?
11    A.    That's my testimony.
12    Q.    At any point after that did your parents help or
13    participate in making any loans or bringing any
14    financing to this litigation?
15    A.    Yes.
16    Q.    Do you remember how much?
17    A.    I believe $40,000 in total.
18    Q.    And that's part of that less than $100,000 that
19    you talked about before?
20    A.    Yes.
21    Q.    And where did that money go to?
22    A.    Litigation expenses.
23    Q.    And specifically?
24    A.    Paying Parker Keough, LLP.
25    Q.    Thank you.
```

```
 1          Let's talk about John McGillian for a moment.  You
 2   mentioned him earlier as one of the people who had
 3   financed the litigation early on.
 4          In August of 2019, did you and Paul Karger reach
 5   out to him to ask him to continue to participate?
 6   A.     Yes.
 7   Q.     And what did he say?
 8   A.     I think he participated and he said, "Don't ever
 9   come to me again for another check for this."
10   Q.     So just to be clear, after the September 15th
11   invoice when you -- well let's say in the first week in
12   October, you were asking him for help and he told you
13   "No"?
14   A.     Yeah.
15   Q.     And has he participated at all since then?
16   A.     Not at all.
17   Q.     (Pause.)  You mentioned earlier that King &
18   Spaulding increased its demand for costs from $250,000
19   to $300,000 in September of 2019.  What was your
20   reaction when they increased that number?
21   A.     I --
22   Q.     Did you agree to it?
23   A.     I did.
24   Q.     Why?
25   A.     Because Paul Karger said he would take care of the
```

1   balance, and I didn't really have a choice.

2   Q.     (Pause.)  You know I don't know that we looked at

3   Exhibit 19 yet, I want to make sure that we've talked

4   about that.  We may have.  Oh, yeah, I think we did.

5        MR. PARKER:  Let me just check one more thing,

6   your Honor, and make sure we've gotten it.

7        (Pause.)

8        MR. PARKER:  You know I think because the Court

9   has allowed us, and the other side has kindly allowed us

10  to attach the rest of the exhibits, then I think we're

11  done with this witness.

12       THE COURT:  Very well.

13       And, Mr. Wodarski, any questions?

14       MR. WODARSKI:  Your Honor, I think it's

15  Mr. Wintner.

16       THE COURT:  Oh, yes, Mr. Wintner, go right ahead.

17

18  CROSS-EXAMINATION BY MR. WINTNER:

19  Q.     Mr. Drouin, can you hear me okay?

20  A.     I can.

21  Q.     Okay.  My name is Tom Wintner, an attorney

22  representing American Tower in this case.  We've met a

23  couple of times before.  Thank you for your time today.

24       I'm going to be asking you some questions and

25  referring to exhibits that should be of record, um, that

1    you or your attorney submitted for purposes of these

2    latest motions, but if you have any question about those

3    exhibits -- and we're also going to be flashing those up

4    on the screen, um, with the benefit of a guy named Jim

5    Doyle.  Okay?

6    A.    (Silence.)

7    Q.    So, Mr. Drouin, we're here today because you claim

8    that your company, CellInfo, was completely unable to

9    pay a $207,900 invoice from the Triple A, correct?

10   A.    Correct.

11   Q.    And this was the invoice that, had you paid it,

12   would have allowed CellInfo to prosecute its claim

13   against American Tower in arbitration, correct?

14   A.    Yes.

15   Q.    It would have covered the arbitration panel's time

16   and expense to study all of the parties' prehearing

17   papers, including their expert reports, conduct the

18   five-day hearing, and render a reasoned decision,

19   correct?

20   A.    I believe so.

21   Q.    And if you paid the invoice, you knew that you'd

22   be able to get to a hearing or a quote, unquote "trial"

23   against American Tower, correct?

24   A.    I believe so.

25   Q.    And you and your lawyers were bullish that you

1    were going to win that trial, i.e. you were going to get

2    a judgment in your favor from the arbitration panel,

3    correct?

4    A.    Yes.

5    Q.    And by winning, you would also get an award of

6    attorneys fees in your favor, correct?

7    A.    Yes.

8    Q.    But if you didn't pay the invoice, you knew you

9    might get defaulted in the arbitration, right?

10   A.    I knew what my attorney told me, which was that

11   the proceedings could be suspended or terminated.

12   Q.    Okay.  Now CellInfo filed suit against American

13   Tower in the beginning of 2018?

14         (Phone rings.)

15         THE COURT:  Wait a minute.

16         (Judge answers phone.)

17         (Pause.)

18         THE COURT:  Proceed.  I'm sorry, Mr. Wintner.

19   Proceed.

20   Q.    Okay.  Now CellInfo filed suit against American

21   Tower in June of 2018, is that correct?

22   A.    I believe that's correct.

23   Q.    And you testified earlier on direct that CellInfo

24   never had the resources to fund a lawsuit by itself,

25   right?

1    A.    Correct, paying a traditional attorneys-fees

2    arrangement.  Correct.

3    Q.    So instead, for litigation funding, CellInfo has

4    always relied on the beneficence of others, correct?

5    A.    Correct.

6    Q.    Now I'm going to throw up a demonstrative exhibit

7    which summarizes some of these payments that derive from

8    three documents that were submitted with respect to this

9    CellInfo financial.  Let me know if you can see that,

10   Mr. Drouin?

11   A.    Not yet.  (On screen.)  Yeah, I see it now.

12        MR. PARKER:  Your Honor, I'm going to object.  I

13   haven't had a chance to review this.

14        (Interruption by Court Reporter.)

15        THE COURT:  Wait.  Wait.  Wait a minute,

16   Mr. Parker.  You spoke, um, for the Court Reporter.

17   Mr. Parker objected.  I'm going to overrule the

18   objection.  It's only a demonstrative.  It's a

19   jury-waived proceeding.  So let's see it and see where

20   we go with it.  There'll be time to sort it out.

21   Q.    Mr. Drouin, what's reflected here is a summary of

22   payments -- and I'm only doing this to save time, rather

23   than going through three voluminous exhibits.  It's from

24   Twin Focus, Jim Berylson, John McGillian, Jeff Parker,

25   and your parents, with dates listed, and also the

1   sources of those exhibits, which are the exhibits that

2   were submitted by your attorneys as part of this latest

3   motion.

4        Do you see that?

5   A.    I see a spreadsheet of litigation funding payments

6   to CellInfo from 2018 to 2020.

7   Q.    Okay.  So, for example, assuming these numbers are

8   accurate and I have checked them against the documents

9   submitted by your attorneys, a man named Jeff Parker

10  provided CellInfo with $340,000 in litigation funding,

11  is that correct?

12  A.    Your spreadsheet says that.

13  Q.    Okay.  Well you see he made a $200,000 payment on

14  January 17th, 2019.  Do you see that?

15  A.    I do.

16  Q.    And that's taken from the 2019 ledger that was

17  submitted by CellInfo in this litigation.  Do you have

18  any reason to believe that's an inaccurate amount?

19  A.    I do not have any reason to believe that that is

20  an inaccurate amount.

21  Q.    Okay.  The underlying exhibits, if I'm not

22  mistaken, are entered into evidence, so they can always

23  be checked if there's any concern here.  But again this

24  is just a demonstrative.

25        Moving on.  Twin Focus Partners, which is some

1    combination, as I understand it, of Paul Karger, Wesley

2    Karger, and John Pantekidis, provided CellInfo with an

3    additional $155,000 in litigation funding, correct?

4    A.    I believe that -- I believe that that number may

5    be high.

6    Q.    And you think that number is high because some of

7    the numbers that are on this spreadsheet, um, came from

8    dates prior to the litigation being filed?

9    A.    Um, that could be part of it.  Now that you

10   highlight that, that could be part of it.  It's my

11   belief -- and I would need to go back and total it up,

12   but it's my belief that the funding from the Twin --

13   from Paul Karger, Wes Karger, John Pantekidis, was

14   closer to $100,000 than to $155,000.

15   Q.    Okay.  Well if we take a look at, um -- whatever

16   your belief is, assuming these numbers are accurately

17   entered into the CellInfo ledger, these are in fact

18   payments that were made by Twin Focus to CellInfo,

19   correct?

20   A.    According to what you're saying.

21   Q.    Okay.  And you're very close friends with Paul and

22   Wesley Karger, correct?

23   A.    I am friends with Paul and Wes Karger.

24   Q.    In fact you're very close friends with them,

25   correct?

1   A.    I would say we are very close friends.  I would

2   like to think we're very close friends.

3   Q.    And you're also business partners with them,

4   correct?

5   A.    I am.

6   Q.    You're also business partners, at least for

7   purposes of CellInfo, with John McGillian, correct?

8   A.    Correct.

9   Q.    And as this demonstrative shows, he provided an

10  additional $150,000 in litigation funding, correct?

11  A.    That's what it says and I believe that that's

12  accurate.

13  Q.    And then if we look at the second column, it shows

14  that a man named James Berylson -- or as you refer to

15  him, "Jimmy Berylson," provided CellInfo with an

16  additional $280,000 in litigation funding, correct?

17  A.    That's what it says.

18  Q.    And finally your parents, who are also investors

19  in Twin Focus Partners, provided CellInfo with an

20  additional $30,000 in litigation funds, correct?

21  A.    It says that they provided $30,000 in funds.  I'm

22  not sure they're partners with Twin Focus.

23  Q.    I didn't ask whether they were partners.  I said

24  your parents are investors in Twin Focus, are they not?

25  A.    You'd have to ask them.  I don't believe so.

1   Q.    Did you sit for a deposition in this case,

2   Mr. Drouin?

3   A.    I did.

4   Q.    Okay.  And that was in connection with this case,

5   correct?

6   A.    Correct.

7   Q.    And were you asked questions and gave truthful

8   answers under oath at that deposition?

9   A.    Yes.

10  Q.    I'd like to call your attention to Page 30 of your

11  deposition, starting at Line 4, and I'm going to read

12  the questions and answers.

13        Question, "Did anyone in your family ever place

14  funds with Twin Focus?"  Answer, "Yes."  Question,

15  "Who's that?"  Answer, "My parents."

16        Did I read those questions and answers correctly?

17  A.    You read the questions and answers correctly.

18  Q.    Was that your testimony when you were deposed

19  under oath?

20  A.    Yes.

21  Q.    And did you have an opportunity to review your

22  deposition testimony and correct it if there were any

23  errors?

24  A.    I did.

25  Q.    Okay.  And, Mr. Drouin, your parents, they

1    currently own the largest power contractor in the State

2    of New Hampshire, correct?

3    A.    I believe that's the case.

4    Q.    Okay.  Now if we go back to the exhibit,

5    Mr. Drouin, and again assuming these numbers are

6    accurately sourced from the very documents that your

7    attorneys produced to us, that's $955,500 in litigation

8    funding from various sources in 2018, 2019, and 2020,

9    correct?

10   A.    I believe so.

11   Q.    The arbitration panel, Mr. Drouin, in the

12   arbitration, they gave CellInfo a deadline -- at least

13   an initial deadline of November 9th, 2019 to pay the

14   outstanding Triple A invoice, correct?

15   A.    I believe that's the case.  I don't have the

16   document in front of me.

17   Q.    Okay.  Well that's in the arbitration order,

18   but -- and we can check it.  But assuming that's the

19   case, if we go back to DDX 1 and we look at the dates,

20   all of these investors, with the exception of

21   Mr. McGillian, gave again after that deadline provided

22   by the arbitrators even after claiming that they were

23   tapped out before that deadline, correct?

24   A.    Correct.

25   Q.    And your parents gave money afresh after that

1   deadline given by the arbitrators, correct?

2   A.    Correct.

3   Q.    So Judge Young, when we were in litigation in the

4   District Court, he issued an order sending this case

5   over to arbitration November 15th, 2018, correct?

6   A.    I have -- I believe so.

7   Q.    Okay.  And if you look again at the dates on this

8   chart, most of the litigation funding that CellInfo

9   raised came in after that date, correct?

10  A.    Correct.

11          MR. WINTNER:  You can take this slide down,

12  Mr. Doyle.

13          (Off screen.)

14  Q.    Now, Mr. Drouin, you knew that arbitration was

15  going to cost a lot of money, not just in lawyer fees,

16  but also in fees to cover the cost of the arbitrators

17  themselves, correct?

18  A.    I don't think I knew how much it would cost, but I

19  knew that litigation and arbitration was expensive.

20  Q.    Okay.  And in fact you had no less than four sets

21  of reputable law firms to advise you of this, not even

22  including the current firm that you're using, Parker

23  Keough, correct?

24  A.    I'm not sure, um, four law firms?

25  Q.    Well let's take it one by one.  You had Cooley,

 1    LLP, which is the well-known law firm with which
 2    Mr. Brogan worked when you initially engaged him,
 3    correct?
 4    A.    Correct.
 5    Q.    Okay.  And you've, on multiple occasions, bragged
 6    that Mr. Brogan is one of the best IT lawyers in the
 7    country, correct?
 8    A.    That's what it says on the internet.
 9    Q.    (Pause.)  Mr. Brogan then went over to King &
10    Spaulding during the course of this litigation, so you
11    also had King & Spaulding to advise you with respect to
12    arbitration and its cost, correct?
13    A.    Correct.
14    Q.    Throughout this time, whether it was 2018, 2019,
15    or even today, you also had the law firm of Todd & Weld,
16    and specifically a lawyer named David Rich, to advise
17    you, correct?
18    A.    Correct.
19    Q.    And that's a well-known Boston law firm, correct?
20    A.    It's a Boston law firm.
21    Q.    And finally, in the early stages when you were
22    negotiating the contract with American Tower, which gave
23    rise to this case and this arbitration cost, you were
24    advised by the Massachusetts law firm of Bowditch &
25    Dewey, correct?

A.    Correct.

Q.    You also had in your hand Judge Young's decision from December of 2018 in which he expressly explained how expensive arbitration could be, especially in a three-panel case, if your lawyers had not done so for you, correct?

A.    Judge Young did opine on the expense of arbitration in his order.

Q.    You also knew, once the arbitration got going, precisely what the hourly rates of the arbitrators were on the three-arbitrator panel, correct?

A.    I did.

     THE COURT:  Just, Mr. Wintner, I don't mean to crowd you in any way, but I'm going to have to take a recess somewhere here, so I ask you, how long do you have with this witness, do you think?

     MR. WINTNER:  I'm happy to take a break right now. I'd say I have 15 to 20 minutes left, something like that.  But it could extend a little bit.  But it's not going to be more than 30 minutes, I'm sure.

     THE COURT:  All right.  Why don't we take a break till 11:15 and then you can resume.

     MR. WINTNER:  That would be fine, your Honor.

     THE COURT:  And let me consult with Ms. Gaudet as to how we'll do this.  She'll give you instructions so

1    we can all get back together.

2         Ms. Gaudet?

3         THE CLERK:  I think it would be best if all

4    counsel just put themselves on mute and disabled their

5    video and just stayed on the actual zoom call.

6         THE COURT:  All right.

7         MR. WODARSKI:  And then the sequestration order

8    stays in place, correct?

9         THE CLERK:  The others are still in the waiting

10   room, so they have not been let in.

11        MR. WODARSKI:  Okay.

12        MR. PARKER:  Your Honor, I'm a little confused

13   here because I am going to need to reach out to our

14   witnesses, one of whom, Mr. Jeff Parker, is having

15   medical procedures this morning, so we don't know

16   exactly what time he would be available to testify.

17   Another who has an 11:00 a.m. meeting scheduled.  And

18   another of whom has a plane to catch at noon.  We didn't

19   anticipate this would take quite so long.  But given

20   that -- and we also understand the judge says that it

21   can be continued to another date, if necessary.

22        Does it make sense to finish the cross-exam of

23   this witness and then continue this on another day?

24        THE COURT:  Well I have till 1:00 with you people

25   and, um, it makes sense to me to do as much as we can

 1   do, so I do propose to take this half-hour recess and

 2   then continue.  You check with the witnesses you have.

 3   You've used up most of this time, you'll understand.

 4   It's gone to your case.  And I don't fault that.  But

 5   you've used it up.  So you check with the witnesses, see

 6   what you have, and when we resume at 11:15, we'll see

 7   where we are.  And once we get through with Mr. Drouin,

 8   we'll see who we have available and we'll see what we

 9   can do, and we'll go from there.

10         Is that understood?

11         MR. PARKER:  Thank you, your Honor.

12         THE COURT:  All right.  So we'll mute ourselves

13   and we'll take ourselves off video.  I will be back at

14   11:15.  We'll stand in recess until that time.

15         MR. WODARSKI:  Thank you, your Honor.

16         (Recess, 10:50 a.m.)

17         (Resumed, 11:15 a.m.)

18         THE COURT:  Let's go back on the record.  So we're

19   back on the record and we'll resume.

20         One thing I should say.  During the break the

21   exhibits have been delivered in hardcopy to the Court,

22   so that when reference is made to them, you'll

23   understand that I have them now before me to refer to.

24         Mr. Wintner, you were examining and you may

25   continue.

1          MR. WINTNER:  Thank you, your Honor.

2     Q.    And, Mr. Drouin, I think if we have bad feedback,

3     maybe you could mute while I'm asking questions, um,

4     that's what the tech person said might be happening.

5     But if not, we'll just proceed because it seemed to be

6     at least tolerable the first time around.  Okay?

7     A.    Okay.

8     Q.    So we were -- we had left off on the subject of

9     hourly rates for the arbitrators and I had asked you,

10    um, whether you knew that each of the arbitrators had a

11    specific hourly rate and I believe your testimony to

12    that was "Yes," correct?

13    A.    Correct.

14    Q.    And specifically the chair of the arbitrable

15    panel, Judge Hohwell, his rate was disclosed at the

16    beginning of the arbitration to be $1,200 per hour,

17    correct?

18    A.    Correct.

19    Q.    And Judge Warren, who was the arbitrator selected

20    by American Tower, um, his rate was disclosed to be $900

21    per hour, correct?

22    A.    Um, I don't have the rate sheets in front of me,

23    but that sounds about correct.

24    Q.    Okay.  Well why don't we take a quick look at

25    Exhibit DX-13.

1          MR. PARKER:  I'm objecting because we don't have

2    an Exhibit 13.

3          MR. WINTNER:  It's getting thrown up.  Mr. Parker,

4    these are simply the exhibits that we sent along to you,

5    they've simply been repackaged with defendants --

6          MR. PARKER:  I never received them.

7          MR. WINTNER:  Um, okay.

8          THE COURT:  Wait a second.  Wait a second.

9    Obviously we're not going to conclude today, um, and

10   while I have it, we're not -- what you're going to have

11   to do is to sit down together -- and I instruct this

12   after we're done today, and you're going to renumber

13   them.  So we'll call this "Defendants' Exhibit 13."  But

14   we're not going to have defendants' exhibits and

15   plaintiff's exhibits.  But it makes perfect sense to use

16   the document to refresh recollection, and it's 13 in the

17   binder I have, and so this makes sense.  But you're

18   going to sit down, and before we resume, and you're

19   going to renumber the defense exhibits at least so that

20   they are numbers different from those that the plaintiff

21   has given me.  But we'll simply call this "Defense

22   Exhibit 13" for now.

23          All right.  Go ahead, Mr. Wintner.

24   Q.    Mr. Drouin, as part of the arbitrable process, um,

25   you and your lawyers received a notice of compensation

1    arrangement for each of the arbitrators, correct?

2    A.    I believe so.

3    Q.    Okay.  And does this exhibit appear to show the

4    hearing rate and study rate for the Honorable James

5    Warren?

6    A.    Um, this is a new document to me.  It's possible

7    that I saw it in the past.  It does appear to show, um,

8    compensation rates for said arbitrators.

9    Q.    Okay.  Do you have any reason to believe that, if

10   nothing else, these arbitration rates were sent to the

11   lawyers representing you in this arbitration?

12   A.    My belief is that arbitration rates would have

13   been sent to my counsel.

14   Q.    Okay.  And the hourly rate for the Honorable James

15   Warren, according to this, is $900 per hour, correct?

16   A.    According to this, correct.

17   Q.    Okay.  And the third arbitrator on the panel was a

18   man named Mr. Tom Brewer, correct, and he was selected

19   by CellInfo, correct?

20   A.    That's correct.

21   Q.    And his hourly rate was $650 per hour, correct?

22   A.    If that's what you're telling me.  I don't know

23   that off the top of my head.

24   Q.    Okay.  Well why don't we now pull up Exhibit

25   DX-12, which is similar to the previous exhibit.

1    A.    (On screen.)

2    Q.    This is another notice of compensation

3    arrangement, um, and it lists for Mr. Brewer a study

4    rate of $650 per hour, do you see that?

5    A.    I do.

6    Q.    And this is the arbitrator that you selected,

7    correct?

8    A.    I believe Thomas Brewer was our choice.

9    Q.    Okay.  So if we're to add up these numbers, $1,200

10   per hour, $900 per hour, and $650 per hour, for one hour

11   of the panel's time, that's $2,750, is that correct?

12   A.    Um, I believe so.

13   Q.    So 1200 plus 900 plus 650 is $2,750, correct?

14   A.    Yes.

15   Q.    Okay.

16         MR. WINTNER:  And you can take down the slide,

17   Mr. Doyle.

18         (Off screen.)

19   Q.    And the parties had agreed at the beginning of the

20   arbitration to set aside five days for the arbitration

21   hearing, correct?

22   A.    I believe so.

23   Q.    Okay.  Do you have any reason to believe that

24   that's incorrect?

25   A.    I don't know if I have information at my disposal

1    as to whether or not it was four days or five days or

2    six days.  It sounds like a procedural thing that my

3    attorneys handle.

4    Q.    Okay, why don't we take a look at DX-015, please.

5    A.    (Looks.)

6    Q.    Do you see that this is a notice of the hearing

7    from the Triple A?

8    A.    Yes, that's what it appear to be.  Yes.

9    Q.    Okay.  Do you see that it says "The hearing in the

10   above-entitled arbitration will be held in person as

11   follows:  Date, December 9th through December 13th,

12   2019"?

13   A.    I do.

14   Q.    Does that refresh your recollection with respect

15   to the length of the hearing which was agreed to for

16   this proceeding?

17   A.    It refreshes -- yes.

18   Q.    Okay.  Now if you're talking about five --

19         MR. WINTNER:  And you can take down, Mr. Doyle.

20         (Off screen.)

21   Q.    If you're talking about five days of the panel's

22   time at 8 hours a day, at $2,750 per hour, that's

23   approximately $110,000 in arbitration costs alone,

24   correct?

25   A.    I -- yes.  But I don't know if I can do math that

1    quickly in my head.

2    Q.    Okay.  I've done it.  The math checks out.

3          So that would be -- so that would be for the

4    panel's time for the hearing, correct?

5    A.    Yeah.  If five days were used, that sounds about

6    right.

7    Q.    Okay.  And the panel would presumably need to

8    spend at least as much time preparing for the hearing,

9    reviewing briefs, reviewing expert reports, and things

10   like that, not to mention post-hearing time to render a

11   reasoned decision, correct?

12   A.    I have no transparency into what the panel does or

13   does not do.

14   Q.    Okay.  But it would surprise you that the panel

15   might prepare for the hearing in some significant way,

16   correct?

17   A.    I would assume that they would do that.

18   Q.    Okay.  And if wouldn't surprise you that the

19   panel, um, would take some time after the hearing to

20   study everything and render a reasoned decision,

21   correct?

22   A.    Correct.

23   Q.    Okay.  Now, not only did you know about the fact

24   that you would be facing arbitration fees, you actually

25   knew precisely how to pay them to the Triple A, did you

1    not?

2    A.    Um, you mean by which method, by a wire or a

3    credit card or?

4    Q.    Well perhaps let me ask the question slightly

5    differently.

6          In one of your sworn declarations that you

7    submitted for purposes of this proceeding, you stated

8    that on December 14th, 2018, you paid $5,750 to the

9    Triple A in fees, correct?

10   A.    Correct.

11   Q.    And then in February of 2019, specifically

12   February 4th of 2019, you stated, in one of your sworn

13   declarations, that you paid $6,500 in Triple A fees,

14   correct?

15   A.    Okay.  Yes.

16   Q.    I'm happy to look at your declaration, if you'd

17   prefer, but, um, these were pretty clearly laid out,

18   okay?

19   A.    (Silence.)

20   Q.    All right.  Now, that payment on February 4th,

21   2019 of $6,500, that was a direct payment from CellInfo

22   to the Triple A, correct?

23   A.    Um, I don't know.  If that's what the declaration

24   says, then it would have been.

25   Q.    Okay, well why don't we pull up the declaration.

1    This is what we've marked as DX-2, which is your, um --
2    I believe this is your July 2nd, 2020 declaration.
3           Do you see in Paragraph 4, on February 4th, 2019,
4    CellInfo paid $6,500 directly to the American
5    Arbitration Association.  Do you see that?
6    A.    I do.
7    Q.    Okay.  So you didn't pay King & Spaulding that
8    money first and then have King & Spaulding send that to
9    the Triple A, you paid it directly to the Triple A,
10   correct?
11   A.    On the February 4th payment it appears that is
12   what happened, um, and on December 14th it looks like it
13   was done differently.
14   Q.    Okay, but on the February 4th, 2019 statement, you
15   knew how to cut out the middle man, correct?
16   A.    I don't know if -- there were instructions on the
17   invoice of how to get payments forwarded from my
18   accounts, so.
19   Q.    Well I know there were instructions.  But I didn't
20   mean to cut you off, Mr. Drouin.
21   A.    It was paid directly.
22   Q.    Yeah, it was paid directly to the Triple A from
23   CellInfo's checking account, correct?
24   A.    Yes.
25   Q.    Okay.  And if you go to the next paragraph on

1    March 19th, 2019, CellInfo got paid an additional $6,000

2    and again directly to the Triple A, correct?

3    A.    That's what it says.

4    Q.    Okay.  And while -- this is a statement that you

5    made under oath in this proceeding, correct, Mr. Drouin?

6    A.    I'm not sure about all the statements that I made

7    under oath.  What you have highlighted is what it says,

8    yes.

9    Q.    Okay.  And then if we go to the next paragraph, on

10   April 17th, 2019, you paid a larger chunk, $43,000,

11   again directly to the Triple A, correct?

12   A.    Correct.

13   Q.    Now, a lot of the money that you were paying to

14   the Triple A was to resolve motions that CellInfo had

15   asked the panel to resolve, not American Tower, correct?

16   A.    I don't know.  I don't know what the invoices were

17   for.

18   Q.    Okay.  Well, for example, you filed, CellInfo

19   filed a motion with the arbitration panel to remand the

20   case back to the District Court, correct?

21   A.    Correct.

22   Q.    And the panel denied that motion in a written

23   decision on April 24th, 2019, correct?

24   A.    That's correct.

25   Q.    Okay.  And CellInfo also filed a motion for a

1   preliminary injunction with the arbitration panel,

2   correct?

3   A.    I believe we did.

4   Q.    And the panel denied that motion in a written

5   decision on September 10th, 2019, correct?

6   A.    Yes, I believe so.

7   Q.    Now, about five days before that September 10th,

8   2019 decision in which the arbitrators denied CellInfo's

9   motion for a preliminary injunction, on September 5th,

10  2019, you received an invoice from the Triple A for

11  $207,900, correct?

12  A.    Correct.

13  Q.    And that invoice came to King & Spaulding on the

14  5th of September and Mr. Jim Brogan forwarded it to you

15  immediately on that same day, correct?

16  A.    He did.

17  Q.    And once you saw that invoice and the terms that

18  were connected with it, you knew that you didn't have to

19  pay the full amount immediately, correct?

20  A.    Correct.

21  Q.    You had to pay 50 percent or approximately

22  $104,000 by October 3rd, 2019, correct?

23  A.    Correct.

24  Q.    And you had to pay the remaining 50 percent, the

25  other $104,000 by Halloween of 2019, October 31st, 2019,

1    correct?

2    A.    Correct.

3    Q.    And in fact the Triple A and the arbitration panel

4    ultimately gave you until January 17th, 2020 to pay that

5    invoice, correct?

6    A.    I don't know how long they gave us to pay the

7    invoice.

8    Q.    Well let's take a look at your declaration.

9    A.    They suspended -- I know they suspended the

10   proceedings in November.

11   Q.    Well let's take a look at your declaration, DX-2,

12   at Paragraph 17, in which you stated under oath "From

13   October 1st, 2019 through the deadline set by the

14   tribunal for paying arbitration fees of January 17th,

15   2020."  Do you see that?

16   A.    I do.

17   Q.    Okay.  So it's correct that at least according to

18   you the deadline that was set by the tribunal, which may

19   have been an internal communication from the tribunal to

20   CellInfo for all we know, was January 17th, 2020,

21   correct?

22   A.    Yes, that is what the declaration says.

23   Q.    Okay.  And in reality, Mr. Drouin, you had until

24   at least March 31st, 2020 to pay the Triple A invoice,

25   and that's the date by which the panel said that

1    American Tower could pay the fees, correct?

2    A.    I suppose.  I mean they set a deadline and that

3    deadline lapsed, you know.  So I suppose.

4    Q.    But that deadline was March 31st, 2020, correct?

5    A.    Um, the deadline, the last deadline that

6    apparently I knew about, was January 17th in my

7    declaration.

8    Q.    Well why don't we take a look at DX-16.

9    A.    (On screen.)

10   Q.    This is an opinion and order that was issued by

11   the Triple A.  And if you look towards the bottom of the

12   page it says that the -- it discusses the election to

13   pay CellInfo's outstanding unpaid charges by March 31st,

14   2020, do you see that?

15   A.    "In the event that ATC elects to pay CellInfo's

16   outstanding unpaid charges by March 31st, 2020"?

17   Q.    Yeah, do you see that?

18   A.    I do, yes.

19   Q.    Okay.  And these orders that were issued by the

20   arbitrable panel, you reviewed, you received and read

21   them, correct?

22   A.    I did.

23   Q.    Okay.  So in theory if CellInfo had the money,

24   they could have paid American Tower and American Tower

25   could have satisfied this by March 31st, 2020, correct?

1    A.    In theory I suppose that's possible.

2    Q.    Okay.  And you knew --

3          MR. WINTNER:  And you can take that down,

4    Mr. Doyle.

5          (Off screen.)

6    Q.    At the time that you got the Triple A invoice, in

7    September, in early September of 2019, you knew that

8    that was a deposit so that the panel could proceed with

9    the hearing and prep for it, and that hearing was only

10   three months away, correct?

11   A.    Correct.

12   Q.    And you also knew that the arbitration panel had

13   the power under the Triple A rules to postpone or

14   terminate the proceedings if you didn't pay the

15   requested deposit, correct?

16   A.    Correct.

17   Q.    And you also knew how to pay the deposit to the

18   Triple A directly without going through your lawyers,

19   correct?

20   A.    I did.

21   Q.    (Pause.)  Now, you stated under oath, in this same

22   declaration that we've been looking at before, that

23   CellInfo was and remains totally unable to pay the

24   $207,900 Triple A invoice, correct?

25   A.    Yes.

1    Q.    Okay.  Yet in an 8-day period, Mr. Drouin, in late

2    August of 2019 alone, CellInfo was able to raise about

3    $230,000, correct?

4    A.    Which 8-day period are you referring to?

5    Q.    Well some of this you discussed earlier on direct.

6    You had a $100,000 commitment from Mr. Karger that came

7    in in late August, correct?

8    A.    The commitment came in, the money never did.

9    Q.    Right, but the commitment, as you articulate in

10   your September declaration at Paragraph 27, was there

11   from Mr. Karger, your very close friend and business

12   partner, correct?

13   A.    Yes.

14   Q.    Okay.  And during that same time period, um, I

15   believe it was in two payments within about 8 days of

16   each other, about $130,000 came in combined from

17   Mr. Parker and Mr. McGillian, correct?

18   A.    Yes.  Yes.  So $130,000 came in inside of, I

19   believe, an 8-day period.  But not the $220,000 that you

20   were talking about earlier.

21   Q.    Well just to be clear, in that period you had

22   about $130,000 cash in the door, correct?

23   A.    I believe so.

24   Q.    And you had a $100,000 commitment from your very

25   close friend and business partner, Mr. Karger?

1    A.    That's correct, yes.

2    Q.    And as of September 5th, 2019, you had that money

3    available to pay the Triple A invoice that you received

4    from the Triple A, correct?

5    A.    Yes, correct.

6    Q.    Okay.  And in fact your friend and business

7    partner admitted that CellInfo had the money in hand as

8    of that date and you went over that e-mail that says "We

9    have it," correct?

10   A.    Yeah, and we intended to pay all three -- all

11   four, myself, Paul Karger, Wes Karger, and John, all

12   agreed that we should satisfy that as soon as possible.

13   Q.    All right.  And as we discussed before, you knew

14   how to pay the Triple A invoice directly, without going

15   through your lawyers, because you had already done that

16   at least three if not four times before, correct?

17   A.    Yes.

18   Q.    You certainly could have paid half of the Triple A

19   invoice with the money that you had from Mr. McGillian

20   and Mr. Parker and you would have still had about

21   $26,000 left over, correct?

22   A.    That sounds about right.

23   Q.    But then five days later, on the 10th of September

24   2019, you learned that the arbitration panel had denied

25   your motion for a preliminary injunction, correct?

A.    Yes.

Q.    Now, Mr. Drouin, in addition to the $230,000 that you either had in hand or had secured from Mr. Karger as of September 5th, 2019, CellInfo had subsequently -- so subsequent to that September date, been able to raise additional money, correct?

A.    That's correct.

Q.    And now I'm going to pull up another demonstrative exhibit simply recounting statements of these monies coming directly from your September 10th declaration.

      MR. WINTNER:  Mr. Doyle, if you could put up DDX.2.

      (On screen.)

Q.    All right.  So this is just showing funds raised after the 5th of September 2019 referencing your September 5th -- sorry, your September 10th declaration of this year and the various paragraph numbers.  And you see there was $50,000 from Mr. Berylson on September 17th?

A.    I do, that was part of the 180 that was committed -- Jimmy Berylson had committed that prior, but didn't get his wire out until the 7th of September.

Q.    You're talking about --

A.    Yeah.

Q.    This is all money that came in after September

1    5th, 2019, correct?

2    A.    Yeah, this is when the money hit the bank account.

3    Correct.

4    Q.    Okay.  And I'm happy to check, but it's directed

5    from statements you made in your sworn affidavit under

6    oath, okay?

7    A.    Okay.

8    Q.    And there was actually a second payment by

9    Mr. Berylson as well in May, do you see that?

10   A.    May of 2020, I do see that.

11   Q.    There were several payments made by your parents,

12   some in 2019 and then others in 2020?

13   A.    One in 2019, yes.

14   Q.    And --

15        MR. PARKER:  May I object here because the way

16   this is appearing on my zoom screen, this thing is cut

17   off.  Can I get a copy of this e-mailed to me so I can

18   see the whole page?

19        THE COURT:  Of course you can get it, and after

20   you've had a chance to review the underlying document,

21   they may be able to move in evidence, both of these

22   summaries, under Rule 1006, on the ground that they are

23   summaries of complex and voluminous data.  But, yes,

24   you'll have a chance to review it all.  But we'll work

25   with what we have now.

1           Go ahead, Mr. Parker.

2           MR. PARKER:  Thank you, your Honor.

3           And the technical support person had just made it

4     so it's more visible.  So thank you, whoever you are,

5     this mysterious person, for that.

6           THE COURT:  All right.  Go ahead.

7           MR. WINTNER:  Okay.

8     Q.    In addition, Mr. Drouin, after September of 2019,

9     you were able to raise several thousand from the "TF

10    Group," which is the "Twin Focus Group," correct?

11    A.    The "TF Group" would be representing Paul Karger,

12    Wes Karger, and John Pantekidis.

13    Q.    And you were also able to raise more money from

14    Mr. Jeff Parker as shown in the May 2020 one, correct?

15    A.    That's correct.

16    Q.    So in total you were able to raise at least

17    $160,000, and this is based on your own declaration,

18    after September of 2019, correct?

19    A.    No, that would be incorrect, it would be $110,000

20    after September of 2019.

21    Q.    Okay, it would be $160,000 after September 5th of

22    2019, correct?

23    A.    Um, Correct.  Yes.

24    Q.    Okay.  And that was plenty of money to pay the

25    $90,000 that you paid to your lawyers at Parker Keough,

1    correct?

2    A.    Yes.

3    Q.    Incidentally, there's no relation between Mr. Jeff

4    Parker, um, your litigation funder, and Mr. Ken Parker

5    at Parker Keough, is there, Mr. Drouin?

6    A.    Not that I know of.  They share the last name.

7    But beyond that, I don't believe so.  I'm not aware of

8    any relation.

9    Q.    Okay, thank you.  I just wanted to confirm that.

10          (Pause.)

11          THE COURT:  Is that for this witness?

12          MR. WINTNER:  I have one last set of questions.

13   It will take 5 minutes.

14          THE COURT:  Go ahead.

15   Q.    Mr. Drouin, the first time that CellInfo raised

16   any kind of inability-to-pay defenses, either before

17   this court or before the arbitration panel, was in

18   January of 2020, correct?

19   A.    I -- I believe that to be true.  I don't know the

20   exact dates off the top of my head.

21   Q.    Okay.  That was after American Tower had moved the

22   arbitration panel, under the Triple A rules, to award it

23   attorney fees in the case, correct?

24   A.    Yeah, I believe American Tower filed a Rule 57

25   motion.

 1   Q.    Okay.  And that was after CellInfo's primary

 2   counsel, King & Spaulding, withdrew from the

 3   arbitration, correct?

 4   A.    That is correct.

 5   Q.    And that was after CellInfo's motion for a

 6   preliminary injunction was denied by the arbitration

 7   panel on September 10th of 2019, correct?

 8   A.    That's correct.

 9         MR. WINTNER:  I have no further questions.  Thank

10   you for your time, Mr. Drouin.

11         THE COURT:  Let me ask one question, Mr. Drouin.

12         THE WITNESS:  Yes, your Honor.

13         THE COURT:  Looking at the books and records of

14   CellInfo during the period of September 5th, 2019

15   through September -- sorry, September 5th, 2019 through

16   March, um, 31st, 2020, that period, what was the largest

17   amount of, um, funds on hand in the books of CellInfo?

18         THE WITNESS:  Your Honor, do you have a, um, an

19   exhibit number that I would be able to reference?

20         MR. PARKER:  Exhibit 1, your Honor.  Exhibit 1 is

21   what you need.

22         THE COURT:  Well I don't, I just wanted to ask

23   that question.  You can look at that.

24         THE WITNESS:  Thank you, your Honor, I will look

25   at that.  And if your Honor would remind me, you said

1    September 1st?

2          THE COURT:  September 5th, 2019 through March

3    31st, 2020.

4          THE WITNESS:  September 5, right?

5          THE COURT:  Right.

6          THE WITNESS:  Okay.  Um, it would have been

7    $147,463.19.  That dropped to --

8          THE COURT:  When was that?

9          THE WITNESS:  That was on September 4th, 2019,

10   your Honor.

11         THE COURT:  Right.

12         THE WITNESS:  And we sent $130,000 of that, under

13   our contingency agreement with King & Spaulding, on

14   September 10th, 2019, your Honor.  And that dropped the

15   bank balance down to $17,463.19.

16         Since that time we received a $50,000, um, loan on

17   September 17th.  That was forwarded to King & Spaulding

18   on September 23rd.

19         Since that time -- leaving us with a balance of

20   $17,377.

21         Since that time, um, through -- through the end of

22   the year, through the end of 2019, that was the highest

23   balance that we had.  And I don't have the 2020 numbers

24   for you, but it wouldn't be --

25         MR. PARKER:  Exhibit 2, if you want to look at it.

1           (Interruption by Court Reporter.)

2           THE WITNESS:  Exhibit 2?

3           And you said through March.  The highest amount we

4    had, in our bank account, through March was $21,581.83.

5    That immediately dropped four days later when we sent

6    $20,000 to Parker Keough, LLP to $1500 -- to $1,581.83.

7           THE COURT:  Thank you.

8           Mr. Parker, nothing further from you, is there?

9           MR. PARKER:  I have some redirect, your Honor.

10          THE COURT:  Very well.  Go ahead.

11

12   REDIRECT EXAMINATION BY MR. PARKER:

13   Q.    All right.  The, um, attorney for ATP -- was it

14   Mr. Whitmore?  Wintner?  I don't know if I got that

15   correct.

16          THE COURT:  Yes, go ahead.

17   Q.    He put up a chart on the screen and he said a lot

18   of people had put in money previously to CellInfo.

19          Did any of these people have any obligation

20   whatsoever at any time to put any more money into

21   CellInfo?

22   A.    No.

23   Q.    So there was no -- no commitment -- no legal --

24   none of them owed the money to CellInfo?

25          MR. WINTNER:  Objection.

1    THE COURT:  The objection's sustained, you're

2    leading the witness.

3    MR. PARKER:  Okay.  Okay.

4    Q.    Well did --

5    MR. PARKER:  It's already been answered, he

6    already said, or answered the earlier question, that no

7    one had any commitment.

8    MR. WINTNER:  Objection.

9    THE COURT:  Well the statement is stricken.  Just

10   ask questions, Mr. Parker.

11   MR. PARKER: Okay.  Thank you, your Honor.

12   THE COURT:  Proceed.

13   Q.    Attorney Wintner said that after these, um, people

14   -- after these investors claimed they were tapped out,

15   they give more.  Let's go through them.

16       Did Jeff Parker ever say that he didn't have any

17   more money, that he was broke?

18   A.    No.

19   Q.    Did he say why he wasn't giving more money to pay

20   the $208,000 invoice?

21   A.    He just said that he could be -- he couldn't at

22   the time, that it would have been a bad investment.  We

23   had no attorney, our attorney walked away, and I had

24   made previous statements to him that turned out to be

25   untrue.  I -- you know, I -- I don't know, we got

1    $100,000 from him in August with him saying it was the

2    last check he had to write.  And when King & Spaulding

3    backed out, um, we were stuck without an attorney, and

4    all the arbitration fees, and, um, I mean just in a

5    horrible position.

6    Q.    And the amounts that, um --

7          MR. PARKER:  If we could put that demonstrative up

8    on the screen again since the, um -- since the

9    defendants were so kind to put together that list.

10         May we have it on the screen, please?

11         THE COURT:  Which one, the second one, the amounts

12   --

13         MR. PARKER:  The very first thing they put up were

14   these list of amounts.

15         MR. WINTNER:  Mr. Doyle, that's DX-01, or DDX-01,

16   I think.

17         THE COURT:  Fine.

18         (On screen.)

19         MR. PARKER:  Thank you.  I appreciate that.

20   Q.    All right.  Now, if we look at the document --

21   okay, folks, now it just changed.  No.  Oh, okay.

22         Do you see the amounts that were put in after

23   October 1st -- can you see the amounts that came in

24   after October 1st?  Can you read those, yes, um,

25   starting with the first one which looks like it was --

1     THE COURT:  The document -- just a moment,

2  Mr. Parker.  We've been over this, the document speaks

3  for itself.  Unless there's some inaccuracies, um, in

4  transposing this from the underlying exhibit numbers,

5  then this is a summary of voluminous documents and I'm

6  going to receive it in evidence.  So I can do the math.

7     MR. PARKER:  No, I have a question about the

8  numbers on redirect, your Honor.  These numbers were

9  characterized, your Honor, by the defendants as more

10  money coming in.  I'm asking, um, on redirect.

11 Q.    Mr. Drouin, were these numbers as high as the

12  amount that these people had previously put in?

13     THE COURT:  Well you can see that.

14     MR. WINTNER:  Yes, objection, your Honor.

15     MR. PARKER:  Okay.  All right.  Then moving right

16  along then -- moving right along to the next topic.

17     THE COURT:  Go ahead.

18 Q.    All right.  Of the four law firms referenced by

19  Attorney Wintner, did any one of them tell you that

20  arbitration fees would be this high?

21     MR. WINTNER:  Objection.

22     THE COURT:  No.  No, I'm going to allow that.

23 A.    No, they clearly didn't.  And as you can tell

24  from, you know, from Jim Brogan's e-mail to us, um, that

25  was already presented, even he was shocked and, um -- so

1    he claims, he was surprised by the amount that the

2    arbitrators were asking for.

3    Q.    And, um, when Mr. Wintner said it was going to be

4    maybe a five-day hearing with three arbitrators, did you

5    know how many hours a day the hearings would last,

6    whether it would be the morning hearing, the afternoon

7    hearing, an alternate hearing, did you have any

8    information on that?

9    A.    No, and I didn't know how many days it would last

10   either.

11   Q.    Okay.  Did you know how many hours of preparation

12   time would be needed prior to the hearing?

13   A.    No.

14   Q.    Did you know how many hours it would take the

15   arbitrator to reach a decision after they had this

16   hearing, how many hours of work that would take?

17   A.    No, my belief was that it would be pretty quick.

18   Q.    Well let me just --

19         THE COURT:  Let me interject here, Mr. Drouin.

20         What made you think that the invoice -- that

21   apparently is the key invoice about which we've been

22   receiving evidence, the $207,900, that that would be the

23   last invoice from the Triple A that would get you

24   through to a decision.  What made you think that?

25         THE WITNESS:  Um, sorry, I'm not sure that I

```
 1    thought that the Triple A invoice would be the last
 2    invoice, so I'm not sure that -- I'm not sure I can say
 3    that too much thought went into that.  What I did know
 4    was what my attorney told me, is that that payment of
 5    $250,000, which later turned into $300,000, was the last
 6    payment that my attorney would seek from me.
 7            THE COURT:  And so -- all right.  I guess I
 8    understand your --
 9            You thought the deal was, if you could come up
10    with $300,000 cash money, they'd pay the Triple A, take
11    the rest of it on contingency, and, um, win lose or
12    draw, that would be the last that your company,
13    CellInfo, would have to put in.
14            Is that what you thought the deal was --
15            THE WITNESS:  Yes, your Honor, on that --
16            THE COURT:  -- why you solicited the last funds?
17            THE WITNESS:  Yes.  Well with one minor
18    correction.
19            THE COURT:  Please.
20            THE WITNESS:  When I solicited the funds, it was
21    $250,000, it was a verbal agreement, and we had never
22    had issues with our attorney communication-wise.  We
23    could have never foreseen him to change it.
24            THE COURT:  All right.
25            THE WITNESS:  That change, when the agreement
```

1    came, um, via paper, after the September 10th decision

2    for a preliminary injunction that we lost, our attorney

3    still sent us the engagement letter on I believe

4    September 15th, it became $300,000 instead of $250,000,

5    it included arbitration fees, it included expert witness

6    costs, all the costs.  And their fees were going to

7    be -- their fees were put on the contingency agreement.

8    So that was papered -- that was the exhibit that you

9    have.

10            THE COURT:  Thank you.

11            Anything further, Mr. Parker?  Is that it?

12            MR. PARKER:  Oh, yes.

13   Q.    You had mentioned that your parents, um, had some

14   relation, some financial relationship with Twin Focus.

15   Were they owners of -- were they managers of Twin Focus?

16   A.    No.

17   Q.    Were they owners of Twin Focus?

18   A.    No.

19   Q.    What was their relationship with Twin Focus?

20   A.    I believe they're a client of Twin Focus.  Twin

21   Focus is a money manager.  I believe that Twin Focus

22   manages money for my family -- for my parents.

23   Q.    Did you believe that you had until March 31st,

24   2020 to have paid the arbitration fees?

25   A.    No.

1   Q.    Okay.  Now Mr. Wintner said that in an 8-day

2   period in late August of 2019, you raised $280,000, is

3   that correct?

4   A.    It's incorrect.

5   Q.    Looking at Exhibit 1, can you tell me how much you

6   actually raised in an 8-day period in August of 2019?

7   A.    (Silence.)

8   Q.    In the highest 8-day period.

9   A.    (Looks.)  On August 30th, 2019, I received -- I'm

10  sorry, the company received two wires in the amount of,

11  um, $100,000 and $30,000, which would bring it to

12  $130,000.  And the next wire that came in would have

13  been on the 17th.  And so the highest amount that I

14  received in an 8-day period would have been $130,000.

15  Q.    Okay, it says that -- Mr. Wintner said that when

16  you learned of the motion for a preliminary injunction,

17  you said you secured $100,000 in funds from Paul Karger.

18  Did Paul Karger ever actually send that $100,000?

19  A.    No, he did not.

20  Q.    And he said that -- when he put up one of the

21  demonstratives -- and I won't take up your time to put

22  it on the screen, he counted a $50,000 investment and

23  you said there was -- he said it was 115 and you said it

24  was 110.  Is he double-counting $50,000 there?

25  A.    I don't know if he's double-counting, but he's

1    mischaracterizing the $50,000.  The $50,000 from James

2    Berylson on September 17th was part of the 250, um,

3    later $300,000 that he sent to King & Spaulding under

4    the contingency fee agreement with the expectation that

5    King & Spaulding would pay the arbitration fees from

6    that -- um, from that money, and awaiting the further,

7    um, funds from Paul Karger's commitment, which was

8    originally $100,000 to $120,000.

9    Q.    Thank you, Mr. Drouin.

10         MR. PARKER:  No further questions of this witness,

11   your Honor.

12         THE COURT:  Nothing further, Mr. Wintner?

13         MR. WINTNER:  Nothing, your Honor.

14         THE COURT:  Thank you.

15         All right, you may call your next witness.

16         MR. PARKER:  Your Honor, calling a witness at this

17   point, because of the sequester, will take a few minutes

18   to contact and locate the witness.  May we have a brief

19   recess to do so?

20         THE COURT:  There's no reason to do that, we'll

21   just wait.

22         MR. PARKER:  Okay.  I have to get off my phone,

23   I've silenced my phone, your Honor, and it will take me

24   a minute to get that up and running.  I'm going to mute

25   myself and I'm going to contact the witness.

1          THE COURT:  Fine.

2          (Pause.)

3          MR. PARKER:  Your Honor, our next witness will be

4     John Pantekidis.  He is currently in the process of

5     logging into zoom, your Honor, which as you know can

6     take a minute or so, depending on what applications

7     you're running and what you have to do to get the screen

8     up.

9          Am I muted?

10         THE COURT:  No, you're fine.

11         MR. PARKER:  Okay, thank you.

12         THE COURT:  We'll wait.

13         (Pause.)

14         MR. PARKER:  While we're waiting, your Honor, why

15    don't we put up that demonstrative, that Defendants'

16    Exhibit 1, because I think that will be helpful.

17         THE COURT:  That may be put up or it may be, um --

18    we'll have access to it.

19         MR. PARKER:  Oh, I'm sorry, your Honor, he's

20    calling me back now.

21         (Pause.)

22         THE CLERK:  Judge, I think I'll need to see the

23    witness before we do the display.

24         THE COURT:  We appreciate that.  Thank you.  There

25    we are.

1          (Pause.)

2          MR. PARKER:  Your Honor, the witness just informed

3    me that he is in the waiting room, the zoom waiting

4    room.

5          THE COURT:  We'll let him in.

6          THE CLERK:  Okay, Mr. Parker, is he in the waiting

7    room as Ipad 7?

8          MR. PARKER:  I do not know.  He's Mr. Pantekidis,

9    but I do not know.

10         THE CLERK:  If you could confirm that with him,

11   because he doesn't have his name on there.

12         MR. PARKER:  I will do so right now, Ms. Gaudet.

13         (Pause.)

14         THE COURT:  Yes, that's him, Ms. Gaudet.

15         THE CLERK:  Okay, thank you.

16         THE WITNESS:  Good afternoon.

17         THE COURT:  Good afternoon.  The Clerk will swear

18   the witness.

19         THE CLERK:  One second, Judge.

20         (JOHN PANTEKIDIS, sworn.)

21

22         * * * * * * * * * * * * * * *

23         JOHN PANTEKIDIS

24         * * * * * * * * * * * * * * *

25

DIRECT EXAMINATION BY MR. PARKER:

Q.    Hi, this is Ken Parker.  Thank you for joining us
this morning -- oh, this afternoon.  We're in the
afternoon, Mr. Pantekidis.

      Mr. Pantekidis, would you please state your full
name for the record.

A.    John Pantekidis.

Q.    And would you please state, um, where you work?

A.    I work at Twin Focus Capital Partners in Boston.

Q.    And what is your role at Twin Focus Capital
Partners?

A.    Um, I'm General Counsel, the Chief Investment
Officer, and I oversee the Wealth Structuring Group
here.

Q.    And have you, um, made any investments in
CellInfo?

      THE COURT:  You mean Twin Focus?

Q.    Have you personally invested funds in CellInfo?

A.    Yes, I have.

Q.    And have you used Twin Focus client funds for
doing that or your own personal funds?

A.    Personal funds.

Q.    And what vehicle or vehicles have you used to put
your personal funds in CellInfo?

A.    Paul, Wes, and I have a vehicle where we do

1    investments, the three of us, and that one vehicle made

2    investments into CellInfo.

3    Q.    So when you say "Paul, Wes, and I," would you

4    please give the full names of those individuals?

5    A.    Paul Karger, Wesley Karger, and myself.

6    Q.    And what is your business relationship with Paul

7    Karger and Wesley Karger?

8    A.    Um, they are my partners.

9    Q.    And, um, in August of --

10   MR. PARKER:  Actually now if you could bring up

11   that demonstrative, please.

12   (On screen.)

13   Q.    So you can see in this demonstrative that it says

14   -- there's a call and it says "Twin Focus."  Are these

15   amounts listed there, the amounts that the three of you,

16   Paul Karger, Wesley Karger, and yourself, invested of

17   your own personal funds into this litigation -- or, I'm

18   sorry, of loans into this litigation?

19   A.    Under the "Twin Focus" column, correct.  Yes.

20   Q.    And so a portion of each of those numbers is money

21   from you, is that correct?

22   A.    That's correct.

23   Q.    And, um, if we look at the numbers from 2019, do

24   you recall the, um -- being asked in 2019 to make a,

25   um -- in August of 2019, to make a loan to help pay for

1    litigation financing for this matter?

2    A.    Um, I do.  I'm not sure it was August.  But it

3    should have been right around August or September.  I --

4    Q.    Oh-oh, hello?  Hello?  Are you there?

5    A.    Yeah, I'm here.  I'm sorry.  I got cut off.

6    Q.    All right.  Do you remember, um, being asked to

7    make a loan in August or September of 2019?

8    A.    I do.  Right around that time, I do.

9    Q.    And do you remember what you said?  Do you

10   remember who asked you?

11   A.    Um, I believe it was Paul, and it may have been me

12   as well.  But Paul definitely.

13   Q.    And do you remember what you said when you were

14   asked?

15   A.    Yeah, at that point, um, I told him I wasn't

16   willing, um, and let me define "willing" here, it was,

17   um -- I just personally, from a financial perspective, I

18   couldn't -- I wasn't in a position to do that, um, and

19   that's what I told him.

20   Q.    And so did you in fact put any money in in August

21   or September of 2019?

22   A.    Um, I don't believe so.  I personally didn't.

23   Q.    You didn't?

24   A.    No.

25   Q.    And, um, you can see here, on this call here, that

1    there's $20,000 in December of 2019 that was put in.  Do

2    you remember whether you participated in that?

3    A.    Yeah, yeah, at that point we did.

4    Q.    And do you remember what changed your mind to get

5    you to put some money in then?

6    A.    Oh, yeah.  You know again this money is -- it's

7    our money, it's my money, Paul's money, Wes's money, but

8    it comes from our compensation from, um, from "profits,"

9    let say, and at that point it was available.  And again

10   I -- because I believe in this story, in the

11   fundamentals, I said, "Let's do it."  Because it was

12   available.  Whereas back in August or September, it

13   wasn't available.

14   Q.    And did Nate Drouin want you to put more money

15   than that in?

16   A.    Um, I'm not sure.  I can't say for sure.  I don't

17   remember.

18   Q.    Did he ask you again for more money at any point

19   after that?

20   A.    Um, me personally?  I don't recall.  He might have

21   through Paul, but not to me personally.

22   Q.    Did Paul subsequently suggest that that money come

23   in from the three of you?

24   A.    He did.

25   Q.    Okay.  And, um, how much did you agree to put in?

A.    Those numbers that you see on that column is what
we put in.

Q.    Were you willing to put more than that in?

A.    If I had -- again, if I could -- let's define
"willing."  "Willing" could mean a lot of things to a
lot of people.  If I had the financial wherewithal and
ability, I would, but I'm married, I have a mortgage, I
have a child who has special needs, um, so I could not
do more than that.  So the answer is that if I had more,
and comfortably, I would be willing to.

Q.    But as a practical matter, when you were asked
whether you were able to -- whether you were ready,
willing, and able, you said you had a mortgage, you
didn't have the money, is that correct?

A.    Correct, that this is what we could put in.

Q.    Okay.  Did you, um, at any time, decline to put
money in because you thought it was a weak case?

A.    Never.

Q.    Did you ever, at any point, decline to put money
in because of a ruling of an arbitrator's tribunal?

A.    Um, I did not.  Personally?  No.

Q.    So the only reason why you decided the amounts you
were putting in was your availability -- was your
"funding availability," as you described it earlier?

A.    Unequivocally, yes.

1          (Pause.)

2          MR. PARKER:  No further questions, your Honor.

3          THE COURT:  Any questions for this witness?

4          MR. WODARSKI:  For the record, this is Attorney

5     Jim Wodarski, your Honor, and we have no questions.

6          THE COURT:  Thank you.

7          THE WITNESS:  Thank you, your Honor.

8          THE COURT:  And you are excused.

9          THE WITNESS:  Thank you, your Honor, I appreciate

10    it.

11         THE COURT:  You may leave the call.

12         THE WITNESS:  Thank you.

13         THE COURT:  We note that Mr. Drouin is still on

14    the call, but you designated him as your person to

15    consult with, so I'm okay with that.  But Mr. Pantekidis

16    is sequestered and he'll leave the call.

17         Call your next witness, Mr. Parker.

18         MR. PARKER:  Mr. Pantekidis, please drop off the

19    call in compliance with the Judge's orders.

20         Can we confirm that he has?

21         THE COURT:  Jenn is watching.  Go ahead.

22         THE CLERK:  Judge, I don't see him.

23         MR. PARKER:  So he's off?  Okay.

24         So I'm going to repeat the routine, assuming I can

25    find my phone here, and call our next -- literally

1   telephone call our next witness.  We're going to go on

2   mute and try and get our next witness to log in.  And

3   that will be Wes Karger -- will be our next witness.

4   And so I'm going to try to get him right now.

5          (Pause.)

6          MR. PARKER:  Your Honor, Mr. Wes Karger is in the

7   process of logging into zoom.  Hopefully Ms. Gaudet will

8   see him in the waiting room shortly.

9          (Pause.)

10          THE CLERK:  He's joining now, Judge.

11          THE COURT:  All right.  Thank you.

12          (Pause.)

13          THE COURT:  Let's swear the witness.

14          (WESLEY KARGER, sworn.)

15

16          * * * * * * * * * * * *

17          WESLEY KARGER

18          * * * * * * * * * * * *

19

20   DIRECT EXAMINATION BY MR. PARKER:

21   Q.   Good afternoon, Mr. Karger, thank you for joining

22   us.  My name is Ken Parker, I am an attorney for

23   CellInfo in this matter.  And we've spoken on the phone,

24   but I don't believe we've met.

25   A.    All right.

1  Q.    The, um -- the first thing I'd like to ask you to

2  do is --

3        THE COURT:  Let's start with "Would you state your

4  full name, sir."

5        MR. PARKER:  Yeah, that's what I was going to say.

6  Q.    The first thing I'd like you to do is state your

7  full name for the record, please.

8  A.    Wesley Karger.

9  Q.    And, Mr. Karger, what do you do for a living?

10 A.    A managing partner at Twin Focus Capital in

11 Boston.

12 Q.    And who are your partners at Twin Focus Capital?

13 A.    I have 7 partners.  Um, I have partners Paul

14 Gardner, John Pantekidis, Will Ward, Larry Grosbaum,

15 Jeff Heisler, um -- and that's it.

16 Q.    And have you and two of -- are any of those

17 partners managing partners other than you?

18 A.    Yes, Paul Gardner and John Pantekidis are managing

19 partners.

20 Q.    And have the three of you invested your personal

21 funds in CellInfo?

22 A.    Um, we have invested in loaned sums of money into

23 CellInfo.

24 Q.    Okay, let's break down those two things.  Invested

25 -- when did you invest in CellInfo?

1   A.    I don't have that off the top of my head, but it
2   was several years ago.
3   Q.    Okay.  And when did you loan funds to CellInfo?
4   A.    I believe there were several traunches of loans
5   that went into the company.
6   Q.    And did you make these loans through an investment
7   vehicle that was Wes Karger and John Pantekidis and you
8   together?
9   A.   I believe there was a third partner involved in
10  that, correct, Paul Karger.  But it wasn't one of
11  several investment entities.
12  Q.    Wes Karger, Paul Karger, and John Pantekidis, the
13  three of you together loaned money to -- through some
14  kind of entity to --
15  A.    Some entity.
16  Q.    Okay.  Was it client money of Twin Focus or was it
17  your personal money?
18  A.    No, sir, it was personal money.
19  Q.    And -- all right.  I'd like to bring up, um, the
20  demonstrative -- "Defense Demonstrative 1" that they had
21  up earlier, or it's "Defense Exhibit 1," or whatever
22  they're calling it.
23  A.    (On screen.)
24  Q.    Okay.  Do you see the column on the left here on
25  this demonstrative, Mr. Karger, where it says "Twin

1  Focus"?

2  A.    Oh, yup, I do.

3  Q.    All right.  Using numbers in the column under the

4  heading "Twin Focus," represent the amounts of the

5  combined personal funds of you, Paul Karger, and John

6  Pantekidis, that the three of you together put into --

7  um, or loaned to CellInfo to finance the litigation

8  against American Tower?

9  A.    Um, what I will say is that I don't have those

10  records in front of me, but if they were provided to you

11  as evidence, then they're likely correct.

12  Q.    Okay.  And do you recall, um, being -- receiving

13  an e-mail from Nate Drouin in August of 2019 in which he

14  said that a contingency fee agreement had been reached

15  with then lawyer Jim Brogan and his law firm, King &

16  Spaulding, under which only another $250,000 would be

17  needed to finance the litigation because there was a

18  contingency fee agreement in place.  Do you remember

19  getting that e-mail?

20  A.    I do vaguely remember that e-mail.

21  Q.    And do you remember whether you agreed to put in

22  money?

23  A.    In August of 2019, I agreed not to put in

24  additional funds, um, via a loan or an investment into

25  CellInfo.

1    Q.    So you agreed not to.  You did not agree to --

2    A.    I agreed not to invest or loan initial funds into

3    CellInfo.

4    Q.    And why did you not agree or why did you -- why

5    did you reach that decision not to make additional loans

6    or investments at that time?

7    A.    Personal circumstances and demands of my cash from

8    family as well as business.

9    Q.    So you didn't invest -- you didn't make any loans

10   or invest because you didn't have the money?

11   A.    That is correct.

12   Q.    If you look at this demonstrative you see on this

13   that later, um, there is, on December 19th, a $20,000

14   amount that was loaned -- or it doesn't say -- well was

15   that a loan or an investment?

16   A.    Um, I don't recall.

17   Q.    Okay.  Do you remember if you participated in

18   that?

19   A.    I don't recall.

20   Q.    Do you recall, at any point, um, after August of

21   2019, being asked to put more money towards the

22   litigation?

23   A.    I do believe that's correct.  Uh-huh.

24   Q.    And at any point did you ever agree to put more

25   money in?

A.     Um, I don't -- I don't know as to -- there were
many conversations about that, um, but after August of
'19 I don't believe I personally contributed additional
money to entities for this.

Q.     So those numbers on this for Twin Focus after
August of 2019, those would have been other people's
money?

A.     Without checking the records, I don't have those
numbers in front of me, so I can't speak for them.

Q.     So you don't know?  If you don't know the
answer --

A.     I don't know.  I don't know.  Uh-huh.

Q.     Okay.  But if you did put in more money, you would
have -- well I'm not going to ask you a hypothetical.
You don't remember putting in any more money?

A.     Correct.

Q.     All right.  Do you remember being asked to put in
more money?

A.     I don't remember that.

Q.     Okay.  Okay.  Do you have any involvement in the
management of CellInfo?  Did you ever have any
involvement?

A.     No, sir.  No, sir.

Q.     Do you have any involvement -- did you ever
promise to -- did you ever make any kind of promise to

1   finance this litigation?

2   A.     I do not believe so.

3   Q.     Okay.

4          MR. PARKER:  No further questions, your Honor.

5          THE COURT:  Any questions for this witness?

6          MR. WODARSKI:  Your Honor, this is Jim Wodarski,

7   and we have no questions.

8          THE COURT:  Thank you.

9          Sir, you are excused.  Please leave the call

10  because we are sequestering witnesses.  Thank you for

11  your appearance here.

12         THE WITNESS:  You're welcome.  Thank you.  Thank

13  you.

14         (Leaves call.)

15         THE COURT:  And call your next witness,

16  Mr. Parker.

17         MR. PARKER:  I will do so, your Honor.  My next

18  witness will be our last witness today because our only

19  remaining witness after this witness is on a flight

20  right now and is therefore unavailable.  I'm hoping I

21  can get our next witness, who's the one I mentioned,

22  Jeff Parker, who's, by the way, no relation, but is in a

23  medical appointment today.  He should be over by now,

24  but hopefully -- if we can't get him today, we can get

25  him during the continuation.

1          THE COURT:  You try and let me know.

2          MR. WODARSKI:  Oh, your Honor, may I raise an

3     issue, before that, based on what we just said?

4          THE COURT:  Yes.

5          MR. WODARSKI:  And this is Jim Wodarski, for the

6     record, by the way.

7          I believe Mr. Parker just said, notwithstanding

8     his witness list that he served yesterday and I believe

9     filed with the Court, um, that Paul Karger, who appears

10    on that witness list, is on a plane and unavailable

11    today.

12         Did I hear that correctly?

13         MR. PARKER:  No, you did not.  You did not.  He

14    was available this morning, but they had a noon flight,

15    and I informed you and the Court earlier this morning

16    that he was only available for a limited time.  But we

17    can't get to him today anyway because the judge has

18    already said we're done at 1:00.

19         MR. WODARSKI:  And yet you elected not to put him

20    on first and --

21         THE COURT:  Wait.  Wait.  Wait.  Wait a minute.

22    It's my practice in the courtroom always to have people

23    talk to me and you're going to have to talk to me, as

24    I've said in the past, "lest I become a potted plant."

25    If there's another witness, we're going to take the

1    other witness.  And we'll deal with people who aren't

2    here when we've taken care of that witness.

3           Call the Witness Parker and see if he's available,

4    Mr. Parker.

5           MR. PARKER:  Thank you, your Honor.  I will do so.

6           (Pause.)

7           MR. PARKER:  Your Honor?

8           THE COURT:  Yes.

9           MR. PARKER:  I have just reached the witness.  He

10   is in transit to a place where he can log in.  He

11   estimates it will take him 15 minutes to get there.  We

12   can either reconvene then or we could reconvene on

13   another day with the last witnesses.

14          THE COURT:  Well you know what Mr. Wodarski said,

15   or was about to say, has some merit.  This business of

16   waiting on other people's convenience does not commend

17   itself.  So here's what we're going to do.  The Clerk

18   will schedule --

19          I take it these last two witnesses won't be any

20   longer than the witnesses that you've -- the witnesses

21   that have just been called.  Mr. Drouin's the long

22   witness.  The other two were not long.

23          And these last two aren't going to be long, are

24   they?

25          MR. PARKER:  I don't imagine they'll be terribly

 1  long, your Honor.

 2        THE COURT:  All right.

 3        MR. WODARSKI:  Your Honor, this is Mr. Wodarski

 4  and may I just have a word on that point?

 5        THE COURT:  You may.

 6        MR. WODARSKI:  Um, Mr. Karger will be, your Honor.

 7  And I think -- I'm going to be candid with you because

 8  it's a --

 9        THE COURT:  Well I think you should always be

10  candid.  Go ahead.

11        MR. WODARSKI:  Thank you, your Honor.

12        What's going on here is they're trying to not put

13  Mr. Karger on.  He could have gone on this morning, as

14  you were just discussing, and I was trying to say, um,

15  that they elected not to put him on, and now what

16  they're trying to do, by putting these other witnesses

17  on first, is give themselves the opportunity of

18  intervening time to prepare a witness who's more

19  important than Mr. Drouin.

20        So I -- I didn't -- I preferred it to go with no

21  sanctions, that this was their burden today, you've

22  given the parties two weeks to prepare, and they simply,

23  with no sense of remorse or apology, tell you that a key

24  witness has elected to hop on a plane and not be

25  available today, um, is troubling for me.

1          MR. PARKER:  Your Honor?

2          THE COURT:  Wait.  Wait a minute.  Wait a minute.

3     I don't know that I'm troubled or not, it's a difficult

4     era in which we live.  I don't know how important a

5     witness is, but it may be that he is important.  The

6     Clerk will suggest to me a date that we reconvene.  I

7     expect those two witnesses and no others to appear on

8     that date and I expect to go first with Mr. Karger.

9     I'll turn to the Courtroom Deputy to suggest a time when

10    we might reconvene.

11         THE CLERK:  Judge, we could do the afternoon of

12    next Thursday, September 24th.

13         THE COURT:  Actually that's excellent, I can go

14    from 2:00 to 4:00 in the afternoon of September 24th.

15    How does that suit?

16         Mr. Parker?

17         MR. PARKER:  That would be perfect for me, but of

18    course I have to confirm that the witnesses are

19    available.

20         THE COURT:  No, you don't have to confirm that the

21    witnesses are available, I expect the witnesses to be

22    available.

23         Mr. Wodarski, how does that suit you?

24         MR. WODARSKI:  Thank you, your Honor, I am

25    available and appreciate it.  I would just also say that

 1    I hope that the sequestration order then would be

 2    communicated, um, to --

 3         THE COURT:  I expect it will.  That doesn't

 4    prevent Mr. Parker from preparing his witnesses.  They

 5    will appear at that time.

 6         All right, this is on for 2:00 p.m. on Thursday,

 7    the 24th of September.  I thank counsel and we will

 8    stand in recess.

 9         I'll expect to have the testimony done during that

10    time, though we may have to reserve some other time for

11    final argument.  Thank you both.

12         MR. PARKER:  Thank you, your Honor.

13         THE COURT:  And thank you all.

14         MR. WODARSKI:  Thank you, your Honor.

15         THE COURT:  We'll recess.

16         (Ends, 12:30 p.m.)

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

3

4

5          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

6     do hereby certify that the foregoing record is a true

7     and accurate transcription of my stenographic notes

8     before Judge William G. Young, on Thursday, September

9     17, 2020, to the best of my skill and ability.

10

11

12

13

      /s/ Richard H. Romanow 09-21-20

14    _____

      RICHARD H. ROMANOW    Date

15

16

17

18

19

20

21

22

23

24

25