```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS (Boston)

 3                          No. 1:18-cv-11250-WGY

 4

 5   CELLINFO, LLC,
                  Plaintiff
 6

 7   vs.

 8

 9   AMERICAN TOWER CORPORATION, et al
                  Defendants
10

11
                          * * * * * * * *
12

13

14              For Zoom Hearing Before:
                Judge William G. Young
15

16              Evidentiary Hearing (Continued.)

17              United States District Court
                District of Massachusetts (Boston)
18              One Courthouse Way
                Boston, Massachusetts 02210
19              Tuesday, September 29, 2020

20

21                          * * * * * * * *

22
                REPORTER: RICHARD H. ROMANOW, RPR
23                   Official Court Reporter
                  United States District Court
24        One Courthouse Way, Room 5510, Boston, MA 02210
                    bulldog@richromanow.com
25
```

```
1                    A P P E A R A N C E S

2

3    KENNETH R. L. PARKER, ESQ.
          965 Walnut Street
4         Newton, MA 02461
          (617) 275-3040
5         Email: Ken@kennethparkerlaw.com
     and
6    NATHANIEL J. LICHTIN, ESQ.
          Parker Keough, LLP
7         51 Winchester Street, Suite 205
          Newton, MA 02461
8         (857) 231-3192
          Email: Nlichtin@parkerkeough.com
9         For Plaintiff

10

11   JAMES M. WODARSKI, ESQ.
     THOMAS H. WINTNER, ESQ.
12   ANDREW DeVOOGD, ESQ.
     DANIEL B. WEINGER, ESQ.
13        Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
          One Financial Center, 42nd Floor
14        Boston, MA 02111
          (617) 348-1855
15        Email: Jwodarski@mintz.com
          For Defendants

16

17

18

19

20

21

22

23

24

25
```

1                            I N D E X

2

3

4    CLOSING ARGUMENT BY MR. PARKER.................   5

5    CLOSING ARGUMENT BY MR. WODARSKI...............  21

6

7

8

9

10                        E X H I B I T S

11                       (All premarked.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    P R O C E E D I N G S

2    (Begins, 10:00 a.m)

3    THE CLERK:  Now hearing Civil Matter 18-11250,

4    CellInfo versus American Tower Corp.

5    THE COURT:  Good morning counsel.  This is an

6    argument on a motion to restore this action to the trial

7    list, it's on our Zoom platform under the auspices of

8    Courtroom Deputy Clerk, Jennifer Gaudet.  On the line is

9    our Official Court Reporter, Rich Romanow, as well as my

10    law clerk.

11    This is an official proceeding of the court and it

12    is open to the press and public.  I do not know if any

13    members of the press or public are present, but of

14    course they are welcome.

15    If they are present, I must remind you to keep

16    your microphones muted and the rules of court remain in

17    full force and effect, that is there is no rebroadcast,

18    taping, streaming, or other transmission of this

19    proceeding.

20    Now with that said, would counsel identify

21    themselves -- counsel who are going to argue, identify

22    themselves and who they represent, starting with

23    CellInfo.

24    MR. PARKER:  Good morning, your Honor, my name is

25    Ken Parker and I represent the plaintiff in this matter,

1    CellInfo, and I'm here along with my colleague,

2    Nathaniel Lichtin.

3             THE COURT:  Thank you, Mr. Parker.

4             And for American Tower?

5             MR. WODARSKI:  Good morning, your Honor, James

6    Wodarski here again for the defendants.

7             THE COURT:  All right.  And thank you.

8             All right, Mr. Parker, we said that you would

9    start because this is your motion, and I'm happy to hear

10   you.

11            MR. PARKER:  Thank you, your Honor, and good

12   morning.

13

14   CLOSING ARGUMENT BY MR. PARKER:

15            The evidence speaks for itself here.  The standard

16   that we need to prove are three things.  First, we need

17   to show that CellInfo did not have the assets to pay

18   required arbitration fees, specifically the September

19   5th, 2019 invoice for 100 -- for, sorry, $207,900.

20   Second of all --

21            THE COURT:  Let me stop you right there, because I

22   want you to frame your argument towards something that

23   concerns me.

24            Even if I were to take all the evidence you've

25   presented and draw inferences favorable to CellInfo, I

1    have to tell you, this sounds like a variation of "The

2    dog ate my homework."  In other words, it appears that

3    there's a supervening cause here.

4         Your real problem with paying the, um, Triple A

5    bills is with the firm of King & Spaulding.  I mean

6    Mr. Drouin and Mr. Karger have made the most serious

7    allegations against that firm and if I were to accept

8    that, that's what we're going to be considering.  Even

9    if I were to accept that -- let's say I do accept it,

10   there's no contrary evidence, you haven't called

11   Mr. Brogan, nor has American Tower, and even if I accept

12   it, it's King & Spaulding misappropriated your money.

13   How does that get you in a position to, um, have this

14   case restored to the trial list here absent working

15   things out or otherwise impressing King & Spaulding?  Go

16   ahead.  That's my concern.

17        MR. PARKER:  Your Honor, you raise a very

18   important question as to what it means to be unable to

19   pay, and does it matter if the reason why they were

20   unable to pay was that King & Spaulding, as you put it,

21   absconded, or as someone put it, absconded with

22   $180,000.  The answer is it doesn't make any difference

23   as to the reason under the law.

24        THE COURT:  Well -- and what authority have you

25   for that proposition?

1          MR. PARKER:  Well, if you look at **Tillman**, if you

2     look at **Alwa**, the question is an ability to pay.

3     There's three things we need to show you, we didn't have

4     the money, we didn't have the income, and we made

5     genuine good faith efforts.  We certainly made genuine

6     good faith efforts, but they were foiled by King &

7     Spaulding.  But let's go back to the beginning.

8          THE COURT:  Well let's test that.  I mean what did

9     you do to, um, bring your company -- to bring to King &

10    Spaulding's attention, um, what your clients, your

11    witnesses have characterized as this egregious

12    misappropriation?  I mean it sounds like nothing was

13    done.

14         MR. PARKER:  Your Honor, there was a great deal

15    done.  There were -- there was begging and pleading with

16    King & Spaulding.  In fact, King & Spaulding's position

17    was constantly shifting.  First, it was "They were not

18    accepting" -- they were like "We don't need you to pay

19    any invoices, here's the balance, everything's going to"

20    -- they basically were financing the litigation

21    themselves.

22         On the position of --

23         THE COURT:  Yet indeed, indeed I had understood,

24    going back over my notes, Mr. Drouin to say that he had

25    a deal with Brogan.  Now it wasn't reduced to writing

1   but he had a deal with Brogan and it was on that basis

2   that he raised the requisite money.

3         MR. PARKER:  Yeah, your Honor, that's in the next

4   phase.  Let me just --

5         THE COURT:  A deal -- I don't mean to be flip here

6   but a deal is a contract.

7         MR. PARKER:  Yes, your Honor.

8         THE COURT:  So then they break the contract --

9         MR. PARKER:  Uh-huh.

10        THE COURT:  -- which seems to me to be one that

11   did not need to be reduced to writing, it's capable of,

12   um, performance within a year, so they break the

13   contract, change the deal -- at least this is what your

14   people are saying, and so you beg and plead?  They've

15   broken the contract with you.

16        MR. PARKER:  Your Honor, it wasn't as simple as

17   that because we -- CellInfo needed a lawyer, they

18   couldn't muscle -- they couldn't sue King & Spaulding

19   for breach of contract because that was -- that was the

20   lawyer that knew the case.  They needed to negotiate

21   with King & Spaulding.  And that's what they did.  So

22   when King & Spaulding changed the deal unilaterally,

23   they altered the deal from $250,000 and costs to

24   $300,000 and costs, as you heard testimony from both

25   Nate Drouin and Paul Karger, CellInfo said, "Okay, we'll

1   raise the additional money," and they in good faith did

2   what they could do to raise that additional money.

3        Now here's the really interesting point that was

4   raised actually by Mr. Wodarski.  Mr. Wodarski says,

5   "Well, the reason why King & Spaulding backed out was

6   totally legitimate, they didn't get their $300,000."

7   Now -- so maybe they didn't do anything unethical, maybe

8   they didn't breach their contract because they only got

9   $180,000.  Maybe CellInfo doesn't have a claim for

10  breach of contract.  But they did make genuine good

11  faith efforts to raise that $300,000.  And therefore,

12  your Honor, it doesn't matter why they --

13       THE COURT:  Well let's look down that line.  Then

14  if I don't believe your witnesses and nothing unethical

15  was done, which is certainly plausible, then what am I

16  to believe?  If these witnesses are not telling the

17  complete truth, what am I left with here?

18       MR. PARKER:  Your Honor, the witnesses are backed

19  up by the documentary evidence in the e-mails.  You

20  don't need to take their word for it, you can look at

21  the August 28th e-mail that they sent to investors

22  saying "We have a deal, we need to raise $250,000."  You

23  can look at the actual written copy of the deal that

24  says $300,000 that came out in mid September.  You know

25  that -- you are absolutely confident, or you should be,

1   that my witnesses are telling the truth because the

2   documents back them up, the financials back them up, the

3   e-mail correspondence backs them up.  It's all entirely

4   consistent.

5        So the question then becomes "Does it matter why

6   King & Spaulding backed out?"  Did they have a

7   legitimate reason, as Mr. Wodarski suggested, for

8   backing out?  They didn't get their full amount.

9        THE COURT:  Well, I don't know, what would that

10   legitimate reason be?

11        MR. PARKER:  The legitimate reason would be that

12   CellInfo didn't hold up its end of the bargain and give

13   them $300,000, it only gave them $180,000.  But it

14   doesn't matter whether it's a legitimate reason or not.

15        THE COURT:  Well let me ask you this.  There's no

16   evidence here that you've complained to the board of bar

17   overseers, Brogan's a Massachusetts attorney.  King &

18   Spaulding may be headquartered elsewhere.  You're

19   talking about people who are bound by the code of

20   professional ethics of the Supreme Judicial Court and

21   that's the same code of professional ethics that bind

22   counsel here in this court.  This is bizarre conduct

23   that, um, your clients have testified to.

24        MR. PARKER:  Your Honor --

25        THE COURT:  Go ahead.

1        MR. PARKER:  Your Honor, I too am troubled by this

2    conduct and I share your concern.  However, would it

3    really have been cutting off their arm despite their

4    face, so to speak, or cutting off their nose despite

5    their face, to file an ethical complaint against their

6    lawyers?  They needed King & Spaulding on board.  King &

7    Spaulding was -- had prepared the expert witnesses, King

8    & Spaulding was familiar with the case.  They were not

9    in the position, at that point in time to file an

10   ethical complaint against King & Spaulding and still

11   have a lawyer to complete the litigation.

12        So what we have to get back to is the timeline

13   because the timeline puts the pieces of the puzzle

14   together and answers the question that was raised by

15   defense counsel in their opening statement.  Defense

16   counsel in their opening statement said, "Hey, eyes wide

17   open, they went into this arbitration, they knew it was

18   going to be expensive.  And they have this network of

19   friends and family that they were going to rely on to

20   pay all their costs.

21        Well you know that's not true, your Honor, because

22   you know that in August of 2018 they went to a

23   litigation financing company, Buford Capital, you know

24   that from Exhibit 3.  You know that later in that month,

25   or in September, they went to LexShares, they had a

1    written agreement for $2 1/2 million.  You know they

2    went to Therium in September and November, a written

3    agreement for $2 million in litigation financing.  You

4    know that in November and December they went to Legalist

5    and they had a written agreement for $500,000 in

6    litigation financing.  You know that in December they

7    went to Lake Whillans and had a written agreement for

8    $2.1 million of litigation financing.  You know they

9    went to Fincom, you know they went to Woodsford, and you

10   know they went to Law Finance Group.  You know that all

11   from the documents in front of you.  And that that ended

12   -- the most recent of all clients was in for $2.5

13   million in April of 2019.

14        So what you know is they did not have friends and

15   family who were going to come up with money to finance

16   this, but they had a good faith basis for believing that

17   they were going to get litigation financing.  Why?  They

18   had lots of correspondence and term sheets from

19   litigation financing companies plus their lawyer said,

20   "Hey this will be no problem."

21        So Plan A, the good faith -- the genuine good

22   faith effort, Plan A, to finance this was litigation

23   financing.  And that seemed to be going on swimmingly

24   until the protective order -- it became clear that was

25   preventing due diligence from taking place, and no

1   litigation financing company was going to sign off.

2        By the time it was April of 2019, however,

3   basically they had a litigation financing company, that

4   was King & Spaulding.  King & Spaulding had been often

5   billing them and allowed the invoices to accumulate, and

6   of course as we know, by August 22nd, they had

7   accumulated to $1.2 million.  So King & Spaulding was

8   financing, as a practical matter, the litigation.

9        In August of 2019, there was a conversation

10  between King & Spaulding and CellInfo in which they

11  said, "Hey, we need to get over the finish line.  We

12  know we're scheduled for trial very soon in this.  We

13  don't have $1.2 million, what can you do for us?"  And

14  King & Spaulding said, "We'll tell you what, just pay

15  our hard costs of $250,000 and you will get over the

16  finish line."  That was Plan B and that was a good-faith

17  effort there to get over the finish line.

18        The problem arose when after the September 5th

19  invoice came in -- there were two problems that arose.

20  One is, first, King & Spaulding changed that to

21  $300,000.  Well, you know, Paul Karger's like, "I'll

22  come with up with a little bit more and we'll make that

23  work."  Then the second problem is Paul Karger's

24  investment in the Chilean compromise, those funds didn't

25  come in.  But the real problem was that King & Spaulding

1   backed out.

2        Now the reason why King & Spaulding backed out,

3   according to the defendant, um, it had something to do

4   with losing a preliminary injunction motion.  As an

5   initial matter I want to point out that that motion was

6   decided not on the likelihood of success on the merits,

7   but just on the irreparable harm prong.  And then on a

8   technical basis, because the arbitrator said, "Well

9   because they're using this in-house, there can't be

10  irreparable harm with a third party," and therefore

11  that's why they didn't grant the preliminary injunction.

12       But the preliminary injunction was meaningless at

13  that point because the trial was scheduled so soon.  It

14  wasn't -- and then how do we know it was meaningless to

15  the financing?  Because of -- according to ATC's theory,

16  they got scared off and they lost financing and that's

17  why the people didn't come up with money as a result of

18  the preliminary injunction decision.  Then why, a week

19  later, did James Berylson's $50,000 come in?  They were

20  still gung-ho, everything was going great until the

21  October 1st e-mail from King & Spaulding.

22       And so the critical fact here is not whether King

23  & Spaulding was unethical or breached a contract, it's

24  whether CellInfo made genuine good faith efforts to

25  raise the money?  And they did everything they could.

1          First, they went to the, um, the litigation

2     finance companies.  Second, they went to their lawyers,

3     a big wealthy law firm, King & Spaulding.  Third, they

4     went to everyone who they could get money from.

5          And, by the way, when -- when ATC says -- well,

6     you know, early on in 2016 in a sworn deposition, um,

7     they bragged -- CellInfo bragged, they bragged that they

8     could, you know -- specifically Paul Karger bragged he

9     could raise $250,000 easily.  Yeah, for a startup

10    company changed circumstances change the ability to

11    raise money.  It's a lot different raising money for a

12    startup company -- pretty sexy and exciting potentially,

13    you know the next Facebook or whatever, right, than

14    litigation financing.  There's a very limited universe

15    of people who will fund litigation financing.  And they

16    went to that universe.

17         How do you know they went to that universe?

18    Because you can look at that August 28th e-mail.  They

19    knew they were almost over the finish line, your Honor,

20    they just needed another $250,000.  And who did they

21    send that e-mail to?  They sent it to James Berylson,

22    Jeffrey Parker, John McGillian, and the three -- the two

23    Karger brothers, and the third, um, partner -- um,

24    managing partner at, um, Twin Focus Capital.  Those six

25    people.  Because that's all they had at that point.

1    That isn't a vast network of friends and family with

2    unlimited resources as ATC would have you believe, your

3    Honor.  That e-mail is evidence (A) of who the universe

4    of people they could go to was and (B) it's evidence

5    that they acted with good faith efforts because they

6    went to the people they could go to and they followed up

7    with those same people.

8         And then they'll say, "Well they'll raised a lot

9    of money since then."  Well the truth is, in the full

10   year -- it's now been a year since that money came in --

11   it's been more that a year, you know to October 1st,

12   almost a full year later, they've raised a grand total

13   of about $100,000 in a year, um, less than half of what

14   they would have needed to pay the invoice.

15        So there is compelling evidence that -- I mean all

16   one has to do is look at the financial documents.  If

17   you look at Exhibit 1, Exhibit 2, and then the last few

18   exhibits, I think it's 78 through 80, and you will see,

19   your Honor, that they didn't have the money and they

20   didn't have the income.  So then you look at the e-mail

21   chain and you see that they made -- they did everything

22   they could to raise the money.

23        And if you -- if you -- well let's take a look for

24   a moment at the argument that ATC is presenting.  ATC

25   says, "Oh, it's a value proposition," your Honor.  They

1   just didn't want to continue this because they didn't

2   think it was valuable enough.  Well if that were the

3   case, why would we be here?  They think that they have a

4   very strong claim.

5        And the value -- if it was -- and sure the value

6   proposition changed from an investor's perspective from

7   2016 when you're investing in a new business to, um, the

8   point in time when they had no lawyers after King &

9   Spaulding or they had no credible lawyer, no good

10  relationship with their lawyer, and no ability to

11  finance the arbitration fees.  Of course the situation

12  changed.

13       But here's a key fact that you need to keep in

14  mind, your Honor, please.  It is not a matter of whether

15  these third-party investors thought it was a good value

16  proposition, it's a matter of whether CellInfo made good

17  faith -- genuine good faith efforts to raise the funds.

18       Now if you look in *Tillman*, you see the only

19  evidence of the genuine good faith efforts was an

20  affidavit, a declaration from the woman who said -- from

21  the plaintiff, she said, "Look, I got some loans and

22  then I couldn't get any more loans."  Here you have a

23  lot more to go on.  You have a lot more.

24       You have four witnesses -- five witnesses -- no,

25  four witnesses who testified.  You have extensive

1    documentary evidence that shows -- that paints a very

2    detailed clear picture.  You do not need to take our

3    witness's word for it because the time that -- the

4    factual scenario that's proposed by the defendant is not

5    plausible.  It's not only fiction, it's science fiction.

6    And why is it science fiction?

7          THE COURT:  Look, um -- I appreciate your argument

8    and, um, it isn't their burden, it's your burden here.

9    And, um, we'll see -- if they're going to impugn the

10   good faith of CellInfo, um, then I will be asking

11   questions as to what they're basing it on.

12         I continue to have problems about the causation

13   here, um, and the role of King & Spaulding.  It is quite

14   candidly hard for me to accept since this would be such

15   egregious violations of the duties of an attorney toward

16   a client, um, preferring their own invoices to the money

17   that was transferred to them.  Again if I credit

18   Mr. Drouin and Mr. Karger, if I credit them, they

19   understood, Brogan understood that the funds transferred

20   to them were to pay the first half of the Triple A

21   invoice.  To say, well they don't have any money, um,

22   when they have come up, in good faith, as you argue with

23   those funds and transmitted them to their attorney, I --

24   I don't know that I'm prepared to believe that the

25   client is so weak in these circumstances.

1          MR. PARKER:  Your Honor, I've had --

2          THE COURT:  That's why we have a board of bar

3     overseers.

4          MR. PARKER:  May I tell you why they're weak in

5     addition to the reason I gave you before the --

6          THE COURT:  Yes, I'm trying to be transparent,

7     this is my problem with your argument.

8          MR. PARKER:  Well the other problem with the

9     argument and the other problem that they were faced with

10    is that the written communications said they'd be used

11    for costs and in fact they were used for costs, they

12    weren't used to pay attorneys fees, they were used for

13    expert witness costs.  So King & Spaulding, I think, has

14    a viable argument that they did -- they kept up their

15    end of the bargain, they used it for costs.

16         Now, whether they were supposed to use it for

17    the -- I think the understanding from my client's

18    perspective, from CellInfo's perspective, was that the

19    first cost they were going to use it for was the

20    arbitration fees, because that's the only thing that

21    makes sense under the circumstances.  But to say that

22    King & Spaulding committed an ethical violation or a

23    contract breach, I'm not so sure you can say that based

24    on the gray areas in that communication.  What I do

25    think is it makes no difference, your Honor.  If you

1    make a finding and --

2        THE COURT:  And that's my point, um, and you came

3    right back to me and that's right, you said, "It makes

4    no difference, look at *Tillman*."  But *Tillman* doesn't --

5    one, I don't have decisional law that governs me here in

6    this circuit.  *Tillman*, as you quite rightly point out,

7    is just an affidavit.  I've had a detailed evidentiary

8    hearing here and I'm grateful for it.

9        You know, um, here I have these exhibits, I have

10   real questions, and to say "Well there's a gray area"

11   about it, um --

12       MR. PARKER:  Your Honor, I'm sorry if I'm not

13   articulating well, I'll afraid it's my fault.  When I

14   say it doesn't matter, it's the genuine effort of Person

15   A is not determined by what Person B says or does.  So

16   the fact that CellInfo tried to get the money and

17   believed that they had a binding contract and believed

18   that this money, the 180,000 -- as long as they believed

19   in good faith that the $180,000 was going to pay for

20   arbitration fees, it is irrelevant why King & Spaulding

21   did what they did.  Whether they thought the case was

22   weak.  Whether someone on their board, you know one of

23   their senior partners, said, "Dump these guys."  Or that

24   somebody's brother-in-law, you know, was an investor in

25   American Tower, said, "I had no idea."  And it doesn't

1  make a whiff of difference, your Honor, why that October

2  1st e-mail got sent by King & Spaulding because it does

3  not impact on CellInfo's genuine good faith efforts,

4  which they made.  It's totally irrelevant.

5          THE COURT:  I understand the argument.

6          All right, let's hear from Mr. Wodarski.

7          MR. WODARSKI:  All right, thank you, your Honor.

8

9  CLOSING ARGUMENT BY MR. WODARSKI:

10          On behalf of the defendant, I think I just would

11  take a moment first to address the colloquy you were

12  just having with Mr. Parker and I think you properly

13  seized on the issue of Mr. Parker calling it a "gray

14  area."

15          Your Honor, the undisputed testimony before you

16  from both sides, both Mr. Drouin's and Mr. Karger's

17  testimony on behalf of CellInfo and then Mr. Brogan

18  speaking through his October 1st, 2019 e-mail, show you

19  there is no ambiguity, there is no gray area.  The deal

20  was CellInfo would pay a total of $300,000 to King &

21  Spaulding and King & Spaulding from that would take sole

22  responsibility for timely paying all litigation costs

23  and expenses.

24          From that perspective, CellInfo wouldn't care in

25  what way it was prioritized and paid, they just had to

1   live up to the obligation to pay the $300,000 and King &

2   Spaulding would have the obligation to pay all costs and

3   expenses.  So there -- coincidentally in that scenario

4   there would have been no instruction where King &

5   Spaulding would have agreed to pay, um, something out of

6   the first $180,000 deposited.

7        THE COURT:  Isn't it plausible that there was an

8   oral deal before this $300,000?  It wasn't $300,000 to

9   start.

10       MR. WODARSKI:  It was 250.

11       THE COURT:  That's right.

12       MR. WODARSKI:  That's right.

13       THE COURT:  All right.

14       MR. WODARSKI:  You would have had to have seen --

15  by the way, there was no testimony or document before

16  you that would suggest that, and you have to the

17  contrary Mr. Karger and Mr. Drouin both testifying that

18  the agreement was, as I just stated, when the term was

19  $250,000, and that when it was revised to $300,000, it

20  was agreed to by both parties as revised.  There's no --

21  there's no document or testimony that would allow you to

22  conclude otherwise.

23       So with that point -- with that point, your Honor,

24  if I may continue?

25       THE COURT:  Please.

1        MR. WODARSKI:  From our perspective, your Honor,

2    this case is very simply put that it is not about a lack

3    of funds, the undisputed fact here is that CellInfo's

4    investors provided CellInfo with just under $1 million

5    in litigation funding.  And the argument they make

6    before you is that despite that fundraising, they could

7    not pay a Triple A invoice that they knew was coming and

8    once paid would allow CellInfo to get what its witnesses

9    repeatedly tell you CellInfo most wanted.

10        (Phone rings.)

11        THE COURT:  Hold on a second.

12        MR. WODARSKI:  Sure.

13        (Pause.)

14        THE COURT:  Go right ahead.

15        MR. WODARSKI:  Thank you, your Honor.

16        What they most wanted was a prompt hearing on the

17    merits for their trade secret claim.

18        Now we don't think that's true, your Honor, but

19    even if it were true, it's a circumstance of their own

20    volitional act, and at best they demonstrated to you

21    that they mismanaged the funds they had, not that they

22    lacked the funds.

23        CellInfo's real intention here is to erase what

24    happened in the course of arbitration, but what happened

25    there matters, your Honor, and we must take account of

1   it.   Arbitration was where this dispute was supposed to

2   be resolved and the panel oversaw proceedings through

3   critical motion practice and extensive discovery.   The

4   panel didn't hold back any punches in its March 4th

5   order.   While litigation is expensive, CellInfo's

6   unnecessarily aggressive and lavish litigation tactics

7   made things much worse than they had to be.   The panel

8   also tellingly recognized that CellInfo's claim of

9   poverty came only after it had lost its request for a

10  preliminary injunction.

11       So you must ask yourself, your Honor, why is it

12  that a group that collectively raised a million dollars

13  for the litigation failed to make this one arbitration

14  payment which was due less than a month after the panel

15  denied the request for a preliminary injunction and

16  exactly as CellInfo's attorneys were informing

17  Mr. Drouin and Mr. Karger that King & Spaulding would

18  withdraw as counsel?   That withdrawal notification, your

19  Honor, comes immediately after King & Spaulding had

20  finished deposing American Tower's fact witnesses.   It's

21  no coincidence.

22       They ask you to believe that the invoice was

23  unexpectedly high, but we know that's not true.   As of

24  at least January of 2019, Triple A disclosures allowed

25  each party to understand, through the panel's hourly

1    rate, how expensive the arbitration could be, but as the

2    panel noted, that did not stop CellInfo from

3    overlitigating the case.

4         But more importantly, your Honor, in his October

5    1st, 2019 e-mail, which is Exhibit 75, Attorney Brogan

6    admits that the arbitration invoice was less than

7    $100,000 more than what they had expected it would be,

8    and the revised -- excuse me, your Honor, and the

9    revised contingency agreement with King & Spaulding

10   would have split the difference.  CellInfo's investors

11   will pay $50,000 more, as they agreed, and the law firm

12   would absorb the rest.

13        The CellInfo witnesses stress to you that they

14   lacked credibility to go back to CellInfo's litigation

15   funders and raise the money that they had expected would

16   come from Mr. Karger, but that too does not make sense.

17   In September of 2019, this group of investors should

18   have jumped at the chance to meet CellInfo's obligation

19   to pay King & Spaulding $300,000 under the new

20   contingency agreement.  That agreement, had CellInfo

21   lived up to its part of the bargain, would have solved

22   all of their problems, your Honor, and brought them

23   coveted certainty as to the cost of litigation.  It

24   covered all past and future attorneys fees and all

25   expenses for the remainder of the arbitration including

1    the outstanding arbitration fees.

2         Far from lacking credibility, Mr. Drouin's and

3    Mr. Karger's solicitations at that very moment would not

4    only have been credible but extremely attractive to the

5    investors who already had several hundreds of thousands

6    of dollars of skin in the game.  So CellInfo's

7    litigation funders should have jumped at the chance

8    unless there was reason not to.

9         To that end, your Honor, how is it credible that

10   an investor group that demonstrated that it was willing

11   to successfully fund all of CellInfo's litigation

12   expenses as needed before October of 2019, and now is

13   again willing to do so after and into the future,

14   somehow refused to fund this singular obligation at this

15   one moment in time?  The same group is already committed

16   to paying the remaining costs of litigation, if it's

17   litigated here, your Honor, and that will still entail

18   paying lawyers, preparing or presenting two experts, and

19   other ancillary expenses.

20        So they say they simply lack the funds, but

21   Mr. Drouin's own testimony shows us that that's not

22   true.  Most notably, Mr. Drouin testified that the

23   reason that Jeff Parker refused to loan CellInfo money

24   in the fall of 2019 was not that he, Jeff Parker, was

25   broke, but rather at that point it would just be a bad

1    investment.  Pausing there, your Honor, that testimony

2    alone proves American Tower's point.

3         THE COURT:  Well, but does it?  He's under no

4    obligation to put up any more money.  He doesn't --

5    there's no contractual agreement here.  And the focus in

6    terms of whether CellInfo is operating in good faith is

7    the books and records of CellInfo and its officers.  I

8    mean they do business as this limited liability

9    corporation, that's the entity.

10        MR. WODARSKI:  Well two points on that, your

11   Honor, if I may?

12        The first is, with respect to the litigation

13   funders and not CellInfo itself, I think what the record

14   has demonstrated is you must look at the course of

15   conduct, your Honor.  I think it is important that when

16   we appreciate, as I said in my opening, that there has

17   never been a time when anyone has looked to others,

18   except for this litigation funding group, to fund the

19   litigation, the course of what they've done matters.

20   And so if they've done it looking backwards historically

21   and met every obligation timely to litigate this dispute

22   and they once again stepped in and, to Mr. Parker's

23   concession right now, showed that they can raise over a

24   5-month period another $100,000, there really is no

25   legitimate reason why they could not have collectively

1    as a group raised the $120,000.

2         THE COURT:  But they don't have to, they don't

3    have to put any money up at all.

4         MR. WODARSKI:  Well if that's the issue, your

5    Honor, then I think the analysis becomes much simpler

6    for me because then we look at the existing

7    jurisprudence in the First Circuit, informed by ***American***

8    ***Express,*** and the Supreme Court's guidance, and we say,

9    "If this argument were to be raised on CellInfo's books

10   and ledgers alone, then the time the argument must have

11   been raised was back before you in August or October of

12   2018 and not two years later," your Honor, and we should

13   look exclusively at the arbitration scheme set forth in

14   the parties's agreement and determine whether, as a

15   scheme, it prevented access to arbitration and redress

16   before the dispute was litigated.

17        So to do so now, your Honor, if it's literally

18   just looking at CellInfo's checking account, the

19   analysis for me becomes much simpler, it's -- not only

20   does the law not permit you to look at the argument now,

21   but if you did so, the evidence you've heard would show

22   the extreme prejudice that American Tower would suffer.

23   And in that case, if that's the analysis, we would ask,

24   on that limited -- on that exclusive basis --

25        THE COURT:  I think there's much to the argument

1   you've just deposited, but I don't follow, what's the

2   extreme prejudice?

3        MR. WODARSKI:  Well, your Honor, the prejudice is

4   that we lived up to the parties's obligation to

5   arbitrate, we arbitrated through all of fact discovery,

6   through 90 percent of expert discovery, and had

7   litigated and received an adjudication of a critical

8   issue, which was irreparable harm, which is the gravamen

9   that lies behind the leverage CellInfo hoped to create

10  in this litigation.  So those are substantial things,

11  your Honor.

12        And I don't think it's as easy to say that the

13  case can be relitigated here.  What they want is to

14  relitigate the case here in front of a jury where they

15  can revisit with a blank slate the issue of irreparable

16  harm, and that's prejudice.

17        THE COURT:  All right, let me argue -- let me not

18  argue, let me ask you these questions.

19        I only have the motion before me, so if I deny

20  their motion, the case remains administratively closed,

21  the causes of action don't go away.  I mean one supposes

22  that it's at least conceivable that, um, things will be

23  worked out with King & Spaulding or Mr. Parker's firm

24  could go back to the arbitrable forum and seek to assess

25  a date.  You agree that the causes of action -- I'm not

1     entering any judgment here, but if you win here today, I

2     deny the motion to restore this to the trial list, the

3     case remains administratively closed and sent to

4     arbitration.

5          Is that right?

6          MR. WODARSKI:  Well, your Honor, if you're -- if

7     you're enticed by following the *Tillman* analysis, the

8     Ninth Circuit says, um, on these facts as we believe the

9     hearing presented, then the proper course would be to,

10    um, deny the motion and then dismiss CellInfo's

11    complaint under Rule 41(b) for its failure to comply

12    with an arbitration order despite its ability to do so.

13    So if the Ninth Circuit's guidance there is followed, I

14    think it would result in dismissal.

15         Beyond that, your Honor, I think what you posited,

16    I would have to wait to see how things play out.  I

17    think --

18         THE COURT:  That's a good cautious answer.  I

19    think that makes some sense.

20         I mean if you take their original complaint, even

21    if they have muffed the arbitration adjudication, but

22    the complaint, under the laws of Massachusetts, charges

23    criminal acts, I mean a theft of trade secrets is a

24    crime in Massachusetts, um, one imagines they can go to

25    the authorities.  And so long as the statute doesn't

1     run, they can complain of the theft of trade secrets.

2     At least conceptually that's accurate, isn't it?

3           MR. WODARSKI:  Well, your Honor, you get me

4     trapped as having lived through the life of the

5     arbitration, which you haven't, and so I would say

6     directly to your answer, "Yes, it's conceptually true."

7     But having lived the life of the arbitration, I don't

8     think it's a significant anxiety.

9           THE COURT:  Again your candor, um, as any

10    attorney's would be, that's always helpful and there's a

11    direct answer.

12          Thank you.  All right.

13          MR. WODARSKI:  You're very welcome, your Honor.

14          THE COURT:  All right.

15          Well I think I understand the argument, um, and I

16    think the matter has been fairly presented and I'm

17    prepared to rule.

18          I reserve my right to write an opinion with

19    additional subsidiary facts because I will speak only in

20    conclusory terms at this juncture.

21          On the matter that is before the Court, the, um,

22    motion to restore this case to the trial list is denied.

23    There are two subsidiary issues before the Court.  The

24    first issue is was CellInfo, um -- looking at CellInfo

25    itself, was it unable to proceed with the arbitration?

On all the record before the Court, I cannot find, by a

fair preponderance of the evidence, that it was unable.

I do not express any opinion as to the ethics of King &

Spaulding, though I note that CellInfo has raised the

most serious accusations against King & Spaulding.

On the second issue, CellInfo's good faith in

coming or seeking this order, um, American Tower argues

strenuously that on this record there is evidence of bad

faith.  This Court does not so find, um, without making

a, um -- without making a finding of the utmost good

faith, I certainly don't find bad faith on CellInfo's

part.

The record -- and it's been helpful that counsel

has so ably developed what actually went on, um, the

principals of CellInfo may well have been confused, may

well have been not sufficiently apprised of their rights

or sufficiently, um, careful in defining the uses to

which their funds were to be put, but just as I cannot

find and I do not find breach of the ethical

responsibilities of King & Spaulding, so too I do not

find an absence of good faith in bringing this motion on

the part of CellInfo.

Unlike the ***Tillman*** court, it is clear to this

court, under the laws of Massachusetts, that under the

laws of the Commonwealth, the issue of arbitration vel

1  non is governed by the Federal Arbitration Act and this

2  Court has addressed that issue and properly sent the

3  matter to arbitration, but the choice of forum does not

4  extinguish the cause of action.  These civil causes of

5  action remain until the statute of limitations has run.

6         At least as Mr. Wodarski forthrightly answers the

7  Court's question, at least there are allegations of

8  criminal activity -- upon which I express no opinion

9  whatsoever, arbitration clauses cannot extinguish or

10  obviate criminal activity and no one suggests that they

11  can.

12         Therefore, on balance -- well not on balance, but

13  at the end of the day, the motion to restore this case

14  to the trial list is denied, the case remains

15  administratively closed.  It may be reopened at any time

16  on -- upon motion by any party, um, pending further

17  proceedings before the arbitrable forum, um, working out

18  of the dispute between CellInfo and King & Spaulding,

19  but there is nothing more for the Court to do today and

20  the Court takes no further action.

21         I'm not going to entertain further argument, but

22  before I recess I should ask if there are any questions.

23         Are there any questions, Mr. Parker?

24         MR. PARKER:  When will you be issuing your written

25  ruling?

1          THE COURT:  Well, the, um -- I'm not clear that I

2     will, I'm reserving my right to.  You have the

3     transcript of today's proceeding and the docket will

4     reflect that the motion is denied.  If I issue one, it

5     will be as soon as I can get to it.

6          MR. PARKER:  Your Honor, um, I'm just concerned,

7     for purposes of appeal, whether there's a -- whether you

8     consider this to be a dispositive decision on this or

9     whether you're inviting another hearing on it, maybe a

10    --

11         THE COURT:  You make a good point.  I'm not

12    inviting another hearing.  I don't know whether you have

13    a right to appeal from this decision.  But I'm not one

14    for, um, in any way obviating anyone's right to appeal.

15         So let's say that if you have a right to appeal --

16    you have a right to appeal from what I've just done, to

17    appeal it within a timely period.  And that if I choose

18    to, um, make more specific findings and explain myself

19    further, I will do so promptly.

20         Does that answer your question?

21         MR. PARKER:  I think so, your Honor.  Thank you.

22         THE COURT:  Yeah, of course -- excuse me.  I

23    express no opinion on the right to appeal.  If you want

24    to appeal, go ahead.

25         Mr. Wodarski, any questions, sir?

1          MR. WODARSKI:  No, your Honor, thank you for your

2     time.

3          THE COURT:  Yeah, well I thank you.  I always --

4     when a lawyer says "Thank you for your time," this of

5     course is what they pay me for.  I appreciate the

6     skilled work that you both -- you all have put in here.

7     That's the order of the Court.  We'll recess.

8          MR. PARKER:  Thank you.

9          MR. WODARSKI:  Thank you, your Honor.

10          (Ends, 10:50 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

3

4          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5     do hereby certify that the foregoing record is a true

6     and accurate transcription of my stenographic notes

7     before Judge William G. Young, on Tuesday, September 29,

8     2020, to the best of my skill and ability.

9

10

11

12

     /s/ Richard H. Romanow 10-05-20
13   _____
     RICHARD H. ROMANOW    Date
14

15

16

17

18

19

20

21

22

23

24

25