UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
CELLINFO, LLC,                 )
                 Plaintiff,    )
                               )
        v.                     )        CIVIL ACTION
                               )        NO. 18-11250-WGY
AMERICAN TOWER CORPORATION,    )
AMERICAN TOWER LLC,            )
AMERICAN TOWER DO BRASIL -     )
CESSAO DE INFRAESTRUTURAS LTDA,)
AND ATC IP LLC,                )
                               )
                 Defendants.   )
_____)
```

YOUNG, D.J.                                    November 30, 2020

**MEMORANDUM OF DECISION**

This case requires analysis of the substantive provisions
of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3-4.  Such
cases are relatively rare today since the overly expansive
interpretation of that Act by a majority of the Supreme Court
and the acquiescence of the Congress has led to marginalizing
the American jury,[1] once the conscience of the community and the

---

[1] Judge Craig Smith & Judge Eric V. Moyé, Outsourcing
American Civil Justice: Mandatory Arbitration Clauses in
Consumer and Employment Contracts, 44 Tex. Tech L. Rev. 281, 282
(2012) ("The Seventh Amendment right to a jury trial is
vanishing before our very eyes.  Many sources point to the
increased reliance upon alternative dispute resolution, and
mandatory arbitration specifically, as an explanation for this
trend.") (footnotes omitted).

"crown jewel" of American jurisprudence,[2] the evisceration of our civil rights and consumer protection laws in the workplace and the marketplace,[3] barring thousands of Americans from their day in Court,[4] and largely banishing the lower courts from the

---

[2] See <u>United States</u> v. <u>West</u>, 552 F. Supp. 2d 74, 75 (D. Mass. 2008), aff'd, 631 F.3d 563 (1st Cir. 2011).

[3] See David Horton, <u>Infinite Arbitration Clauses</u>, 168 U. Pa. L. Rev. 633, 649 (2020) ("Forced arbitration clauses became a routine part of consumer and employment contracts, provoking heated debate about the privatization of the justice system."); Alyssa Schaefer, Note, <u>Sexual Harassment in the Shadow of Mandatory Arbitration</u>, 34 Wis. J. L. Gender, & Soc'y 237, 259 (2019) ("Employers currently wield the ability to require arbitration of sexual harassment and other statutory rights claims."). As the Honorable Judges Smith and Moyé note,

> A person cannot open a bank account, obtain a credit
> card, buy a car, or use a cell phone without
> contracting away the Seventh Amendment right to a jury
> trial. In reality, a person must yield his or her
> very access to the courts in order to meaningfully
> participate in our modern society. Slowly but surely,
> the widespread enforcement of mandatory arbitration
> clauses has chipped away at the basic tenets of
> contract law and of the fundamental freedoms upon
> which our nation was founded: the right to a jury
> trial in civil cases.

Smith & Moyé, <u>surpa</u> note 1, at 282 (footnotes omitted). <u>See also</u> <u>id.</u> at 297 ("The resolution of these matters outside of the court system deprives the citizenry of an open, accessible development of the common law as it pertains to commercial, consumer, and employment disputes.").

[4] As professor Margaret Moses writes,

> [T]he U.S. system of imposing arbitration on consumers
> without their full understanding or consent has
> reduced their access to court systems, which means no
> right to a jury trial, no right to a class action
> (even if a class action is the only effective means of

development of law in these areas.[5]  As every district judge
knows, about all that's left is figuring out whether the parties
can somehow be said to have actually agreed to arbitration,[6]

_____

recourse), and, because an arbitrator's decision is
not reviewable on the merits, no supervision by the
courts as to whether arbitration is properly
protecting consumer rights.

Margaret L. Moses, How the Supreme Court's Misconstruction of
the FAA Has Affected Consumers, 30 Loy. Consumer L. Rev. 1, 19
(2017).  See also Arthur R. Miller, What Are Courts for? Have We
Forsaken the Procedural Gold Standard?, 78 La. L. Rev. 739, 775-
77 (2018).

[5] See In re Nexium (Esomeprazole) Antitrust Litig., 309
F.R.D. 107, 145 (D. Mass. 2015), as amended (Aug. 7, 2015),
aff'd, 842 F.3d 34 (1st Cir. 2016).

In industries where arbitration has become the
dominant forum for dispute resolution and very few
disputes have made their way through the courts in
recent decades, the public law is underdeveloped and
possibly even frozen.  Disputants trying to determine
what the current law is in a particular area might try
to comb through the few arbitration awards that are
publicly available, and analyze any hints to what
legal norms arbitrators applied.  In other words, the
shadow of substantive outcomes in arbitration is a
dark, murky shadow -- unknown, hard to ascertain, and
unpredictable.

Jill I. Gross, Bargaining in the (Murky) Shadow of Arbitration,
24 Harv. Negot. L. Rev. 185, 201-02 (2019) (footnotes omitted).

[6] I do not mean to suggest that this is simple.  Well aware
that forced arbitration constitutes a very effective barrier to
inquiry into corporate misconduct, business continually seeks to
extend and heighten this barrier.  See, e.g., Ting v. AT&T, 319
F.3d 1126, 1151 (9th Cir. 2003); Murray v. Grocery Delivery E-
Servs. U.S.A., 460 F. Supp. 3d 93 (D. Mass 2020), appeal
pending.  See CellInfo, LLC, v. American Tower Corps., 352 F.
Supp. 3d 127, 137 (D. Mass. 2018) ("CellInfo I"), appeal
pending; see also Horton, supra note 3, at 647 ("[E]ven the

and, if so, sending the parties off to arbitrate and closing the case.[7]

"But let that bide."[8]

This case is different. It presents an issue of first impression in this circuit, viz. can a litigant who is properly sent to arbitration come back to court if it runs out of money? After all, arbitration is a private dispute resolution mechanism and it is expensive[9] -- this case illustrates just how expensive.

---

broadest clause could not cover the elementary question of whether the parties had consented to arbitrate in the first place.").

Since the FAA, by its terms, does not apply "to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," 9 U.S.C. § 1, there is also a robust subset of cases addressing the claims of workers who seek to avoid the arbitration bar. See, e.g, Oliveira v. New Prime, Inc., 857 F.3d 7, 11 (1st Cir. 2017), aff'd, 139 S. Ct. 532 (2019); Waithaka v. Amazon.com, Inc., 966 F.3d 10, 13 (1st Cir. 2020); Biller v. S-H OpCo Greenwich Bay Manor, LLC, 961 F.3d 502, 507 (1st Cir. 2020).

[7] In rare instances, the parties do come back, seeking to confirm or vacate the arbitration award. See 9 U.S.C. § 10. Here, in all but the rarest of cases, the job is promptly to confirm the award, see UBS Fin. Servs. Inc. v. Asociación de Empleados del Estado Libre Asociado de Puerto Rico, 419 F. Supp. 3d 266, 269, 272 (D. Mass. 2019), appeal pending.

[8] Captain Abel Jones, HQ Army of the Potomac, Late Sergeant, 24th Foot (South Wales Borderers) (from Owen Parry, Faded Coat of Blue 2, 5, 9, 10, 27, 31 (Avon Books, 1999)).

[9] See Gross, supra note 5, at 189 ("[S]cholars examining arbitration procedures contend that today's arbitration process has become too litigation-like, eliminating the advantages of arbitration as a speedy and economical alternative dispute resolution process.").

### I.   The Legal Framework

At first glance this would appear to be quite a dubious proposition.  After all, it apparently makes no difference to the Supreme Court majority that consumers, employees and small businesses rarely have the "ability, training, or resources to navigate the arbitration process effectively,"[10] nor that customers complaining about alleged telephone overcharges cannot, as a practical matter, afford to pursue their claims unless they can pursue a class action,[11] nor that it is unconscionable and senseless to compel families to arbitrate wrongful death claims against a negligent nursing home[12] -- when in arbitration the families typically would be grossly disadvantaged (lower recovery chills lawyers' enthusiasm to take cases),[13] nor that a plaintiff's costs of individually arbitrating a federal statutory claim exceeds the potential

---

[10] See Miller, supra note 4, at 778.

[11] See generally AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011).  See also Smith & Moyé, supra note 1, at 295 ("Consumer claims are often small in value compared to amounts at issue in disputes between corporate entities.  Alone, these small-dollar claims appear insignificant and are far less likely to see their day in court.") (footnotes omitted).

[12] See generally Marmet Health Care Ctr., Inc. v. Brown, 565 U.S. 530 (2012).

[13] Andi Alper, Comment, Seeking Justice for Grandma: Challenging Mandatory Arbitration in Nursing Home Contracts, 2016 J. Disp. Resol. 469, 476 (2016).

recovery,[14] nor that sending "wholly groundless" matters to arbitration would run afoul of the very purpose of arbitration to be expeditious, affordable, and effective.[15]

Nevertheless, the Fifth, Eighth, Ninth, and Tenth Circuits have mapped out a path, albeit narrow, to return to court from arbitration.

## A.    The Lifespan of a "Stay"

"Section 3 of the Federal Arbitration Act allows parties to an arbitration agreement to move the court to 'stay a judicial proceeding when the matter before the court involves an issue governed by an agreement to arbitrate.'" CellInfo I, 352 F. Supp. 3d at 132 (quoting Campbell v. General Dynamics Gov't Sys. Corp., 407 F.3d 546, 552 (1st Cir. 2005)).  "Section 4 of the Federal Arbitration Act permits parties 'aggrieved by another party's refusal to arbitrate to petition a district court to compel arbitration in accordance with the parties' preexisting agreement." Id. (quoting Campbell, 407 F.3d at 552).  Sections 3 and 4 should be interpreted together. Marie v. Allied Home Mtge. Corp., 402 F.3d 1, 13 (1st Cir. 2005) ("[T]he Supreme

---

[14] See American Exp. Co. v. Italian Colors Rest., 570 U.S. 228, 228 (2013); Miller, supra note 4, at 775.

[15] See Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 527 (2019).

Court has cautioned us to interpret sections 3 and 4 of the FAA together.").

A stay remains "until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."  9 U.S.C. § 3.

**B.   When Would a Termination of Arbitration as a Result of Non-Payment Be "in Accordance with the Terms of the Agreement" and Permit Lifting a Stay?**

Consulting the decisions below, whether the arbitration "has been had in accordance with the terms of the agreement," depends on whether the non-payment was a failure, neglect, or outright refusal to arbitrate, as opposed to an innocent inability to pay and proceed with the arbitration.  See 9 U.S.C. § 4; Tillman v. Tillman, 825 F.3d 1069, 1075 (9th Cir. 2016).

Like CellInfo, the district court compelled Tillman to arbitrate.  See Tillman, 825 F.3d at 1072-73.  In that case, too, the paying party who compelled the arbitration elected not to cover the arbitration fees for Tillman.  Id. at 1072, 1074.  There, too, the arbitration was terminated due to non-payment pursuant to Rule-57 of the Commercial Arbitration Rules and Mediation Procedures, American Arbitration Association (2013) ("AAA Rule-57").  Id. at 1072.  There, too, Tillman, the compelled party, asked to lift the stay and proceed in court.

[7]

Id. at 1074-75.  Under these circumstances, the Ninth Circuit
held that the arbitration complied with the terms of the
arbitration agreement and the district court properly lifted the
stay.  Id.

The Ninth Circuit was conscious of the fact that the
compelled party was the very one who caused the arbitration to
terminate.  Lifting the stay was nonetheless appropriate only
because the non-paying party acted in good faith during the
arbitration and became genuinely unable to afford it.

> Our decision that Tillman's case may proceed does not
> mean that parties may refuse to arbitrate by choosing
> not to pay for arbitration.  If Tillman had refused to
> pay for arbitration despite having the capacity to do
> so, the district court probably could still have
> sought to compel arbitration under the FAA's provision
> allowing such an order in the event of a party's
> "failure, neglect, or refusal" to arbitrate.  9 U.S.C.
> § 4.1.  Or, in that context, the court could, and most
> probably should, dismiss Tillman's complaint under
> Fed. R. Civ. P. 41(b), for failure to comply with the
> order to arbitrate despite its ability to do so.
> Here, however, the district court found that Tillman
> had exhausted her funds and was "unable to pay for her
> share of arbitration."  As a result, the district
> court excused Tillman's lack of compliance with its
> order compelling arbitration under 9 U.S.C. § 4.

See id. at 1075-76 (emphasis in original).  In a footnote, the
Tillman Court added:

> A question may arise in such circumstances as to
> whether an arbitration "has been had in accordance
> with the terms of the agreement," 9 U.S.C. § 3, when
> it has been terminated due to the nonpayment of a
> party who has the ability to pay but simply chooses
> not to.  Even if such an arbitration has been
> terminated in accordance with the rules governing the

[8]

arbitration, as Tillman's arbitration was here, it may
be contrary to "the structure and purpose of the FAA"
to allow a party to an arbitration agreement to
benefit from their intentional noncompliance with an
arbitrator's rules. Sink v. Aden Enters., 352 F.3d
1197, 1200 (9th Cir. 2003). But because Tillman was
unable to pay, gave notice of her inability to pay
during arbitration, and "made genuine efforts to make
alternate payment arrangements," id. at 1199, we need
not decide how to construe 9 U.S.C. §§ 3 and 4 in the
event of a party's willful nonpayment of an
arbitrator's fees.

Id. at 1076.

Other courts support this observation.

[W]hen a party who has engaged in arbitration in good
faith is unable to afford to continue in such a forum,
that party may seek relief from the superior court.
If sufficient evidence is presented on these issues,
and the court concludes the party's financial status
is not a result of the party's intentional attempt to
avoid arbitration, the court may issue an order
specifying: (1) the arbitration shall continue so long
as the other party to the arbitration agrees to pay,
or the arbitrator orders it to pay, all fees and costs
of the arbitration; and (2) if neither of those occur,
the arbitration shall be deemed "had" and the case may
proceed in the superior court.

Weiler v. Marcus & Millichap Real Estate Inv. Servs., Inc., 22

Cal. App. 5th 970, 981 (2018), review denied (Aug. 15, 2018),

cert. denied, 139 S. Ct. 2665, 204 (2019). See also Dobbins v.

Hawk's Enters., 198 F.3d 715, 716 (8th Cir. 1999) ("[T]he

district court held an evidentiary hearing to provide the

Dobbinses the opportunity to present evidence on their financial

condition and inability to pay the arbitration fees. Following

the evidentiary hearing, the district court lifted the stay,

reopened the case, and found that the arbitration fees precluded the Dobbinses from availing themselves of the arbitral forum."); Miller v. Aaacon Auto Transp., Inc., 545 F.2d 1019, 1020 (5th Cir. 1977) ("Had the failure of arbitration been caused by plaintiff's dilatory tactics, vacating the stay may have been improper, since plaintiff would be profiting from her own wrongdoing.").

The focus in the cases above on good faith compliance with the arbitration resonates with this Court.

The integrity and efficacy of the arbitration institution as well as court orders and contract laws are at stake here. Parties should be deterred from manipulating the justice system by forum shopping and noncompliance. Therefore, only upon a satisfactory showing that the non-paying party acted in good faith and under a genuine indigency -- inadvertently causing the premature termination of the arbitration proceedings -- would lifting a stay and adjudicating in court be appropriate.

Needless to say, a party should do more than simply show empty pockets. Rather, it must show that it diligently arbitrated, that it sought alternative funds but failed, that it attempted to adjust payment, get a discount or delay from the AAA, that it did not drag foot without action, that it made reasonable efforts to arbitrate in good faith.

As the Tenth Circuit reasoned in a similar case:

In the arbitration proceeding, Mr. Cahill did not show
he was unable to afford payment, ask the arbitrators
to modify his payment schedule, or move for an order
requiring Pre-Paid to pay his share for him so that
arbitration could continue.  Instead, by refusing
multiple requests to pay, he allowed arbitration to
terminate.

Pre-Paid Legal Servs., Inc. v. Cahill, 786 F.3d 1287, 1294 (10th

Cir. 2015).

## II.  **The Present Case**

Assuming without deciding that the Ninth Circuit's analysis

in Tillman properly applies the mandate of the FAA, this Court

held a two-day evidentiary hearing to determine what

transpired.[16]

The Plaintiff, CellInfo, LLC ("CellInfo"), is a

Massachusetts-based business that provides services to wireless

companies to improve cellular coverage.  Compl. ¶¶ 2, 19, ECF

No. 1.  The Defendant, American Tower Corporation, owns,

operates, and develops communications real estate, and is the

parent company of American Towers LLC, ATC IP, and American

Tower do Brasil (collectively, "American Tower").  Id. ¶¶ 12-14;

Defs.' Mem. Supp. Dismiss or Stay & Compel Arbitration 1

("Defs.' Mem. Dismiss/Stay"), ECF No. 18.

CellInfo and American Tower contracted for the purchase of

---

[16] All hearings on the motion to reopen have been conducted
via video conference due to the Covid-19 pandemic.  Clerk's
Notes, ECF Nos. 91, 93, 102, 109, 112.

lease options, site acquisition services, and consulting
services.  Compl. ¶¶ 21, 30, 43.  CellInfo and ATC IP entered
into a Master Consulting Services Agreement (the "Agreement") on
January 23, 2017.  CellInfo's Mot. Prelim. Inj., Ex. 5, Master
Consulting Services Agreement ("MCSA"), ECF No. 29-5.

By June 2018, the business relationship between the parties
had derailed and terminated.  CellInfo brought an action against
American Tower, alleging misappropriation of confidential
information and trade secrets and unfair competition, as well as
other claims.  Compl. ¶¶ 1, 8.  In response, American Tower
filed a motion to dismiss or, in the alternative, stay and
compel arbitration, which CellInfo opposed.  Defs.' Mot. Dismiss
or Stay & Compel Arbitration ("Defs.' Mot. Dimiss/Stay"), ECF
No. 17; Pl.'s CellInfo, LLC's Resp. Defs.' Mot. Dimiss or State
& Compel Arbitration ("Pl.'s Opp'n"), ECF No. 27.

The Agreement contained a "Dispute Resolution" provision,
Article Seven, which compels arbitration in a broad scope of
issues.  Defs.' Mem. Dismiss/Stay 2-3, 6-15; see MCSA § 7.1.
This Court ruled that all the American Tower entities were
entitled to rely on the agreement's arbitration provision.
Accordingly, based on the extensive arbitration clause, the
Court stayed the action and administratively closed the case in
order to allow the parties to commence arbitration and further
explore the arbitrability of the issues under dispute.  See

CellInfo I, 352 F. Supp. 3d at 130, 133-35.

Consequently, CellInfo initiated arbitration proceedings before a panel of three arbitrators (the "Panel"), just as the Agreement stipulated.  See MCSA § 7.1.  From the outset, CellInfo faced daunting financial problems in prosecuting this arbitration. American Tower was CellInfo's largest customer and when their business relationship fell apart, CellInfo's income stream essentially dried up.  See Sept. 24, 2020 Hr'g Tr. 52, ECF No. 110; Sept. 17, 2020 Hr'g Tr. 6-7, ECF No. 106; Decl. Victor Nathan Drouin, Ex. 2, Dep. Paul Karger 48-49, ECF No. 94-2.  At once CellInfo began to seek litigation financing to support what it insists is a very strong case.  See Sept. 17, 2020 Hr'g Tr. 10, 32-51.  At once it ran into a severe problem. Since the heart of this case involves alleged trade secrets, the parties jointly negotiated, and this Court entered, a protective order governing the disclosure of discovery materials.  Order Allowing Modified Protective Order, ECF No. 54; Order Granting Stipulated Protective Order, ECF No. 55.  To hear CellInfo tell it now, this protective order was a fatal misstep by its attorneys because the protective order prevented it from showing potential litigation investors the actual strengths of its case. See Sept. 17, 2020 Hr'g Tr. 36, 42, 46, 48-51.

Nevertheless, buoyed by a small core of loyal investors who kept extending loans to CellInfo, it plunged hammer and tongs

[13]

into discovery and preparation for the arbitral hearing, running up legal fees in the amount of over $1,300,000 in the process. See Pl. CellInfo, LLC's Reply Memo, Ex. A, Decl. Victor Nathan Drouin, Ex. 20, Summ. Outstanding Invoices 10/25/19 p. 99 ("Outstanding Invoices"), ECF No. 95-1; Sept. 17, 2020 Hr'g Tr. 56-57.

As this Court indicated in CellInfo I, arbitration is expensive, 352 F. Supp. 3d at 136, and three-person arbitration is especially expensive.  Here, the arbitrator chosen by CellInfo charges $650 per hour, Sept. 17, 2020 Hr'g Tr. 81-82; AAA's Notice Compensation Thomas Brewer, Joint Hr'g Ex. 12, the one chosen by American Tower charges $900, Sept. 17, 2020 Hr'g Tr. 79-81; AAA's Notice Compensation James Warren, Joint Hr'g Ex. 13, and the retired judge chairing the panel charges $1,200 per hour, Sept. 17, 2020 Hr'g Tr. 79; AAA's Notice Compensation Richard Holwell, Joint Hr'g Ex. 14.

In sum, CellInfo submitted several motions to the Panel that were ultimately denied, engaged in expensive discovery, and timely paid all the arbitration fees from December 2018 until April 2019 in the total amount of $61,250.  See Panel's Op. & Order, March 4, 2020, 2-3 ("Panel's March 4 Op. & Order"), Joint Hr'g Ex. 35; Pl. CellInfo Memo. Supp. Mot. Reopen Case & Set Trial, Ex. A, AAA Detail Invoice, ECF 70-1 ("AAA Invoice"); Sept. 17, 2020 Hr'g Tr. 85-87.

[14]

On September 5, 2019, CellInfo received an invoice from the American Arbitration Association in the amount of $207,900 to cover arbitration expenses through the scheduled hearing and decision.  One half of this sum was due by October 3, 2019 and the remainder by October 31.  See AAA Invoice; Sept. 17, 2020 Hr'g Tr. 88.  By now, CellInfo's legal fees exceeded $1,250,000. See Sept. 17, 2020 Hr'g Tr. 28; Outstanding Invoices 99. CellInfo went to its loyal investors who agreed to pony up enough additional funds to pay at least the first half of the AAA invoice.  See Sept. 17, 2020 Hr'g Tr. 25-27; Sept. 24, 2020 Hr'g Tr. 17-18.

At this juncture,[17] Victor N. Drouin, CellInfo's CEO ("Drouin"), testified that CellInfo's lawyer, confident of the strength of CellInfo's case, said that his law firm would pay

---

[17] What follows is a tale of raw chicanery, deception, and betrayal charged to CellInfo's lawyer and law firm.  It is supported only by the sworn testimony of CellInfo's CEO, Victor N. Drouin, and corroborated by one of its loyal investors, Paul Karger, as well as the final proposed $300,000 contingency fee agreement.  Pl. CellInfo, LLC's Reply Memo, Ex. A, Decl. Victor Nathan Drouin, Ex. 16, Amended Agreement for Legal Services 84, ECF No. 95-1.  CellInfo never called its lawyer to testify and American Tower naturally was not privy to what passed between CellInfo and its lawyer.  The Court views this testimony with some skepticism and thus will use the terms "lawyer" and "law firm" throughout.  Nevertheless, so serious are the breaches of professional responsibility alleged that this Court will refer the matter to the Massachusetts Board of Bar Overseers for a full report and recommendation.  There the lawyer and law firm will be afforded a fair chance to defend their conduct in a confidential proceeding.

the arbitration fees and press the case through to a decision --
all on a contingency basis -- if only CellInfo would pay
$250,000 up front.  See Sept. 17, 2020 Hr'g Tr. 24, 28, 105,
120.  Faced with ever mounting attorneys' fees, this seemed like
a good deal and Drouin jumped at it, telling his investors this
would be the final loan he would solicit.  See id. 55, 101-02;
Sept. 24, 2020 Hr'g Tr. 44.  Drouin thus turned over to the
lawyer $180,000 raised for the arbitration fee, believing that
this sum would be paid to the American Arbitration Association.
See Sept. 17, 2020 Hr'g Tr. 25, 28.  Instead, the law firm
applied these funds to other litigation expenses (deposition and
expert report preparation) and the arbitration fee went unpaid.
See id. 52-53; Email from Lawyer to Drouin, Oct. 1, 2019, Joint
Hr'g Ex. 75.  Moreover, the lawyer went back to Drouin and told
him that, since the arbitration fees were greater than he had
thought, the up-front payment necessary to effectuate the
proposed contingent fee agreement had now risen to $300,000.
See Sept. 17, 2020 Hr'g Tr. 29; Email from Lawyer to Drouin,
Oct. 1, 2019, Joint Hr'g Ex. 75.  Drouin felt he had been
double-crossed and unable to return to his investors, having
told them he had asked for the "final" loan.  See Sept. 17, 2020
Hr'g Tr. 55.  Even so, he tried and, in fact, raised some
additional funds for CellInfo.  See Sept. 17, 2020 Hr'g Tr. 63,

94-97; Sept. 24, 2020 Hr'g Tr. 70.  The $300,000 up-front payment was never made.  See Sept. 17, 2020 Hr'g Tr. 53-56.

On October 23, 2019, several weeks before the scheduled hearing on the merits, CellInfo's lawyer notified the Panel of his withdrawal from representation without further explanation. Withdrawal Letter, Joint Hr'g Ex. 70.

CellInfo then requested to stay the arbitration proceedings to seek substitute legal counsel and created a debt in the arbitration account.  Panel's March 4 Op. & Order 3.  The Panel set a deadline for satisfying the outstanding fees, and, upon the passage of the deadline with no payment, suspended the proceedings pursuant to AAA Rule-57 on November 18, 2019.  AAA Order of Suspension, Nov. 18, 2019, Joint Hr'g Ex. 72.

American Tower thus moved for default judgment against CellInfo while CellInfo cross-moved that the Panel certify to this Court that CellInfo's alleged inability to pay prevented effective vindication of its claims.  Panel's March 4 Op. & Order 1.  The Panel denied both motions and renewed the suspension, declining to decide whether CellInfo's non-payment was a result of inability or willfulness and suggesting that American Tower pay CellInfo's outstanding AAA invoices to keep the arbitration going.  Id. 1, 3.

Since neither party paid the overdue fees, the Panel eventually terminated the proceedings on April 21, 2020.  AAA Final Order, Joint Hr'g Ex. 74.

On July 2, 2020, CellInfo filed a motion to reopen the case in this Court and to proceed to trial.  CellInfo, LLC.'s Mot. Reopen Case & Set Trial Date ("CellInfo's Mot."), ECF No. 68; Pl. CellInfo, LLC's Mem. Supp. Mot. Reopen & Set Trial Date ("CellInfo's Mem."), ECF No. 70.

American Tower opposed and moved to dismiss the case with prejudice for noncompliance with this Court's order compelling arbitration.  American Tower's Opp'n. Mot. Reopen ("American Tower's Opp'n"), ECF No. 82; American Tower's Mot. Rule 11 Sanctions ("American Tower's Mot."), ECF No. 84.

On September 3, 2020, this Court heard the parties' oral arguments on the motions.  Elec. Clerk's Notes, ECF No. 93.  The parties agreed that before this Court could reopen the case, it must be satisfied that CellInfo was unable, as opposed to unwilling, to pay its arbitration fees, and that CellInfo made a good faith attempt to overcome the payment hurdle and proceed with the arbitration.  See Sept. 3, 2020 Hr'g Tr. 7, 13, ECF No. 100.  The parties also agreed that the Court may rely solely on the exhibits attached to the briefs in rendering a decision. See id.

CellInfo claimed that it genuinely lacked the funds to continue arbitration within the time frame that had been set by the Panel.  Id. 13-14.  American Tower conceded that CellInfo's financial papers supported indigency but argued that CellInfo enjoyed the financial support of a group of loyal investors and thus was able (but reluctant) to pay for arbitration.  Id. 5.

After hearing the parties, this Court took the matter under advisement and scheduled a tentative evidentiary hearing on the issue of non-payment, allowing the parties to supplement their arguments in writing and provide additional evidence.  Id. 16, 21.  In the interim, the parties submitted new arguments and a large volume of new exhibits to support their positions. CellInfo's Opp'n Mot. Sanctions & Exs., ECF No. 92; Decl. Drouin & Dep. Paul Karger, ECF No. 94; CellInfo's Reply Resp. Mot. Reopen & Exs., ECF No. 95.

Due to the complexity of the matter, which involved third-party's statements and factual disputes, the Court decided that conducting an evidentiary hearing was advisable.  See Sept. 3, 2020 Hr'g Tr. 20-21.

At the evidentiary hearing on September 17, 2020, the Court heard live testimony from Drouin and CellInfo's investors: John Pantekidis and Wesley Parker, both partners in TwinFocus Capital Partners LLC.  Elec. Clerk's Notes, ECF No. 102; Sept. 17, 2020 Hr'g Tr. 3, 111, 117-18.  On September 24, 2020, the hearing

[19]

resumed with the testimony of another TwinFocus partner and
CellInfo investor, Paul Karger.  Elec. Clerk's Notes, ECF No.
109; Sept. 24, 2020 Hr'g Tr. 7.  On September 29, 2020, the
Court heard the parties' closing arguments and entered an order
denying CellInfo's motion to reopen, reserving the right to
enter a written decision later.  Elec. Clerk's Notes, ECF No.
112; Sept. 29, 2020 Hr'g Tr. 33.  In doing so, the Court held
that CellInfo failed to prove by a preponderance of the evidence
an inability to pay or to proceed with the arbitration and that
the evidence was inconclusive as to CellInfo's good faith.
Sept. 29, 2020 Hr'g Tr. 31-32.

### III. Applying the Legal Framework

In determining whether the termination of the arbitration
proceedings due to CellInfo's non-payment warrants lifting the
stay, it is easier to dispose of the second part of the
condition for lifting a stay, which requires that the applicant
for the stay be in good standing in the arbitration.  9 U.S.C.
§ 3.  Here, the American Tower entities -- the applicants of the
stay and the opponents of reopening -- complied with the
arbitration proceedings, paid their invoices, and have not
defaulted.  Panel's March 4 Op. & Order 3.  Therefore, the

second condition for lifting the stay could be quickly set
aside.[18]

As for the first part of the condition, if CellInfo's non-
payment was a "failure, neglect, or refusal" to arbitrate, 9
U.S.C. § 4.1, then it could not be said that the arbitration was
"had in accordance with the terms of the agreement," id. § 3,
and reopening the case in the District Court would be
unjustified.

_____

[18] It appears that the FAA's drafters were more concerned
with abusive parties that would not only torpedo arbitration but
also prevent their adversaries' recourse in court than of the
situation where a party would purposely drain its own funds just
to evade arbitration and litigate in court instead.  See Weiler,
22 Cal. App. 5th at 981 n. 3.  As the California Court of
Appeals noted in Weiler,

> At oral argument, defendants claimed that allowing
> parties to seek relief from arbitration in the courts
> based on their current financial condition creates an
> open invitation for abuse by those seeking to escape
> their arbitration obligations. We seriously doubt
> parties will purposefully make themselves impecunious
> to have their cases returned to the courts.
> Regardless, we are more concerned with deep-pocketed
> parties leveraging their wealth to deprive their
> opponents of the right to resolve their disputes than
> we are with parties choosing to bankrupt themselves as
> a way out of arbitration and into court. And, under
> our holding today, a court may not grant relief if the
> evidence demonstrates a party's financial status is a
> result of the party's intentional attempt to avoid
> arbitration.

Id.

True, it is undisputed that CellInfo itself lacked sufficient funds to afford arbitration.  Sept. 17, 2020 Hr'g Tr. 21-22, 57, 67-68; Decl. Victor Nathan Drouin Supp. Pl. CellInfo, LLC's Mot. Reopen Case & Set Trial Date ¶ 8, Joint Hr'g Ex. 34.

CellInfo's litigation, however, has been financed mostly by a small group of outside investors from the inception of this civil action.  Sept. 17, 2020 Hr'g Tr. 58-59, 68-73.  The record does not reflect that these investors are obliged to loan CellInfo any money, but the fact of the matter is that they have significantly and continuously extended loans.  Sept. 17, 2020 Hr'g Tr. 100, 113-14; Sept. 24, 2020 Hr'g Tr. 23-25.

Even were the Court to credit CellInfo's evidence that it struggled to raise enough for the $207,900 AAA invoice and also secure the contingency agreement with its lawyer, see Sept. 17, 2020 Hr'g Tr. 22-29, CellInfo failed to do the one simple thing common sense calls for in such a situation, that is, to reach out to the AAA to address its financial hardship.  See Tillman, 825 F.3d at 1074 ("Current Rule R-53 allows the AAA to prescribe fees and gives it the sole discretion to reduce fees in the event of hardship."); see also Lifescan, Inc. v. Premier Diabetic Servs., Inc., 363 F.3d 1010, 1013 (9th Cir. 2004) ("Unlike the more inflexible Federal Rules of Civil Procedure, the AAA rules allow the arbitrators to adjust the payment of costs in light of circumstances."); Wells Fargo Bank Nat'l Ass'n

[22]

v. Chance, No. 2:19-CV-02120-RDP, 2020 WL 1891224, at *5 n.1
(N.D. Ala. Apr. 16, 2020) ("Indeed, the Panel may suspend the
hearing, but it does not have to.  If so desired, the Panel
could continue the proceedings without prepayment of the
fees.").

It is puzzling that CellInfo reached out to the AAA to
request an extension of time to retain a new lawyer, at a time
when it knew it could no longer afford the arbitration, electing
to withhold such crucial information from the AAA.  See
CellInfo's Mot. Extend Time Retain Successor Counsel, Joint Hr'g
Ex. 77; Email from Richard J. Holwell to Parties, Oct. 30, 2019,
Joint Hr'g Ex. 71.

CellInfo's inaction differentiates it from Tillman, who
"gave notice of her inability to pay during arbitration" and
"made genuine efforts to make alternate payment arrangements."
Tillman, 825 F.3d at 1075 n.1.

Ironically, it was American Tower that finally brought the
issue to the attention of the Panel by moving for default
judgment against CellInfo as a remedy for non-payment of its
arbitration fees portion.  See Sept. 17, 2020 Hr'g Tr. 97
(Drouin's testimony); Panel's March 4 Op. & Order.  Even then,
CellInfo did not offer a satisfactory explanation to the Panel
for the alleged financial hardship.  Panel's March 4 Op. & Order

6 ("The record is silent as to why Twin Focus Capital Partners has withdrawn its support.").

Relying only on its drained bank account, CellInfo held back from the Panel helpful information and missed the opportunity to put forward what allegedly transpired with the lawyer and impacted the investors' willingness to maintain its litigation financing.

It was all fresh back then: the hearing on the merits before the Panel was around the corner, the lawyer was no longer in the picture (CellInfo had hired new counsel), CellInfo was supposed to try to save the arbitration, and as a bonus, CellInfo might even have compelled American Tower to pay the bills.  What kept CellInfo from disclosing everything -- as it did to this Court -- to the Panel back then?

CellInfo's conduct appears to this Court as failure or neglect to comply with the arbitration.  What's more, CellInfo's forbearance during the arbitration weakens the credibility of its later evidence of financial inability and good faith.  See Hyatt v. Kappos, 625 F.3d 1320, 1335 (Fed. Cir. 2010), aff'd and remanded, 566 U.S. 431 (2012).

Notably, only one investor jumped ship; the rest resumed financing CellInfo's litigation as soon as it retained its current lawyer in December 2019, while the arbitration was still pending.  Sept. 17, 2020 Hr'g Tr. 73; Sept. 24, 2020 Hr'g Tr.

[24]

70-72.  In the aggregate, CellInfo raised a total sum of
$110,000 from December 2019 through May 2020.  Sept. 17, 2020
Hr'g Tr. 96.  This, at least, shows a modest yet stable
fundraising ability, and since CellInfo never asked the AAA for
payment modifications after disclosing the root of the financial
hardship, who knows what the AAA would have replied?

     Considering the fundraising ability and the advanced stage
of the arbitration proceedings, the AAA might have been willing
to entertain reduced fees or late payment.  After all, the AAA
enjoys sole discretion in this business.  See Tillman, 825 F.3d
at 1074.

     CellInfo had met true financial challenges; however, the
good faith standard required it to do more.  In sum, CellInfo
has simply not demonstrated a sufficiently sincere good faith
effort to comply with the flexible AAA requirements.  Therefore,
lifting the stay would be unwarranted.  Yet, for a good while,
CellInfo had complied with the Court's order to arbitrate by
initiating the arbitration, cooperating with the arbitration
proceedings for months and paying the previous AAA invoices.
Therefore, the Court will not take a step further and dismiss
the civil action.  This would be an unnecessarily harsh sanction
under the circumstances.

     Although the Court is not persuaded that the evidence
justifies altering the previous order compelling arbitration,

[25]

the Court's ruling does not affect the viability of these civil
(and potentially criminal, <u>see</u> Sept. 29, 2020 Hr'g Tr. 30-33)
causes of action.  These causes of action may still be pursued
in accordance with the parties' preexisting agreements (if the
AAA would be willing to reconsider termination or if the parties
agree to turn to a different arbitrable forum).

## IV.  CONCLUSION

In conclusion, CellInfo's motion to reopen the case in this
Court was DENIED, ECF No. 68, and the case remains
administratively closed.  At any time, any party may move to
reopen the case for entry of final awards as a result of
arbitration or settlement or for other appropriate reason.

<u>/s/ William G. Young</u>
WILLIAM G. YOUNG
DISTRICT JUDGE

[26]